FILED

1  LATHAM & WATKINS LLP
     Pamela S. Palmer (Bar #107590)
2    *pamela.palmer@lw.com*
     Victor Leung (Bar #268590)
3    *victor.leung@lw.com*
   355 South Grand Avenue
4  Los Angeles, CA 90071-1560
   Telephone: (213) 485-1234
5  Facsimile: (213) 891-8763

6  Attorneys for Plaintiff
   CHARTER SCHOOL CAPITAL, INC.
7

2014 MAY -1  PM 4: 04

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

8              **UNITED STATES DISTRICT COURT**

9          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

11  CHARTER SCHOOL CAPITAL,        CASE NO.: **CV14-03385**-GW(PLAx)
    INC., a Delaware Corporation,
12
                  Plaintiff,        **COMPLAINT FOR:**
13
          v.                        **(1) FEDERAL COPYRIGHT**
14                                       **INFRINGEMENT**
    CHARTER ASSET MANAGEMENT           **(17 U.S.C. § 501(a));**
15  FUND, L.P., a Delaware Limited
    Partnership; PAUL IM, an individual, **(2) TRADE SECRET**
16  and DAVID PARK, an individual        **MISAPPROPRIATION;**
                                         **(Cal. Bus. & Prof. Code § 16607 and**
17                Defendants.            **Cal. Civ. Code § 3426);**

18                                   **(3) STATE UNLAWFUL, UNFAIR,**
                                         **AND FRAUDULENT**
19                                       **COMPETITION**
                                         **(Cal. Bus. & Prof. Code §§ 17200);**
20
                                     **(4) INTENTIONAL INTERFERENCE**
21                                       **WITH PROSPECTIVE BUSINESS**
                                         **ADVANTAGE**
22                                       **(California Common Law);**
23
                                     **(5) UNJUST ENRICHMENT**
24                                       **(California Common Law)**

25                                   **(6) CONSTRUCTIVE TRUST**
                                         **(Cal. Civ. Code §2224)**
26

27                                   **DEMAND FOR JURY TRIAL**

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES                                              COMPLAINT

1    Plaintiff Charter School Capital, Inc. ("CSC") brings this Action against
2  Defendants Charter Asset Management Fund, LP ("CAM") and CAM's Principals,
3  Paul Im and David Park, for copyright infringement, misappropriation of CSC's
4  trade secrets, and other illegal and unfair competition as follows:

5                              **INTRODUCTION**

6    1.    Established in 2006, CSC is a nationally acclaimed market leader in
7  providing working capital and facilities financing exclusively to charter schools.
8  CSC pioneered a novel, proprietary receivables financing approach that enables
9  start-up and continuing charter schools to obtain steady financing on terms that
10  would be unavailable or more costly through traditional lending sources.

11    2.    Charter schools face unique financing challenges because they rely on
12  revenue payments from state and local governments, which are often delayed and
13  are based on complex calculations and variables that are hard to predict.
14  Meanwhile, schools need steady financing for daily operations to provide
15  uninterrupted educational services to students, make payroll, pay landlords, and
16  purchase supplies.  CSC's founders recognized that charter schools needed
17  consistent access to funds for operations in an environment where the school's
18  primary funding source, the State of California and local government payers, were
19  not delivering funds in a reliable and timely manner.  CSC's founders answered the
20  need by developing a new, creative approach to financing charter schools.

21    3.    At significant expense, and over many months, CSC and its legal
22  counsel developed a suite of financing documents ("Financing Agreements") that
23  adapt receivables purchase financing concepts to the unique circumstances of the
24  charter school industry.  These legal documents reflect CSC's proprietary "secret
25  sauce" that CSC used to launch its start-up charter school financing business seven
26  years ago.  CSC has grown its business from scratch to become California's
27  industry leader in charter school financing, with expanded operations in other
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

2

COMPLAINT

1   states.  CSC has provided financing to literally hundreds of charter schools and has

2   become an important pillar of financial strength in the industry.

3        4.      In order to protect its proprietary financing product from copying and

4   free exploitation by potential competitors, CSC has registered its Financing

5   Agreements for copyright protection with the United States Copyright office.  CSC

6   also guards the confidentiality of the Financing Agreements and methodologies.

7   Among other things, CSC requires its clients to execute Confidentiality

8   Agreements included in the Financing Agreements.

9        5.      Defendant Paul Im betrayed the trust and confidence of one of CSC's

10  longest-term charter school clients by misappropriating and using CSC's

11  proprietary Financing Agreements and methodologies.  In 2012, while Im was

12  employed as an officer by one of CSC's clients, he worked directly with CSC, was

13  given full access to CSC's Financing Agreements, and was able to observe how

14  CSC's proprietary approach to charter school financing worked.  Although Im

15  knew that his employer was subject to a contractual obligation that forbade

16  disclosure or use of CSC's Financing Agreements for any purpose other than

17  financing for the school, Im launched a charter school financing business using

18  CSC's proprietary information.  Im associated himself with Defendant David Park

19  and they formed CAM.  While still employed with CSC's client, CAM began its

20  operations by soliciting another CSC charter school client and taking an interest in

21  receivables in which CSC already had an interest.

22       6.      Although Im knew—and admitted to his employer—that his side-

23  business created a conflict of interest given his employer's important relationship

24  with CSC, he chose to use the confidential information he had learned on the job to

25  go into competition with CSC.  He was terminated in February 2013.

26       7.      CSC's client (Im's former employer) advised CSC that Im had gone

27  into competition with CSC while still on the job.  After Im was terminated, CSC

28  naturally became concerned that Im was improperly using CSC's confidential,

1  proprietary financing documents and methodologies for his own enrichment, and

2  sent him a warning letter to cease and desist.  In June 2013, Im replied, giving CSC

3  false assurances that he was not, and would not "use either CSC's or [the school's]

4  trade secret information."  He asked CSC to "please take this response as my

5  assurance to CSC and [the school] that I have not illegally obtained, misused or

6  otherwise disclosed any of CSC's or [the school's] trade secret or proprietary

7  information.  Please also rest assured that I do not plan to do so in the future."

8      8.     A few months later, CSC caught Im and CAM red-handed:  CAM was

9  financing receivables with CSC's own clients using financing agreements based on

10  extensive coping from CSC's Financing Agreements that Im had misappropriated.

11  Defendants had modified CSC's Financing Agreements to insert CAM's name and

12  delete the Confidentiality Agreement.  In short, Defendants entered into

13  competition with CSC and have sought to obtain a competitive advantage by

14  making free use of proprietary, confidential information that CSC had worked long

15  and hard to develop.  Defendants did not invest the time, money, and ingenuity that

16  CSC had invested, but instead became free riders at CSC's expense.

17      9.     Defendants' unlawful conduct constitutes copyright infringement,

18  misappropriation of trade secrets, unfair competition in violation of California law,

19  and intentional interference with prospective business advantage, and has resulted

20  in unjust enrichment and continuous, ongoing injury to CSC's business, reputation,

21  client relationships and goodwill.

22                              **THE PARTIES**

23      10.    Plaintiff CSC is a corporation duly organized under the laws of the

24  State of Delaware, with its principal place of business at 225 SW Broadway, Suite

25  300, Portland, Oregon 97205.  CSC is in the business of providing working capital

26  and financing options to charter schools.

27      11.    CSC alleges on information and belief that Defendant CAM is a

28  limited partnership organized under the laws of the State of Delaware, with its

1   principal place of business at 530 Lytton Avenue 2d Floor, Palo Alto, California
2   94301.

3      12.    CSC alleges on information and belief that Defendant Paul Im is a
4   Managing Member of CAM and is a citizen of the state of California.

5      13.    CSC alleges on information and belief that Defendant David Park is a
6   Managing Member of CAM, and is a citizen of the State of California.

7                      **JURISDICTION AND VENUE**

8      14.    This Court has subject matter jurisdiction over CSC's claims for relief
9   for violation of the federal copyright statues pursuant to 17 U.S.C. § 501 and 28
10  U.S.C. §§ 1331(a).  This Court has supplemental jurisdiction over CSC's state law
11  claims pursuant to 28 U.S.C. § 1367(a) because those claims are joined with
12  substantially related claims under the federal copyright laws and form part of the
13  same case or controversy under Article III of the United States Constitution.

14     15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2),
15  because events giving rise to CSC's claims occurred in this District, including,
16  among other things, Defendants' appropriation and use of materials that infringe
17  CSC's copyrights.

18     16.    This Court has personal jurisdiction over Defendants because each of
19  them knowingly committed some or all of the acts in this District that form the
20  basis of this Complaint and purposely availed themselves of the privileges of doing
21  business in this District, as set forth herein.

22                      **GENERAL ALLEGATIONS**

23                **CSC Devised a Novel Business Model and Proprietary**
24                **and Trade Secret Financing Agreements.**

25     17.    On information and belief, CSC was the first company to adapt a
     method of receivables purchase financing to the unique characteristics of the
26   charter school industry.  Charter schools face financing challenges because their
27   primary sources of revenue are state and local governments that are often slow to
28

1    pay and calculate payments based on complex formulas and variables that can be
2    hard to predict and control.  Additionally, because of budgetary pressures, the State
3    of California and other states have resorted to reducing, delaying and deferring
4    their payment obligations to charter schools, sometimes to later fiscal years.  CSC
5    keeps track of the ever-changing budget status and payment schedules, and adjusts
6    its approach to facilitate charter financing (which requires continuous investment
7    and expertise).  For the vast majority of charter schools, borrowing money from
8    banks is not an option; banks generally will not lend to charter schools, particularly
9    startups and those with short operating histories.  For the small minority of charter
10   schools able to obtain loans from banks and other traditional lending sources,
11   borrowing is expensive because lenders charge high interest rates to compensate
12   for the relatively high credit risk that charter schools present.

13          18.    CSC's founders conceived an idea about how to provide charter
14   schools with accessible and generally lower-cost financing.  CSC and its legal
15   counsel executed on this inspiration by developing, at significant expense to CSC,
16   a suite of legal documents that dramatically reduces the risk to investors who
17   supply funding for charter schools.  The Financing Agreements include innovative
18   terms and conditions designed to function effectively, and to be enforceable, in the
19   complex legal and regulatory environment in which charter schools operate.

20          19.    CSC launched its business as a venture start up with no clients and no
21   revenue.  CSC worked hard.  CSC's business plan and financial product were good
22   and the business succeeded.  CSC's financing vehicle was attractive both to
23   investors and to charter schools:  investors were willing to commit their funds at
24   lower rates of return and charter schools were able to obtain much-needed
25   financing.  CSC has refined and improved its business model and suite of financing
26   documents as it has gained experience in the industry.  CSC's reputation grew.
27   Word spread and CSC has formed business relationships with hundreds of charter
28   schools in multiple states, including scores in California.  Most charter schools are

1   repeat customers who look to CSC for new financings to bridge reoccurring gaps

2   between receipt of government revenue and the daily operational needs of the

3   school.

4        20.    The "secret sauce" of CSC's business model is captured in the

5   proprietary and copyright-protected Financing Agreements which creatively adapt

6   receivables purchase financing concepts to the unique circumstances of the charter

7   school industry.  Those Financing Agreements cost CSC more than $1 million in

8   legal fees to create, and were the product of many months of intensive

9   development.  Put simply, CSC owns confidential information embedded in

10  innovative terms and conditions of the Financing Agreements which operate

11  together to effectuate a means of financing that reduces credit and investment risk,

12  and enables CSC to provide charter schools with working capital under short time

13  constraints (the "Trade Secrets").  The centerpiece of CSC's suite of Financing

14  Agreements is a roughly 50-page Receivables Purchase Agreement which includes

15  a robust Confidentiality Agreement.

16       21.    CSC has successfully expanded its charter school financing business

17  model to states beyond California, and currently finances charter school clients in

18  Arizona, Florida, Minnesota, North Carolina, and Ohio.  With each expansion,

19  CSC makes additional significant investments in the proprietary suite of legal

20  documents as needed to adapt to different state and local legal environments.

21       22.    CSC's counsel was the author of the Financing Agreements and has

22  assigned its copyrights in those works to CSC, including rights to prosecute past

23  and future infringement.  CSC submitted applications with the U.S. Copyright

24  Office to register its form of Financing Agreements and the 2012 version to which

25  Im had access while employed with one of CSC's long time charter school clients.

26  CSC's copyright applications have been granted by the U.S. Copyright Office and

27  CSC has been issued certificates of registration for its Financing Agreements.

28

23.    CSC's Financing Agreements and methodologies are not generally available to the public or accessible to competitors.  CSC derives significant economic value from maintaining privacy in its financing products so that competitors cannot unfairly exploit CSC's innovative works for their own benefit.

24.    CSC protects the confidentiality of its proprietary legal documents and information in several ways.  CSC limits access to the information only to employees who need it to perform their work for CSC.  CSC also requires its employees to sign Confidentiality Agreements acknowledging that they will not disclose CSC's Trade Secrets or use them in except in the service of employment with CSC.  CSC requires all clients to sign a Confidentiality Agreement as part of the Receivables Purchase Agreement, and even requires school representatives to sign a Confidentiality Agreement in order to review CSC's documents *before* the school becomes a client.  The Confidentiality Agreement prohibits duplication or distribution to any third parties without CSC's express written consent, and requires reasonable measures to maintain security and confidentiality.

**Defendants Infringed on CSC's Copyrights and Misappropriated CSC's Trade Secrets.**

25.    In or about 2011 through January 2013, Im was employed as an operations officer with one of CSC's long-standing charter school clients.

26.    During Im's term of employment, CSC provided financings to the school under CSC's Financing Agreements dated June 15, 2012 and November 29, 2012.  The Receivables Purchase Agreement includes the following Confidentiality Agreement in which the term "Purchaser" refers to CSC and "Seller" refers to the school:

> Confidentiality:  (a) To the maximum extent permitted by law, all documents and information related to this Agreement, including each exhibit and the other Transaction Documents, are the property of Purchaser and are not to be duplicated or distributed to any third parties without Purchaser's express written consent. . . . Seller further agrees to take such measures as shall be reasonably requested by Purchaser to protect and maintain the security and confidentiality of the information set forth herein. . . .

LATHAM&WATKINS
ATTORNEYS AT LAW
LOS ANGELES

8

COMPLAINT

1  In his role as an officer with the school, Im communicated routinely with CSC and
2  was directly involved in the school's relationship with CSC.  Im learned all about
3  the school's financing with CSC and had full access to CSC's Financial
4  Agreements.  He was privy to how CSC's financing model worked in practice.

5       27.    As an employee of the school, Im received and acknowledged the
6  terms of employment in the school's employee handbook which forbade him from
7  disclosing or using confidential information obtained as a result of his employment
8  outside the scope of employment.  Im's employee handbook provides, in part:

> Unless a public record, all records and files maintained by [school] are
> confidential and remain the property of [school].  Such confidential
> records and files are not to be disclosed to any outside party without
> the express permission of the Executive Director. . . .  Confidential
> information obtained during or through employment with [school]
> may not be used or disclosed by an employee, except as job-related.
> Employees must also maintain the confidentiality, use or disclosure of
> confidential information at all times following termination of
> employment.

14

15       28.    On information and belief, in late 2012, Im told the school's
16  Executive Director that he planned to launch a business supporting charter schools
17  in mid-2013.  In early 2013, Im admitted that he had already launched his own
18  business by financing receivables for another charter school.  That school was a
19  client of CSC located in Los Angeles and specializing in arts education.  Im
20  refused to follow the Executive Director's advice to discuss his competitive
21  activities directly with CSC.

22       29.    On information and belief, it became apparent to the Executive
23  Director that Im had a conflict of interest by going into competition with CSC
24  while he was employed at the school and privy to confidential information
25  regarding CSC's proprietary financing model and terms.  This situation created a
26  potentially serious problem for the school, given its longstanding relationship with
27  CSC and its desire to continue to work with CSC on new financings.

28

30.     On information and belief, Im expressly recognized that he had a conflict of interest given his position of trust and responsibility with the school and he offered to resign. He did not, however, resign. On or about February 28, 2013, the school terminated Im's employment.

31.     Im promoted CAM's competing business on CAM's website by making misleading statements about his former employer's experiences with CSC. CAM's website claims that while Im worked at a "charter school in Los Angeles" (*i.e.*, CSC's client), "we had no choice but to access working capital at a very high cost. This cost and the relentless worries about funding hampered the ability of our students and teachers to achieve their full potential." This statement implies negative information about the school's own performance and about CSC's financing that, on information and belief, the school does not share or believe and for which CAM and Im have no genuine factual basis.

32.     After the school terminated Im's employment, CSC became concerned that CAM was using CSC's proprietary, Trade Secret legal documents and confidential information to solicit charter schools for receivable financing. In response to CSC's "cease and desist" letter in June 2013, Im denied that he had taken or was using CSC's proprietary and confidential information:

> Rest assured that I do not wish to use or acquire either CSC's or [the school]'s confidential or proprietary information, and I am confident that in performing my duties for any future employer, I will not be required nor expected to use either CSC's or [the school]'s trade secret information. . . . [P]lease take this response as my assurance to CSC and [the school] that I have not illegally obtained, misused, or otherwise disclosed any of CSC's or [the school]'s trade secret or proprietary information. Please also rest assured that I certainly do not plan to do so in the future.

33.     These assurances were false. As CSC later discovered, CAM was making wholesale use of CSC's Financing Agreements and inserting CAM's name on the documents. Put simply, CAM has been illegally copying and using CSC's confidential, proprietary receivable financing methodology and copyright-protected Financing Agreements.

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

34.     Relying on Im's representation that he would not use CSC's confidential or proprietary information, CSC took no further action against CAM. But several months later, in October 2013, CSC learned that CAM had not only been soliciting CSC's clients, but was copying and using CSC's confidential and proprietary legal documents.  CSC learned from one of its charter school clients, a leadership academy in San Diego, that it had received financing through CAM. The academy provided CSC with a copy of its "Agreement for the Sale of Receivables" dated July 29, 2013.  To CSC's surprise and dismay, most of the contract had been copied verbatim from CSC's Financing Agreements that were available to Im during his prior employment with CSC's charter school client.  A side-by-side comparison of provisions of the agreements shows extensive verbatim copying.  One of the few modifications CAM made to the CSC agreement was to omit the Confidentiality Agreement, thereby exposing CSC's proprietary, Trade Secret information to risk of improper exposure and use by other potential competitors and damaging CSC's property.

35.     CSC later discovered another incident of blatant misappropriation and use of CSC's copyright protected and Trade Secret legal documents:  CSC obtained an "Agreement for the Sale of Receivables" dated October 22, 2013 between CAM and another CSC client that operates an academy in Riverside.  The provisions were again copied verbatim from CSC's Financing Agreements with the school at which Im had been employed.  A side-by-side comparison of provisions of the agreements again shows extensive, verbatim copying.  Again, one of the few modifications CAM made was to omit the Confidentiality Agreement, thereby exposing CSC's proprietary, Trade Secret information to risk of appropriation and use by potential competitors, thereby damaging CSC's property.

36.     In all three of these instances where CAM financed receivables of CSC clients—the art academy in LA, the leadership academy in San Diego and the math and science academy in Riverside—CSC had a reasonable expectation that, if

1 | not for CAM's interference, CSC would have financed the school's receivables.
2 | CSC already had existing business relationships with each of the schools and was
3 | strongly positioned to provide new financing when needed, which would have
4 | been economically beneficial to CSC and to the schools.

5 |       37.    CAM knew about CSC's pre-existing business relationships when
6 | CAM financed receivables for these schools.  Indeed, CAM's contract with the art
7 | school in LA expressly acknowledges CSC's prior interest in the school's
8 | receivables, and includes a representation by the school that CAM's financing
9 | would not violate any agreement with CSC.  As it turned out, CAM's financing did
10 | conflict with CSC's financing interests for priority in the same receivables.

11 |       38.    Further, CSC routinely files UCC financing statements that put CAM
12 | (and the world) on notice of CSC's prior interests in the receivables of all of CSC's
13 | charter school clients.  Indeed, it appears that CAM may be using the UCC public
14 | filing system as a guide to identify and solicit CSC's clients.

15 |       39.    As of the date of this Complaint, CSC has learned of 14 instances in
16 | which CAM has financed receivables of CSC clients.  In addition to the three
17 | already discussed, CSC has learned that CAM financed receivables of the several
18 | other CSC clients, including an alternative school located in Woodland Hills; an
19 | academy foundation headquartered in Newark, California; jointly operated charter
20 | schools in Central and South Los Angeles; and two community based charter
21 | schools that obtained their charters based on the strength of CSC's letters of intent
22 | to provide financing (one in South Los Angeles and one in Sacramento).

23 |       40.    Further, in 12 of those instances, CSC has ongoing agreements in
24 | place with the schools under which CSC already was committed to provide further
25 | financing.  CSC literally was standing by to provide additional financing, for
26 | which the schools already partially paid, when CAM solicited the schools and
27 | provided financing at additional cost to the schools and, on information and belief,
28 | using CSC's copyright protected, Trade Secret financing documents.

41. In each and every instance in which CAM has financed receivables, of which CSC is aware, CAM convinced the schools to do business without offering CSC an opportunity to competitively bid. On information and belief, CAM touts its financing as priced lower than CSC's financing, but in the sole instance when any such cost proposition was tested by a San Diego charter school that engaged in a competitive bidding process, CSC won the business.

42. Further, CAM has published misleading and factually inaccurate statements on its website regarding CSC. For example, until recently removed, the website touted an attribution from a South Los Angeles school that obtained its charter based on CSC's letter of intent to finance the school's receivables—but for which CSC never actually financed any receivables. CAM's website nonetheless purported to quote the school's representative that "CAM's fees were $16,000 less than the fees from another well-known company." Charter Asset Management Website, Nov. 13, 2013, http://charterassetmanagement.com. CAM posted this statement knowing that it had no genuine factual basis.

43. Given that Im and Park formed their charter school financing business while Im was employed with CSC's charter school client, it stands to reason that Park is privy to the fact that Im misappropriated CSC's legal documents. CSC is informed and believes that he and Im work closely together in executing CAM's business strategies.

44. CSC is informed and believes that Defendants have benefited from infringing on CSC's copyright protected Financing Agreements and misappropriating CSC's Trade Secrets. Defendants have unfairly enriched themselves at the expense of CSC's business relationships, reputation, good will and prospective business opportunities.

1

2

3

4

## FIRST CLAIM FOR RELIEF
## COPYRIGHT INFRINGEMENT
### (17 U.S.C. § 501(a) *et. seq.*)
### (Against All Defendants)

5         45.    CSC realleges and incorporates by reference the allegations in

6   paragraphs 1 through 44, as set forth herein.

7         46.    CSC is the exclusive owner of the copyrights in CSC's Financing

8   Agreements, including the structure and content of the terms and provisions.

9         47.    CSC has never authorized or licensed Defendants to use any of its

10   copyrighted works, including the structure or the content of the provisions therein.

11         48.    Defendants' copying and use of CSC's copyrighted works in

12   financing agreements with charter school clients constitutes copyright infringement

13   in violation of 17 U.S.C. § 501(a).

14         49.    Due to Defendants' conduct, CSC has suffered, and will continue to

15   suffer, harm to its business reputation and goodwill, as well as diversion of trade

16   and loss of profits.  CSC is entitled to a temporary and final injunction to prevent

17   CAM's continued infringement pursuant to 17 U.S.C. § 502(a), and is further

18   entitled to recover its actual damages and Defendants' profits made from their

19   wrongful acts pursuant to 17 U.S.C. § 504.

20

21

22

23

## SECOND CAUSE OF ACTION
## MISAPPROPRIATION OF TRADE SECRETS
### (Cal. Civ. Code §§ 3426, et seq.)
### (Against All Defendants)

24         50.    CSC realleges and incorporates by reference the allegations in

25   paragraphs 1 through 44, as set forth herein.

26         51.    CSC has expended significant time and resources in creating and

27   developing its Financing Agreements.  The terms, structure, and content of the

28   Financing Agreements that are specific to the charter school environment,

1   including the Receivables Purchase Agreement, are trade secrets within the

2   meaning of Section 3426.1 of the California Civil Code.

3       52.   CSC is informed and believes, and on that basis alleges, that

4   Defendants used CSC's Trade Secrets without express or implied consent, and

5   used improper means to acquire CSC's Trade Secrets.

6       53.   The Trade Secrets used by Defendants are highly confidential and

7   derive substantial economic value by not being readily accessible and generally

8   known to the public, and specifically to Defendant's competitors.

9       54.   CSC undertakes reasonable efforts to maintain the secrecy of its Trade

10  Secrets, including, *inter alia*, requiring clients to enter into Confidentiality

11  Agreements limiting the use and disclosure of the Financing Agreements,

12  including the Receivables Purchase Agreement, storing the information in secure

13  locations and limiting access to the information only to those individuals who need

14  it to perform their responsibilities as CSC employees.

15      55.   Defendants' conduct constitutes misappropriation and use of CSC's

16  Trade Secrets.  As a direct and proximate result of Defendants' conduct, CSC has

17  suffered and will continue to suffer harm, including ongoing loss of business

18  opportunities, impairment of client relationships, reputational harm, exposure of its

19  Trade Secrets to other potential competitors who may enter the market by making

20  free use of CSC's significant investment in its proprietary financing methods.

21      56.   Pursuant to Section 3426.2 of the California Civil Code, CSC is

22  entitled to an injunction to prohibit Defendants from using or disclosing CSC's

23  Trade Secrets in order to eliminate commercial advantage to Defendants based on

24  their misappropriation and use.

25      57.   In performing the conduct described herein, Defendants acted

26  willfully and maliciously, intending to injure CSC and to wrongfully advantage

27  themselves at CSC's expense and detriment.  Pursuant to Section 3426.3(c) of

28  California Civil Code, CSC is entitled to an award of punitive and exemplary

1   damages against Defendants, and each of them, sufficient to punish and deter them

2   from engaging in such conduct in the future, in an amount to be ascertained at trial.

3   Pursuant to Section 3426.4 of the California Civil Code CSC is also entitled to an

4   award of its attorneys' fees and costs incurred in this action.

5   **THIRD CLAIM FOR RELIEF**

6   **STATUTORY AND COMMON LAW UNFAIR COMPETITION**

7   **(California Bus. & Prof. Code §§ 17200 *et seq.*)**

8   **(Against All Defendants)**

9       58.    CSC realleges and incorporates by reference the allegations in

10   paragraphs 1 through 57, as set forth herein.

11       59.    The actions of Defendants, and each of them, constitute unlawful

12   business practices pursuant to and proscribed by Sections 17200, *et seq.*, of the

13   California Business and Professions Code and California common law.

14       60.    Defendants' acts have impaired CSC's goodwill, have created a

15   likelihood of confusion, and have otherwise adversely affected CSC's business and

16   reputation by use of unlawful business practices.  Defendants' conduct violates

17   federal and state statutory law, as set forth herein.  By Defendants' inequitable

18   pirating of the fruits of CSC's labor as described herein, Defendants have gained

19   an unearned economic benefit from them.  These acts constitute unfair competition

20   and unfair business practices under California Business and Professions Code §§

21   17200 *et seq.*, the analogous statutes of other states, and California common law.

22       61.    Absent injunctive relief, CSC has no means by which to control

23   Defendants' deceptive and confusing use of CSC's copyrights.  CSC is thus

24   entitled to injunctive relief prohibiting Defendants from continuing such acts of

25   unfair competition.  CSC also is entitled to recover Defendants' profits, as well as

26   CSC's costs and attorneys' fees.

27

28

62.     As a direct and proximate result of Defendants' wrongful acts, CSC has suffered and will continue to suffer irreparable injury to its business operations, reputation, and goodwill as well as substantial pecuniary losses.

63.     CSC is entitled to restitution of all moneys lost as a result of defendants Defendant's conduct, and disgorgement of all profits Defendants have or will receive due to their unlawful conduct.

64.     In performing the conduct described herein, Defendants acted with oppression, fraud or malice, intending to injure CSC and to wrongfully advantage themselves at CSC's expense.  By reason thereof, CSC is entitled to an award of punitive and exemplary damages against Defendants sufficient to punish and deter them from engaging in such conduct in the future.

### FOURTH CLAIM FOR RELIEF

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

### (California Common Law)

### (AGAINST ALL DEFENDANTS)

65.     CSC hereby restates and incorporates by reference paragraphs 1 through 64 above, as though fully set forth herein.

66.     Economic relationships existed between CSC and its charter school clients to which CAM has provided receivables financing, which included probable future economic benefits or advantage to CSC.

67.     CSC alleges on information and belief that, at all material times, Defendants were aware that CSC had economic relationships with its charter school clients, each of which contained the probability of future economic benefit or advantage to CSC.

68.     CSC alleges on information and belief that Defendants used CSC's copyrighted works without CSC's consent in order to compete against CSC with the intent to disrupt these economic relationships.

1        69.   As a direct and proximate result of Defendants' wrongful conduct,

2    particularly Defendants' violations of CSC's copyrights, misappropriation of

3    CSC's Trade Secrets, and acts of unfair competition, CSC's economic

4    relationships or prospective economic relationships were, in fact, disrupted,

5    causing irreparable injury as well as damages in an amount to be proven.

6        70.   The acts by Defendants have caused and will continue to cause

7    damage, loss and injury to CSC in an amount to be determined.

8        71.   CSC is informed and believes and thereon alleges that in committing

9    the acts alleged herein, Defendants acted in conscious disregard of the rights of

10   CSC and with the attempt to injure CSC.  Defendants are guilty of oppression,

11   fraud, or malice within the meaning of California Civil Code Section 3294,

12   entitling CSC to punitive or exemplary damages in an amount appropriate to

13   punish Defendants and deter future misconduct.

14   **FIFTH CAUSE OF ACTION**

15   **UNJUST ENRICHMENT**

16   **(California Common Law)**

17   **(Against All Defendants)**

18       72.   CSC hereby incorporates and realleges the allegations set forth in

19   Paragraphs 1 through 71 above.

20       73.   On information and belief, CSC alleges that Defendants, by engaging

21   in the acts alleged herein, have wrongfully benefited directly or indirectly by such

22   acts.  As a result, Defendants have been unjustly enriched to their benefit and to the

23   detriment of CSC.

24       74.   By virtue of the wrongful acts alleged herein, Defendants hold any

25   and all revenues and proceeds derived therefrom as constructive trustees for the

26   benefit of CSC.  Defendants have a duty to turn over to CSC all monies, property,

27   assets, Trade Secrets, proprietary information, and all other benefits received or to

28   be received, directly or indirectly, by Defendants as a result of their wrongful acts.

1    75.    As a result of those wrongful acts, Defendants have been unjustly

2    enriched in an amount to be proven, and CSC is entitled to the imposition of a

3    constructive trust on such sums.

4                            **SIXTH CLAIM FOR RELIEF**

5                            **CONSTRUCTIVE TRUST**

6                            **(Cal. Civ. Code §2224)**

7                            **(Against All Defendants)**

8    76.    CSC hereby restates and incorporates by reference paragraphs 1

9    through 75 above, as though fully set forth herein.

10    77.    CSC alleges on information and belief that Defendants have

11    unlawfully received fees and other income as a result of their wrongful acts and

12    omissions as alleged above.

13    78.    Pursuant to Section 2224 of California Civil Code, Defendants

14    became and remain involuntary trustees for the benefit of CSC over all things

15    obtained through their wrongful acts.

16    79.    Pursuant to Section 2224 of California Civil Code, a constructive trust

17    of the fees and other income which Defendants unlawfully received should be

18    established and the Defendants should pay over to CSC all such fees and income.

19                            **PRAYER FOR RELIEF**

20    **WHEREFORE**, CSC prays for the following relief:

21    1.    That the Court enter a judgment in favor of CSC and against

22    Defendants on all counts alleged herein;

23    2.    That the Court enter a judgment against all Defendants that they have:

24        a)    Infringed the copyrights of CSC in copying CSC's Financing

25              Agreements protected by its federal copyrights;

26        b)    Engaged in misappropriation of trade secrets;

27        c)    Engaged in unfair, unlawful, and fraudulent competition;

28

1        d)     Engaged in intentional interference with prospective economic

2               advantage; and

3        e)     Engaged in unfair competition.

4      3.    That the Court issue a temporary, preliminary and, thereafter,

5 permanent injunction against Defendants, including their officers, agents, servants,

6 employees and all others in active concert or participation with Defendants with

7 notice, enjoining and restraining them from using, disclosing and/or otherwise

8 benefiting from CSC's Trade Secrets and further infringing on CSC's copyrights.

9      5.    That the Court order Defendants to pay to CSC general, special, actual

10 and/or statutory damages, according to proof at trial.

11     6.    That the Court order Defendants to pay restitution of their profits from

12 the above-described activities to CSC.

13     8.    That the Court order Defendants to pay to CSC both the costs of this

14 action and reasonable attorneys' fees incurred by CSC in prosecuting this action.

15     9.    For punitive and exemplary damages.

16    10.   For interest at the legal rate.

17

18 Dated: May 1, 2014             LATHAM & WATKINS LLP

19                          Pamela S. Palmer
                            Victor Leung

20

21                   By _____

22                       Pamela S. Palmer
                       Attorneys for Plaintiff
                       Charter School Capital, Inc.

23

24

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2       CSC hereby demands a trial by jury on each of its claims for relief that are

3 triable before a jury.

4 Dated: May 1, 2014                 LATHAM & WATKINS

5                                Pamela S. Palmer
                               Victor Leung

6

7                     By

8                            Pamela S. Palmer
                           Attorneys for Plaintiff
                           Charter School Capital, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28