1   LATHAM & WATKINS
   Pamela  S. Palmer (Bar #107590)
2   *pamela.palmer@lw.com*
   Victor Leung (Bar #268590)
3   *victor.leung@lw.com*
   Jamie L. Summers (Bar #287689)
4   *jamie.summers@lw.com*
   355 South Grand Avenue
5   Los Angeles, CA 90071-1560
   Telephone:  (213) 485-1234
6   Facsimile:  (213) 891-8763

7   Attorneys for Plaintiff
   CHARTER SCHOOL CAPITAL, INC.

8

9               **UNITED STATES DISTRICT COURT**

10        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11

12  CHARTER SCHOOL CAPITAL,    | CASE NO.: 2:14-cv-03385-GW-PLA
   INC., a Delaware Corporation,

13            Plaintiff,

14     v.

15  CHARTER ASSET MANAGEMENT
   FUND, L.P., a Delaware Limited
16  Partnership; PAUL IM, an individual,
   and DAVID PARK, an individual
17

18          Defendants.

| CASE NO.: 2:14-cv-03385-GW-PLA |
| --- |

**PLAINTIFF CHARTER SCHOOL CAPITAL'S NOTICE OF MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

[Declaration of Stuart Ellis, Declaration of Charles Cardall, Declaration of Victor Leung; Proposed Order; Application to Seal Exhibits and supporting documents concurrently filed]

Date:      July 21, 2014
Time:      8:30 a.m.
Judge:     Hon. George H. Wu
Location:  Courtroom 10,
312 North Spring Street, Los Angeles

1  TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

2        PLEASE TAKE NOTICE that on July 21, 2014, at 8:30 a.m. or as soon

3  thereafter as counsel may be heard by the Honorable George H. Wu, Courtroom

4  10, United States Courthouse, 312 North Spring Street, Los Angeles, California,

5  Plaintiff Charter School Capital, Inc. ("CSC") will and hereby does move for a

6  preliminary injunction restraining and enjoining Defendants Charter Asset

7  Management Fund, L.P. ("CAM"), Paul Im and David Park (collectively

8  "Defendants" or "CAM") and all of their officers, agents, servants, employees, and

9  attorneys, and all persons in active concert of participation or privity with any of

10  them, from infringing by any means, directly or indirectly, CSC's exclusive rights

11  under the Copyright Act, 17 U.S.C. § 106, by unauthorized copying and use of

12  CSC's copyrighted works, including but not limited to innovative financing

13  agreements that CSC developed for use in providing working capital to charter

14  schools (the "CSC Financing Agreements").

15       As shown in the accompanying Memorandum of Points and Authorities,

16  Declarations of Stuart Ellis, Charles Cardall, and Victor Leung and exhibits

17  thereto, good cause exists for a preliminary injunction for the following reasons:

18    • Defendants have violated, are violating, and, unless enjoined, will continue

19      to violate 17 U.S.C. § 106 by copying the terms, structure and content of

20      copyrighted CSC Financing Agreements.

21    • Defendants' copyright infringement is causing immediate and irreparable

22      harm to CSC because CSC is continuing to (1) lose exclusive control over its

23      copyrighted works; (2) lose business opportunities; (3) suffer damage to its

24      business reputation and goodwill; and (4) face risk of general public

25      disclosure of its confidential and proprietary information.

26    • The balance of hardships weighs decisively in favor of CSC because CSC is

27      suffering irreparable harm as a result of Defendants' infringement, but

28      Defendants will not suffer any injury by being precluded from continuing to

violate the Copyright Act; further, they are free to continue to run their business using financing agreements that do not infringe on CSC's copyrighted works.

- Issuance of a preliminary injunction will further the public interest, including the interest of charter school community, by upholding the copyright laws and halting infringement of protected materials on which CSC relies to sustain its financial support of charter schools.

This Motion is based on this Notice of Motion and Motion; the attached Memorandum of Points and Authorities; the Declarations of Charles Cardall, Stuart Ellis, Victor Leung and exhibits thereto submitted in support of the Motion; the Complaint filed on May 1, 2014; and such other and further pleadings, evidence or argument as may be presented to the Court at or before the hearing and decision on this Motion.

Dated: May 16, 2014

LATHAM & WATKINS LLP
Pamela S. Palmer
Victor Leung
Jamie L. Summers


By /s/ Pamela S. Palmer
Pamela S. Palmer
Attorneys for Plaintiff
Charter School Capital, Inc.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................ 1

II.     STATEMENT OF FACTS ................................................... 3

    A.  CSC's Legal Counsel Authored Original Financing
        Agreements to Enable CSC's Innovative Plan to Finance
        Charter Schools ............................................................ 3

    B.  CSC's Innovative Charter School Financing Model Has
        Succeeded and Expanded ............................................. 5

    C.  Defendants Had Full Access to CSC's Original Financing
        Agreements and Infringed the Copyright ...................... 6

    D.  CSC Registered the Financing Agreements with the
        United States Copyright Office ..................................... 9

III.    ARGUMENT ...................................................................... 9

    A.  The Standards for Issuance of a Preliminary Injunction
        Are Satisfied and Injunctive Relief Is Warranted .......... 9

        1.  CSC Is Likely to Prevail on the Merits of Its
            Copyright Infringement Claim ............................... 9

            a.  CSC Owns the Exclusive Copyrights in the
                Financing Agreements and Receivable
                Purchase Agreement ...................................... 10

            b.  CAM Engaged in Unauthorized Copying of
                CSC's Receivables Purchase Agreement ......... 13

        2.  CSC Will Continue to Suffer Irreparable Injury
            Absent a Preliminary Injunction to Stop
            Defendants' Infringement .................................... 15

        3.  The Balance of Hardships Strongly Warrants
            Issuance of a Preliminary Injunction ..................... 18

        4.  Public Policy Strongly Weighs in Favor of
            Issuance of a Preliminary Injunction ..................... 19

    B.  A Minimal Bond Would Be Sufficient ............................ 19

IV.     CONCLUSION .................................................................. 20

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

CHARTER SCHOOL CAPITAL'S MOTION FOR
PRELIMINARY INJUNCTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Apple Computer, Inc. v. Franklin Computer Corp.*,
    714 F.2d 1240 (3d Cir. 1983) ...................................................................19

*Apple Computer, Inc. v. Microsoft Corp.*,
    35 F.3d 1435 (9th Cir. 1994) ...................................................................13

*Apple Inc. v. Psystar Corp.*,
    673 F. Supp. 2d 943 (N.D. Cal. 2009)....................................................18

*Baxter v. MCA, Inc.*,
    812 F.2d 421 (9th Cir. 1987) ...................................................................14

*Bridgeport Music, Inc. v. Justin Combs Publ'g*,
    507 F.3d 470 (6th Cir. 2007) ...................................................................15

*Cadence Design Sys. v. Avant! Corp.*,
    125 F.3d 824 (9th Cir. 1997) ...................................................................18

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
    664 F.3d 922 (Fed. Cir. 2012) .................................................................18

*Cosmetic Ideas v. IAC/ Interactive Corp*,
    606 F.3d 612 (9th Cir. 2010) ...................................................................11

*Credit Bureau Connection, Inc. v. Pardini*,
    726 F. Supp. 2d 1107 (E.D. Cal. 2010) ..................................................18

*Daritech, Inc. v. Ward*,
    2011 WL 2150137 (D. Or. May 26, 2011)..............................................17

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
    109 F.3d 1394 (9th Cir. 1997) ...........................................................13, 14

*Eldred v. Ashcroft*,
    537 U.S. 186 (2005)..................................................................................19

*Elvis Presley Enters v. Passport Video,*
  357 F.3d 896 (9th Cir. 2001) ................................................................. 19

*Fonar Corp. v. Domenick,*
  105 F.3d 99 (2d Cir. 1997) ................................................................. 10

*Fox TV Stations v. BarryDriller Content Sys.,*
  915 F. Supp. 2d 1138 (C.D. Cal. 2012) ........................................... 16

*Gable-Leigh, Inc. v. N. Am. Miss,*
  2001 WL 521695 (C.D. Cal. Apr. 13, 2001) .................................. 19

*Gaste v. Kaiserman,*
  863 F.2d 1061 (2d Cir. 1988) .......................................................... 11

*Herbert Rosenthal Jewelry Corp. v. Kalpakian,*
  446 F.2d 738 (9th Cir. 1971) ........................................................... 11

*Intimo, Inc. v. Briefly Stated, Inc.,*
  948 F. Supp. 315 (S.D.N.Y. 1996) .................................................. 13

*Mattel, Inc. v. Walking Mountain Productions,*
  353 F.3d 792 (9th Cir. 2003) ........................................................... 10

*Merritt Forbes & Co. v. Newman Inv. Sec., Inc.,*
  604 F. Supp. 943 (S.D.N.Y. 1985) .................................................. 12

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
  518 F.Supp. 2d 1197 (C.D. Cal. 2007) ........................................... 16

*Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,*
  558 F.2d 1090 (2d Cir. 1977) .......................................................... 15

*Oracle Corp. v. SAP AG,*
  734 F. Supp. 2d 956 (N.D. Cal. 2010) ............................................ 13

*Peermusic, III, Ltd. v. Liveuniverse, Inc.,*
  2010 U.S. Dist. LEXIS 142929 (C.D. Cal. May 13, 2010) ......... 17, 18, 19

*Phoenix Renovation Corp. v. Rodriguez,*
  439 F. Supp. 2d 510 (E.D. Va. 2006) .............................................. 12

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

CHARTER SCHOOL CAPITAL'S MOTION FOR
PRELIMINARY INJUNCTION

*Professional Systems & Supplies Co., Inc. v. Databank Supplies & Equipment Co.,*
  202 U.S.P.Q. 693, 1979 U.S. Dist. LEXIS 12849 (W.D. Ok. 1979) ...............12

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.,*
  944 F.2d 597 (9th Cir. 1991) .........................................................................16

*Rice v. Fox Broad. Co.,*
  148 F. Supp. 2d 1029 (C.D. Cal. 2001)......................................................10, 14

*S.O.S., Inc. v. Payday, Inc.,*
  886 F.2d 1081 (9th Cir. 1989) .......................................................................10

*Salinger v. Colting,*
  607 F.3d 68 (2d Cir. 2010) .............................................................................15

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,*
  562 F.2d 1157 (9th Cir. 1977) .......................................................................13

*Smith v. Jackson,*
  84 F.3d 1213 (9th Cir. 1996) ...........................................................10, 13, 14

*Sony Computer Entertainment America, Inc. v. Gamemasters,*
  87 F. Supp. 2d 976 (N.D. Cal. 1999).............................................................17

*Spectravest, Inc. v. Mervyn's, Inc.,*
  673 F. Supp. 1486 (N.D. Cal. 1987)..........................................................14, 15

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
  240 F.3d 832 (9th Cir. 2001) .........................................................................16

*Therapeutic Research Faculty v. NBTY, Inc.,*
  488 F. Supp. 2d 991 (E.D. Cal. 2007) ...........................................................11

*Three Boys Music Corp. v. Bolton,*
  212 F.3d 477 (9th Cir. 2000) ....................................................................10, 13

*Ticketmaster LLC v. RMG Techs., Inc.,*
  507 F. Supp. 2d 1096 (C.D. Cal. 2007).........................................................16

*Triad Sys. Corp. v. Southeastern Express Co.,*

64 F.3d 1330 (9th Cir. 1995) ................................................................18

*Twentieth Century-Fox Film Corp. v. MCA, Inc.,*

    715 F.2d 1327 (9th Cir. 1983) ......................................................14, 15

*Warner Bros. Entertainment, Inc. v. WTV Systems, Inc.,*

    824 F. Supp. 2d (C.D. Cal. 2011) ................................................17

*Warner Bros. Entm't, Inc. v. WTV Sys.,*

    824 F. Supp. 2d 1003 (C.D. Cal. 2011)........................................16

*Winter v. Natural Res. Def. Council, Inc.,*

    555 U.S. 7 (2008)........................................................................9

## STATUTES

17 U.S.C. § 102 ................................................................................11

17 U.S.C. § 102(a) ............................................................................10

17 U.S.C. § 106 ..................................................................................9

17 U.S.C. § 201(a) ......................................................................10, 12

17 U.S.C. § 201(d)(1) ........................................................................12

## OTHER AUTHORITIES

Nimmer on Copyright § 2.18 (2013) ................................................11

Richard A. Posner, *Reasoning by Analogy*, 91 Cornell L. Rev. 761

    (2006)..........................................................................................16

## RULES

Federal Rule of Civil Procedure 65(c)..............................................19

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 8................................................................11

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3         This action involves a textbook example of copyright infringement.  Plaintiff

4    Charter School Capital, Inc. ("CSC") is a specialized financing company that

5    provides working capital to charter schools by purchasing the school's government

6    receivables.  CSC launched its business as a startup venture, financing its first

7    charter school client in the headwinds of the financial crisis.  CSC pioneered a

8    novel business plan to provide charter schools with affordable access to capital that

9    many schools could not obtain through traditional lending sources.  At significant

10   cost, effort and expense, CSC and its legal counsel created a suite of proprietary,

11   highly specialized financing documents ("Financing Agreements") uniquely

12   designed to carry out CSC's financing model, which had never been done before in

13   the charter school environment.  CSC owns all right, title and interest in those

14   Financing Agreements, including the copyrights.

15        Charter Asset Management Fund, L.P. and its principals, Paul Im and David

16   Park (collectively "Defendants" or "CAM") have infringed on CSC's copyrights

17   by entering into financing transactions with charter schools based on extensive

18   verbatim copying of CSC's Financing Agreements.  Paul Im had access to the

19   Financing Agreements when he was employed by one of CSC's charter school

20   clients.  He went into competition with CSC while he was employed there, despite

21   a written confidentiality agreement requiring the school to protect CSC's

22   Financing Agreements from third-party access and use.  After Im was terminated,

23   he falsely represented to CSC that he was not making use of CSC's proprietary

24   agreements in his new line of work.  CSC caught him red-handed several months

25   later with CAM's name on two charter school financing agreements that are near

26   verbatim reproductions of a CSC Financing Agreement ("Infringing Agreements").

27        As soon as CSC discovered CAM's infringement, CSC took steps to further

28   secure its intellectual property rights.  CSC obtained an assignment of the

1  copyrights in the Financing Agreements from CSC's outside counsel, Orrick,

2  Herrington & Sutcliffe LLP, effective February 14, 2014.  Cardall Decl., Exh. D.

3  The assignment includes "all right, title, and interest" in the work, including the

4  right to apply for copyright registration and to bring actions for all "past, present

5  and future infringements, misappropriations, [and] unlawful use."  *Id.*  CSC

6  promptly applied for copyright registration with the United States Copyright Office

7  which was granted in April 2014.  Leung Decl. ¶¶ 3-6, Exhs. B, C.  CSC promptly

8  filed this action on May 1, 2014 for copyright infringement, trade secret violation,

9  and other wrongful conduct.  CSC now seeks a preliminary injunction to stop

10  CAM's continued violation of CSC's copyrights.

11      CSC respectfully submits that the standards for entry of a preliminary

12  injunction in this case are clearly met:

13      First, CSC is likely to succeed on the merits of its copyright infringement

14  claim.  CAM indisputably has engaged in unauthorized copying, reproduction and

15  self-serving use of CSC's Financing Agreements.  The word-for-word duplication

16  between the Infringing Agreements and the CSC Financing Agreements, and the

17  high degree of access Im had to the CSC Financing Agreements, demonstrate

18  wholesale copying in violation of the Copyright Act.  *See* Ellis Decl., Exhs. E, F.

19      Second, every time CAM puts its name on CSC's proprietary financing

20  documents, CSC suffers irreparable harm.  CAM intangibly harms CSC's hard

21  earned reputation and good will in the industry as a financing innovator, conveys a

22  misleading impression that CSC's financing terms are standard documents rather

23  than CSC's proprietary and uniquely sophisticated financing terms, deprives CSC

24  of control over its proprietary agreements, exposes CSC to further

25  misappropriation and copying by other free riders, and subjects CSC to loss of

26  clients and market share by means of infringement.  *Id.* ¶¶ 24-31.

27

28

2

1    <u>Third</u>, the balance of hardships strongly favors CSC.  CSC will suffer

2    irreparable harm if CAM's infringement is allowed to continue, while CAM is free

3    to continue to compete with CSC using its own forms and financing agreements.

4    <u>Finally</u>, the public interest is served by enforcement of CSC's copyrights for

5    all the reasons that copyright protection exists under the law.  Further, CAM's

6    infringing use of CSC's uniquely sophisticated financing documents presents a

7    misleading message in the charter school community that CAM has the same

8    expertise in charter school finance as CSC after years of hard work and study.

9    **II.    STATEMENT OF FACTS**

10   **A.    CSC's Legal Counsel Authored Original Financing Agreements to
         Enable CSC's Innovative Plan to Finance Charter Schools**

11

12   CSC was founded in 2006 by three college friends who pursued widely

13   different careers that ultimately converged in the formation of CSC to address a

14   critical need of charter schools for access to working capital.  Ellis Decl. ¶¶ 3-5.

15   CSC's founders came up with an innovative business plan to provide immediate

16   and accessible working capital to charter schools by purchasing their government

17   receivables, which had not been done before.  CSC became the first company to

18   adapt receivables purchase financing to the unique financial, legal, and regulatory

19   environment of charter schools.  *Id.* ¶¶ 3-7.

20   Charter schools are tuition-free public schools that operate independently

21   from traditional school districts.  They receive funding from the state at certain

22   times of the year which are distributed through local school districts, counties, and

23   county offices of education.  Charter schools rely on government funding to pay

24   for daily operations, such as salaries of teachers and administrators, leasing

25   facilities, overhead and utilities, supplies, and other expenses necessary to provide

26   continuing services to students.  Cardall Decl.¶ 5.

27   State funding commitments are financial assets of the charter schools.  State

28   budgetary pressures often lead to delays in payment of government funding

1   obligations to charter schools—a situation that worsened during the financial crisis.

2   Cardall Decl. ¶ 6; Ellis Decl. ¶¶ 5, 12.  But charter schools have daily operational

3   costs that require access to capital, sometimes in advance of the next government

4   payment.  CSC's founders recognized that many charter schools had minimal or no

5   access to traditional bank loans, and that many were failing for lack of financial

6   support, despite successful academic models.  *Id.* ¶¶ 5-6.  CSC's founders designed

7   a business model that would fill the gap by effectively accelerating the school's

8   receipt of government receivables.  *Id.* ¶ 11; Cardall Decl. ¶ 6.

9          CSC launched as a startup venture with no clients but a good business plan.

10   CSC engaged Orrick, Herrington & Sutcliffe LLP ("Orrick") to research and

11   develop the financing documents that would enable CSC to execute on its business

12   plan.  CSC and Orrick developed the Financing Agreements, a suite of documents

13   that included innovative terms and conditions designed to function effectively in

14   the specialized legal and regulatory environment in which charter schools operate.

15   Cardall Decl. ¶ 7; Ellis Decl. ¶ 9.  The Financing Agreements materially reduce

16   risk of loss to investors, thus enabling CSC to access funds affordably and provide

17   working capital to charter schools.  *Id.* ¶ 11.

18          There were no businesses at the time offering similar capital financing to

19   charter schools.  Orrick and CSC had no precedents, public or private, that

20   provided a road map for the contracts necessary to achieve CSC's business plan.

21   Cardall Decl. ¶¶ 8-10.  While Orrick was able to use some standard contract

22   language and terminology, it developed many of the terms through original

23   creative drafting.  *Id.*  The centerpiece of the CSC Financing Agreements is a

24   comprehensive Receivables Purchase Agreement which includes the following

25   original terms by way of example (*id.* ¶¶ 10, 14, Exh. A):

26                  a.  definition of "Attendance Receivable";

27                  b.  definition of "Material Adverse Effect";

28                  c.  definition of "Receivable Information";

d. Section 2.01(a), which describes the purchase of receivables, including the concept of "Receivables Files";

e. Section 3.02, which sets forth the initial closing date conditions;

f. "Representations and Warranties," including the "Charter in Good Standing," "Status," "No Audit," "Location of Attendance Receivables Supporting Information," and "Names"; and

g. Bill of Sale (Exhibit A to Receivables Purchase Agreement).

CSC owns all right, title and interest in the Financing Agreements, including the copyrights, by assignment from Orrick. Cardall Decl. ¶ 15, Exh. D; Ellis Decl. ¶ 10. CSC has registered the Financing Agreements, including the Receivables Purchase Agreement, with the U.S. Copyright Office. Leung Decl. ¶ 6, Exhs. B, C.

**B.    CSC's Innovative Charter School Financing Model Has Succeeded and Expanded**

CSC entered the charter school financing market on the eve of the credit crisis and became a pillar of financial strength in the charter school industry. Ellis Decl. ¶ 12. As of now, CSC has provided funding to well more than 180 charter schools in California, and hundreds more outside of California as CSC has expanded its support of charter schools into other states, including Arizona, Florida, Minnesota, North Carolina and Ohio. *Id.* One of CSC's founders, Stuart Ellis, was honored as a recipient of Ernst &Young's Entrepreneur of the Year award based on CSC's innovation and achievement in charter school financing. *Id.*

Most charter schools are repeat clients that look to CSC for new financings to bridge recurring gaps between receipt of government funds and the daily operational needs of the school. *Id.* ¶ 14. CSC has strengthened long standing relationships with its clients by offering charter schools the opportunity to make arrangements for future funding. CSC commits to purchase new receivables in the future, and agrees to charge a lower rate in connection with the current and future funding, but obtains a pre-payment from the school on the future funding. Both

1   CSC and its client benefit financially in the expectation of future transactions:

2   Schools have an incentive to finance with CSC because of its commitment to fund

3   at reduced rates, and the school's pre-payment of the facility fee. *Id.*

4       **C.**   **Defendants Had Full Access to CSC's Original Financing**
5               **Agreements and Infringed the Copyright**

6         Defendant Paul Im was employed in 2012 and early 2013 with Academia

7   Avance Charter School ("Avance"), which is one of CSC's long-standing charter

8   school clients located in Los Angeles. Ellis Decl. ¶ 15. He was involved directly

9   in Avance's relationship with CSC and communicated regularly with CSC. *See*

10  *id.* While Im was employed with Avance, CSC provided new financings under

11  Receivables Purchase Agreements dated June 15, 2012 and November 29, 2012

12  ("Avance Agreements"). *Id.*, Exhs. A, B. Im had access to these Avance

13  Agreements and worked with CSC to implement them. *Id.* ¶ 15.

14        The Avance Agreements, like all of CSC's Financing Agreements, contain a

15  provision obligating the school to assure that its employees and agents maintain the

16  confidentiality of CSC's financing arrangements, as follows: "all documents and

17  information related to this Agreement, including each exhibit and the other

18  Transaction Documents, are the property of [CSC] and are not to be duplicated or

19  distributed to any third parties without [CSC]'s express written consent." *Id.* ¶ 16,

20  Exhs. A and B at section 7.17. Each page is stamped "CONFIDENTIAL" in the

21  footer. *Id.* This agreement is designed to ensure that the Financing Agreements

22  will not be made generally available to third parties who would seek free rider

23  entry into the charter school financing market by exploiting CSC's and Orrick's

24  work. *Id.* ¶¶ 16, 17; Cardall Decl. ¶ 11.

25        CSC learned in 2013 that Im planned to launch a business financing charter

26  schools, and that Avance subsequently terminated Im's employment. On February

27  28, 2013, Im sued Avance. Ellis Decl. ¶¶ 18-19. In light of this information, CSC

28  was concerned that Im would use the Financing Agreements and confidential CSC

1    business information to compete with CSC.  By letter dated May 23, 2013, through
2    legal counsel, CSC reminded Im of his obligations to honor the confidentiality of
3    CSC's information and not to use information that he gained as an employee of
4    Avance for his own benefit and in breach of his fiduciary duties to the school.
5    Ellis Decl. ¶ 20, Exh. C.  CSC advised Im that while he was free to compete with
6    CSC, he was not free to use CSC's confidential information in doing so and
7    demanded that Im cease and desist.  *See id.*

8         Im responded by letter dated June 4, 2013, denying that he had taken or was
9    using CSC's proprietary information:

10        Rest assured that I do not wish to use or acquire either CSC's or [the
11        school]'s confidential or proprietary information, and I am confident
12        that in performing my duties for any future employer, I will not be
13        required nor expected to use either CSC's or [the school]'s trade
14        secret information. . . . please take this response as my assurance to
15        CSC and [the school] that I have not illegally obtained, misused, or
16        otherwise disclosed any of CSC's or [the school]'s trade secret or
17        proprietary information.  Please also rest assured that I certainly do
18        not plan to do so in the future.

19    *Id.* ¶ 21, Exh. D.  In reliance on this, CSC took no further action at that time.  *Id.*
20         CSC learned a few months later, however, that Im's representations were
21    false:  CAM was copying CSC's proprietary legal documents in providing
22    financing to charter schools.  *Id.* at ¶ 22.  One of CSC's charter school clients, an
23    academy in San Diego, told CSC that it had received financing from CAM.   CSC
24    obtained a copy of CAM's financing agreement titled "Agreement for the Sale of
25    Receivables," dated July 29, 2013 (Infringing Agreement, "CAM-H").  *Id.*, Exh. E.
26    Most of the CAM-H Agreement is a verbatim copy of the Receivables Purchase
27    Agreement to which Im had access while employed with Avance.  Cardall Decl. ¶¶
28    13-14, Exh. C; Ellis Decl. ¶ 22, Exh. E; Leung Decl.¶¶ 7-10.  One of the few

1  modifications CAM made was to omit CSC's confidentiality provision.  Ellis Decl.

2  ¶¶ 22-23; *compare* Ellis Exhs. A and B, Section 7.17, *with* Exh. E.

3      Soon after, CSC discovered another incidence of copying by CAM.  *See*

4  Ellis Decl. ¶ 23. CSC obtained a copy of the "Agreement for the Sale of

5  Receivables," dated October 22, 2013, between CAM and another CSC client that

6  operates an academy in Riverside (Infringing Agreement, "CAM-R").  *Id.* ¶ 23,

7  Exh. F; Cardall Decl., Exh. C.  CAM again omitted CSC's confidentiality

8  provision.  Ellis Decl. ¶¶ 22-23; *compare* Exhs. A and B, Section 7.17, *with* Exh.

9  F.

10     Both the July 29, 2013 and October 22, 2013 Infringing Agreements consist

11 of large tracts of terms and conditions that are identical to provisions in the

12 Receivables Purchase Agreement.  *Id.*; Leung Decl. ¶¶ 7-8, 10; Ellis Decl., Exhs.

13 E, F (illustrative highlighting). The language that CAM copied includes key

14 provisions and original content that Orrick and CSC created, such as the definitions

15 of "Attendance Receivable," "Material Adverse Effect," and "Receivable

16 Information," among other provisions.  Cardall Decl. ¶¶ 10, 14.

17     CSC has learned from reviewing public Uniform Commercial Code

18 ("UCC") financing statements, that Im has financed receivables of about 20 charter

19 schools in California, most of which are clients of CSC, and include two

20 community based charter schools that obtained their charters based in part on the

21 strength of CSC's letters of intent to provide financing.  Ellis Decl. ¶ 24.  Further,

22 most of those CSC clients had entered into long term financing agreements; thus,

23 CSC literally was standing by to provide additional financing for which the schools

24 already partially paid when CAM solicited the schools and provided financing at

25 additional cost to the schools.  *Id.* ¶ 25.  CSC has lost business and is losing market

26 share based on CAM's entry into the market as a free-rider on CSC's Financing

27 Agreements and other intellectual property.

28

### D.  CSC Registered the Financing Agreements with the United States Copyright Office

When CSC discovered CAM's infringement, CSC took steps to secure its intellectual property rights.  As noted, CSC obtained an assignment of the copyrights in the Financing Agreements from Orrick, effective February 14, 2014.  Cardall Decl., Exh. D.  The assignment includes "all right, title, and interest" in the work, including the right to apply for copyright registration and to bring actions for all "past, present and future infringements, misappropriations, [and] unlawful use." *Id.*  CSC applied for copyright registration with the United States Copyright Office, which was granted in April 2014 (effective as of February 28, 2014, presumably when CSC's application was received).  Leung Decl. ¶¶ 4-6.  Upon learning that registration had been granted, CSC filed this lawsuit on May 1, 2014.

## III.  ARGUMENT

### A.  The Standards for Issuance of a Preliminary Injunction Are Satisfied and Injunctive Relief Is Warranted

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  CSC has demonstrated all of these requirements.

#### 1.  CSC Is Likely to Prevail on the Merits of Its Copyright Infringement Claim

CSC is likely to prevail on its claim for copyright infringement. The majority of CAM's Infringing Agreements are copied verbatim from CSC's Receivables Purchase Agreement. Given the undeniable duplication between the Infringing Agreements and the copyrighted Financing Agreements, the inference is clear that Defendants have infringed CSC's exclusive copyrights.

The Copyright Act, 17 U.S.C. § 106, protects the owner of a copyright by granting exclusive rights to "'reproduce, distribute, and publicly display copies of

1   the work.'" *Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 799 (9th

2   Cir. 2003) (citations omitted).  "A plaintiff asserting infringement of copyright

3   must prove:  (1) ownership of a valid copyright; and (2) infringement—that

4   defendant copied protected elements of the plaintiff's work." *Rice v. Fox Broad.*

5   *Co.*, 148 F. Supp. 2d 1029, 1048 (C.D. Cal. 2001) (citing *Three Boys Music Corp.*

6   *v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000)).  Absent a direct admission of

7   copying, "infringement" can be established by showing that the defendant had

8   "access" to the copyrighted work and that the works are "substantially similar."

9   *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996).

10                a.    **CSC Owns the Exclusive Copyrights in the Financing**
                        **Agreements and Receivable Purchase Agreement**

11

12        CSC owns valid copyright registrations in the CSC Financing Agreements,

13   which include a form of the Receivables Purchase Agreement, and in the specific

14   Avance Receivables Purchase Agreements to which Im had access during his

15   employment with Avance.  Leung Decl., Exhs. A, B, C.  In the Ninth Circuit,

16   copyright registration constitutes "prima facie evidence of the validity of the

17   copyright[s]." *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 (9th Cir. 1989);

18   *see also Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997) ("'A certificate

19   of copyright registration is prima facie evidence that the copyright is valid' . . .

20   [and] 'creates a rebuttable presumption that the work in question is

21   copyrightable.'") (citations omitted).  CSC has been granted copyright registration

22   in both the CSC Financing Agreement forms and in the Avance Receivables

23   Purchase Agreements to which Im had access.  Therefore, it is presumed as matter

24   of law that CSC owns valid and enforceable copyrights in these works.

25        But even without the benefit of this presumption—to which CSC is

26   entitled—the evidence is clear that CSC owns valid copyrights in the CSC

27   Financing Agreements, including the Receivables Purchase Agreement.  Orrick

28   was the original author and owned the copyright as soon as the works were created,

1   and Orrick assigned all of its rights to CSC.  Under the Copyright Act, protection

2   attaches to a work "at the time of [its] creation" and "vests initially in the author or

3   authors of the work."  *Cosmetic Ideas v. IAC/ Interactive Corp*, 606 F.3d 612, 618-

4   19 (9th Cir. 2010); 17 U.S.C. § 201(a).  Protection extends to "original works of

5   authorship fixed in any tangible medium of expression . . . from which they can be

6   perceived, reproduced, or otherwise communicated[.]"  17 U.S.C. § 102(a).

7         Under the Constitution and by statute, copyright validity depends upon

8   originality.  U.S. Const. art. I, § 8, cl. 8; 17 U.S.C. § 102.  "Originality" in this

9   context is a low threshold.  It "means only that the work was independently created

10  by the author (as opposed to copied from other works), and that it possesses at least

11  some minimal degree of creativity."  *Therapeutic Research Faculty v. NBTY, Inc.*,

12  488 F. Supp. 2d 991, 995 (E.D. Cal. 2007).  The "requisite level of creativity is

13  extremely low; even a slight amount will suffice."  *Id.*; *see also Herbert Rosenthal*

14  *Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 740 (9th Cir. 1971); *Gaste v.*

15  *Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988).

16        The CSC Financing Agreements contain far more than minimal creativity.

17  The CSC Financing Agreements were drafted and structured to adapt a receivables

18  purchasing model of financing to the charter school industry, which had never

19  before been done.  *See* Cardall Decl. ¶¶ 7-10.  While Orrick was able to use some

20  standard contract language and terminology, the firm developed many of the terms

21  and definitions based on research, analysis, and original creative drafting.  *Id.* ¶ 8.

22  The structure and operation of the provisions were drafted to specifically operate in

23  the specialized charter school financing environment.  *See id.* ¶¶ 9-10.

24        Further, the law is clear that contracts and legal documents are validly

25  copyrightable.  *See* Nimmer on Copyright § 2.18 (2013) ("There appear to be no

26  valid grounds why legal forms such as contracts, insurance policies, pleadings and

27  other legal documents should not be protected under the law of copyright.");

28  *Merritt Forbes & Co. v. Newman Inv. Sec., Inc.*, 604 F. Supp. 943, 950-51

1   (S.D.N.Y. 1985) (rejecting an argument that bond documents are not

2   copyrightable); *Professional Systems & Supplies Co., Inc. v. Databank Supplies &*

3   *Equipment Co.*, 202 U.S.P.Q. 693, 1979 U.S. Dist. LEXIS 12849, at *8-12 (W.D.

4   Ok. 1979) (holding that form agreements contained sufficient originality to be

5   entitled to copyright protection and issuing a permanent injunction to enjoin

6   defendant from committing further infringement).

7        In a case strikingly similar to this one, *Phoenix Renovation Corp. v.*

8   *Rodriguez*, 439 F. Supp. 2d 510 (E.D. Va. 2006), the court found copyright

9   infringement of a consumer contract.  In *Phoenix*, two former employees of a

10  plumbing company that specialized in a niche market of pipe replacement went

11  into competition with the company using contracts that were substantially similar

12  to the form contracts created by the plumbing company.  *Id.* at 514.  After

13  discovering the infringement, the plumbing company registered its contracts with

14  the U.S. Copyright Office and sued for infringement.  *Id.*  The district court held

15  that "[l]egal forms, if original, may properly be the subject of copyright protection"

16  and found defendants were liable for infringement for copying the contracts.  *Id.* at

17  515.  Further, despite containing some standard contract language, the plumbing

18  company's contract contained sufficient originality because portions of the contract

19  were drafted to address "particular circumstances surrounding the polybutylene

20  pipe replacement industry."  *Id.* at 516.

21        Likewise, the CSC Financing Agreements contain original terms and

22  conditions created to address the specialized legal, regulatory and financial

23  circumstances of charter schools.  The Financing Agreements (including the

24  centerpiece Receivables Purchase Agreement) are, therefore, original works

25  protected by the federal copyright laws when created.  As the author, Orrick owned

26  the copyrights.  *See* 17 U.S.C. § 201(a).  However, "ownership of a copyright may

27  be transferred in whole or in part."  17 U.S.C. § 201(d)(1).  Orrick transferred

28  ownership of the copyright to CSC.  Cardall Decl. ¶ 15, Exh. D.  Therefore, CSC is

1  the owner of valid copyrights in the CSC Financing Agreements.  *See Oracle*

2  *Corp. v. SAP AG*, 734 F. Supp. 2d 956, 961 (N.D. Cal. 2010) ("accrued claims [for

3  copyright infringement] may also be transferred") (citing *Intimo, Inc. v. Briefly*

4  *Stated, Inc.*, 948 F. Supp. 315, 317-19 (S.D.N.Y. 1996)).

**b.    <u>CAM Engaged in Unauthorized Copying of CSC's<br>Receivables Purchase Agreement</u>**

6       CSC also has established the "infringement" element of CAM's copyright

7  violation by showing that Defendant had "access" to the copyrighted work and that

8  the Infringing Agreements are "substantially similar" to CSC's copyrighted

9  Receivables Purchase Agreement.  *See Smith v. Jackson*, 84 F.3d 1213, 1218 (9th

10  Cir. 1996).  "Access is proven when the plaintiff shows that the defendant had an

11  opportunity to view or to copy plaintiff's work."  *Sid & Marty Krofft Television*

12  *Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977).  Im had

13  full access to the CSC Financing Agreements when employed by Avance.  *See*

14  Ellis Decl. ¶ 15.  CSC and Avance entered into two Receivables Purchase

15  Agreements during Im's employment with the school.  *See id.*, Exhs. E, F.  Im

16  indisputably had a "reasonable" opportunity to access the CSC Financing

17  Agreements.  *See Three Boys Music*, 212 F.3d at 482 (access is demonstrated

18  where defendant has a "reasonable opportunity" to view plaintiff's work).

19       Courts employ two different tests to determine whether two works are

20  "substantially similar" for purposes of determining a copyright violation.  The

21  extrinsic test "objectively considers whether there are substantial similarities in

22  both ideas and expression."  *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d

23  1435, 1442 (9th Cir. 1994).  The intrinsic test subjectively "asks if an 'ordinary

24  reasonable person' would perceive a substantial taking of protected expression."

25  *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1398 (9th Cir.

26  1997).  The overwhelmingly obvious similarities between the Infringing

27

28

1    Agreements and the CSC Financing Agreements satisfy both tests.  Cardall Decl.

2    ¶¶ 13-14, Exhs, B, C; Leung Decl. ¶¶ 7-10.

3        For deeper analysis, the extrinsic test compares objective criteria using

4    analytic dissection, which  "'requires breaking the works down into their

5    constituent elements, and comparing those elements for proof of copying" *Rice*,

6    148 F. Supp. 2d at 1050.  "[E]ven if only a small portion of a copyrighted work is

7    copied, substantial similarity may properly be found when this portion is

8    qualitatively important." *Spectravest*, 673 F. Supp. at 1492 (citing *Baxter v. MCA,*

9    *Inc.*, 812 F.2d 421, 425 (9th Cir. 1987)).  A lower showing of substantial similarity

10   is required where "a high degree of access is shown." *Smith v. Jackson*, 84 F.3d

11   1213, 1218 (9th Cir. 1996) (describing "Inverse Ratio Rule").

12       Where, as here, there are "overwhelming[]" similarities between the works

13   in question, a plaintiff is likely to succeed on the merits of a copyright violation

14   claim.  *See Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1330

15   (9th Cir. 1983) (judgment of violation "where works are so overwhelmingly

16   identical that the possibility of independent creation is precluded"); *Dr. Seuss*

17   *Enters.*, 109 F.3d at 1398-99 (affirming grant of preliminary injunction where

18   works were substantially similar); *Spectravest, Inc.*, 673 F. Supp. at 1491-93

19   (concluding two designs were "strikingly similar" and granting judgment on a

20   copyright claim).  Here, beyond minor changes to the structure and order of the

21   Receivables Purchase Agreements, almost all of the provisions and exhibits of

22   CAM's Infringing Agreements were copied from the CSC Financing Agreements.

23   *See* Cardall Decl. ¶¶ 14-15, Exhs. B, C; Leung Decl. ¶¶ 7-10.  The agreements are

24   "substantially similar" in both "ideas and expression," and the similarities rise to a

25   level that precludes the possibility of independent creation; accordingly, the

26   extrinsic test for copyright infringement is satisfied.

27       Alternatively, the intrinsic test "asks if an 'ordinary reasonable person'

28   would perceive a substantial taking of protected expression." *Dr. Seuss Enters.*,

109 F.3d at 1397.  Where the works are overwhelmingly identical, the possibility of independent creation is precluded.  *Twentieth Century-Fox Film Corp.*, 715 F.2d at 1330.  A court may use its "lay" eyes and ears to conclude that two works are substantially similar under the intrinsic test. *See, e.g.*, *Spectravest, Inc.*, 673 F. Supp. at 1493 (concluding two fabric designs were substantially similar).  Here, the word-for-word similarities and the amount of text copied in the Infringing Agreements makes it likely that an "ordinary reasonable person" would perceive a substantial taking of protected expression. *See Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1093 (2d Cir. 1977) (reversing the district court's denial of a preliminary injunction, finding that two designs were "to our 'lay' eyes . . . almost identical").  Therefore, considering the high degree of access Im had to CSC's copyrighted works and the overwhelming similarity of the works, CSC is likely to succeed on its copyright infringement claim.

### 2.   CSC Will Continue to Suffer Irreparable Injury Absent a Preliminary Injunction to Stop Defendants' Infringement

CSC will continue to incur irreparable harm if CAM is not ordered to stop infringing on CSC's copyrights.  In assessing irreparable harm, courts recognize that some losses are "difficult to replace or difficult to measure" and others are "a loss that one should not be expected to suffer." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010).  Injunctive relief generally is necessary to prevent copyright infringement because "the denial of a request for injunctive relief could otherwise amount to a forced license to use the creative work of another." *Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 492 (6th Cir. 2007).  CSC faces a range of harms that are difficult to measure and intangible but severely threaten the continued successful operation of its charter school financing business.

Foremost, CAM's infringement deprives CSC of control over the use and enforcement of the Financing Agreements which are the foundation of CSC's success as a business.  Ellis Decl. ¶ 28. *See Warner Bros. Entm't, Inc. v. WTV*

1  *Sys.*, 824 F. Supp. 2d 1003, 1012 (C.D. Cal. 2011) ("interfere[nce] with Plaintiffs'

2  ability to control the use and transmission of their Copyrighted Works, thereby

3  caus[es] irreparable injury to Plaintiffs") (citing *Metro-Goldwyn-Mayer Studios*

4  *Inc. v. Grokster, Ltd.*, 518 F.Supp. 2d 1197, 1218 (C.D. Cal. 2007)).  As this Court

5  recently noted, the very purpose of the Copyright Act is to prevent free riders from

6  undercutting the hard work, investment, and industry of creators.  *See Fox TV*

7  *Stations v. BarryDriller Content Sys.*, 915 F. Supp. 2d 1138, 1146 n.11 (C.D. Cal.

8  2012) ("[t]he purpose [of the Copyright Act] is to prevent the form of free riding

9  that consists of waiting for someone to spend money creating a valuable expressive

10  work and then preventing him from recouping his investment[.]") (quoting Richard

11  A. Posner, *Reasoning by Analogy*, 91 Cornell L. Rev. 761, 771 (2006)).  An

12  injunction is the only way CSC can protect its exclusive right to control the use and

13  enforcement of its Financing Agreements, including with respect to charter schools

14  and government obligors.  *See Warner Bros*, 824 F. Supp. 2d at 1012.

15       Further, every time that CAM puts its name on CSC's proprietary Financing

16  Agreements, CAM inflicts irreparable harm on CSC's reputation and good will in

17  the charter school industry.  This is a well-established form of irreparable harm

18  supporting injunctive relief.  *See, e.g., Ticketmaster LLC v. RMG Techs., Inc.*, 507

19  F. Supp. 2d 1096, 1115 (C.D. Cal. 2007); *Stuhlbarg Int'l Sales Co. v. John D.*

20  *Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of

21  prospective customers or goodwill certainly supports a finding of the possibility of

22  irreparable harm."); *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental,*

23  *Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("intangible injuries, such as damage to . . .

24  goodwill qualify as irreparable harm").

25       Defendants' use of CSC's Financing Agreement damages CSC's reputation

26  and brand among charter school clients by conveying the false impression that

27  CAM is instantly as sophisticated and expert in the financing field as CSC, and that

28  the Infringing Agreements are somehow industry standards, rather than CSC's

1    unique and proprietary works. *See* Ellis Decl. ¶¶ 2, 27. CAM's exploitation of

2    CSC's work diminishes CSC's valuable property and hard earned standing in the

3    charter school community as a financial innovator. *See Peermusic, III, Ltd. v.*

4    *Liveuniverse, Inc.*, 2010 U.S. Dist. LEXIS 142929, at *12 (C.D. Cal. May 13,

5    2010) (entering preliminary injunction where "Defendants' unauthorized use of

6    [Plaintiff's] work deprives Plaintiffs of the ability to ensure the accuracy of the

7    [works] and control the quality of their presentation."); *Sony Computer*

8    *Entertainment America, Inc. v. Gamemasters*, 87 F. Supp. 2d 976, 988 (N.D. Cal.

9    1999) (recognizing irreparable harm from consumer confusion).

10        Further, Defendants' copying and unauthorized exploitation of CSC's

11    Financing Agreements and omission of any confidential provision exposes CSC to

12    harm from other competitors who would seek to enter into the charter school

13    financing business by riding free on CSC's proprietary works. *See* Ellis Decl. ¶¶

14    16-17, 26; Cardall ¶ 11. CAM's removal of the confidentiality provision frustrates

15    CSC's efforts to protect its property rights and shows a willful intention to harm

16    CSC by putting CSC's proprietary work at high risk of wide exposure and

17    unauthorized use by others for their own gain at CSC's expense. In fact, CSC

18    found one of CAM's Infringing Agreements on the public website of a charter

19    school. The school removed the copy at CSC's request. *See* Ellis Decl. ¶ 29.

20        Finally, Defendants' exploitation of CSC's copyrighted works is

21    demonstrably causing CSC to lose clients, market share, and business

22    opportunities, all of which are well-recognized intangible injuries warranting

23    injunctive relief. *See* Ellis Decl. ¶ 26; *Daritech, Inc. v. Ward*, 2011 WL 2150137,

24    at *2 (D. Or. May 26, 2011) (irreparable harm includes "lost business, lost business

25    opportunities, lost economic value of protected previously confidential and

26    proprietary information"); *Warner Bros. Entertainment, Inc. v. WTV Systems, Inc.*,

27    824 F. Supp. 2d 1003, 1012-14 (C.D. Cal. 2011) (irreparable harm includes loss of

28    opportunities to negotiate other agreements); *Credit Bureau Connection, Inc. v.*

1  *Pardini*, 726 F. Supp. 2d 1107, 1123 (E.D. Cal. 2010) (plaintiff "may establish

2  irreparable harm by pleading and proving harm to business reputation and market

3  share"); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir.

4  2012) ("loss of goodwill, damages to reputation, and loss of business

5  opportunities" may establish irreparable harm).

### 3. The Balance of Hardships Strongly Warrants Issuance of a Preliminary Injunction

7  The balance of hardships weighs heavily in CSC's favor. CSC will suffer

8  severe hardship if CAM is allowed to continue using CSC's Financing Agreements

9  for its own benefit in financing charter schools.  CSC will continue to suffer

10 irreparable harm from the loss of control over use and enforcement of its valuable

11 and sophisticated Financing Agreements, damage to its reputation and good will,

12 lost business opportunities, and risk of widespread exposure of its Financing

13 Agreements to other potential competitors.  Ellis Decl. ¶¶ 24-30.

14 On the other hand, Defendants will suffer no cognizable harm from being

15 forced to stop violating CSC's copyrights.  "Any hardship to Defendants flowing

16 from having to cease their infringing activity obviously does not justify the denial

17 of a preliminary injunction." *Peermusic III*, 2010 U.S. Dist. LEXIS 142929 at *12.

18 "Where the only hardship that the defendant will suffer is lost profits from an

19 activity which has been shown likely to be infringing, such an argument in defense

20 'merits little equitable consideration[.]'" *Triad Sys. V. Southeastern Express Co.*,

21 64 F.3d 1330, 1338 (9th Cir. 1995) (citation omitted); *Cadence Design Sys. v.*

22 *Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997); *Apple Inc. v. Psystar Corp.*, 673

23 F. Supp. 2d 943, 950 (N.D. Cal. 2009) ("Since [small start-up defendant] does not

24 (and cannot) claim any legitimate hardships as a result of being enjoined from

25 committing unlawful activities, and Apple would suffer irreparable and

26 immeasurable harms if an injunction were not issued, this factor weighs strongly in

27 favor of Apple's motion.").  Defendants are free to continue to compete for charter

28

school financing business—but not by using CSC proprietary agreements and information. *See* Ellis Decl. ¶ 31.

### 4. <u>Public Policy Strongly Weighs in Favor of Issuance of a Preliminary Injunction</u>

The Ninth Circuit and the Supreme Court have made clear that upholding copyright protection is in the public interest. *See, e.g., Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2005) ("[t]he economic philosophy behind the [Copyright] [C]lause . . . is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors"); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983) ("it is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work"); *Gable-Leigh, Inc. v. N. Am. Miss,* 2001 WL 521695, at *14 (C.D. Cal. Apr. 13, 2001) (preliminary injunction granted; "copyrighted works must be protected as an incentive for people to create new works").

This Court put the point succinctly in quoting the Ninth Circuit: "[t]o neglect the public interest in the protection afforded a copyright is to forget the purpose of the copyright law." *Peermusic III*, 2010 U.S. Dist. LEXIS 142929 at *13 (quoting *Elvis Presley Enters v. Passport Video*, 357 F.3d 896, 899 (9th Cir. 2001). In short, public policy supports the issuance of a preliminary injunction against Defendants' continued infringement.

### B. <u>A Minimal Bond Would Be Sufficient</u>

The bond required under Federal Rule of Civil Procedure 65(c) for issuance of a preliminary injunction should be minimal in this case. Any harm that Defendants face from an injunction results from their voluntary decision to start a business based on violating the CSC's rights. Defendants are free to independently

1  develop their own financing agreements. As such, CSC respectfully submits that

2  security in the amount of $10,000 is appropriate.

3  **IV.**   **CONCLUSION**

4       For the foregoing reasons, CSC respectfully requests that this Court issue an

5  Order of Preliminary Injunction to prevent CAM from further infringing on CSC's

6  copyrights.

7

8  Dated: May 16, 2014                          LATHAM & WATKINS LLP

9                                               Pamela S. Palmer
                                                 Victor Leung
10                                               Jamie L. Summers

11

12                                       By  /s/ Pamela S. Palmer
                                             Pamela S. Palmer
13                                           Attorneys for Plaintiff
                                             Charter School Capital, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28