1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

4

5   CHARTER SCHOOL CAPITAL, INC.,          )
                                           )
6                   Plaintiff,             )
                                           )
7        vs.                               )          Case No.
                                           )2:14-cv-03385-GHW(PLAx)
8   CHARTER ASSET MANAGEMENT FUND, LP,     )
    et al.,                                )
9                                          )    (Pages 1 - 80)
                    Defendants.            )
10  _____)

11

12

13          REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
                 TRIAL DAY 7 - AFTERNOON SESSION
14                 MONDAY, AUGUST 22, 2016
                          2:05 P.M.
15               LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22   _____

23          CAROL JEAN ZURBORG, CSR 7921, CCRR
              FEDERAL OFFICIAL COURT REPORTER
24         312 NORTH SPRING STREET, ROOM 414
             LOS ANGELES, CALIFORNIA  90012
25                  (213) 894-3539

1                    APPEARANCES OF COUNSEL:

2

3    **FOR THE PLAINTIFF:**

4        LATHAM & WATKINS LLP
         BY:  RUSSELL F. SAUER, JR.
5        BY:  JAMES H. MOON
         BY:  JAMIE L. SPRAGUE
6            Attorneys at Law
         355 South Grand Avenue
7        Los Angeles, California 90071
         (213) 485-1234
8

9    **FOR THE DEFENDANTS:**

10       SAUER & WAGNER LLP
         BY:  GERALD L. SAUER
11       BY:  AMIR A. TORKAMANI
             Attorneys at Law
12       1801 Century Park East, Suite 1150
         Los Angeles, California 90067
13       (310) 712-8100

14       MOBILITY LEGAL P.C.
         BY:  DAVID R. BURTT
15           Attorney at Law
         317 Washington Street, Suite 207
16       Oakland, California 94607
         (510) 208-1909
17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | **LOS ANGELES, CALIFORNIA; MONDAY, AUGUST 22, 2016** |
| 2 | **2:05 P.M.** |
| 3 | **--oOo--** |
| 4 | THE COURT:  All right.  Now we will have the closing |
| 5 | closing arguments or closing arguments from the plaintiff. |
| 6 | MR. R. SAUER:  Thank you, Your Honor. |
| 7 | So where we left it before the break was Orrick had |
| 8 | concluded it could work, and they were going to put their mind |
| 9 | to developing the tools to build the business.  And you may |
| 10 | recall from the opening statements, CAM's opening statement -- |
| 11 | I've got to tell you, I'm part of the profession, and one thing |
| 12 | we're not is original or creative. |
| 13 | But you heard the Orrick's lawyers, "CAM was wrong."  Our |
| 14 | lawyers, Orrick lawyers, Mr. Cardall, Ms. Mao, Mr. Mitchell all |
| 15 | said that there were a lot of things that were new and novel |
| 16 | here.  There was nothing out there that they could use.  All of |
| 17 | these provisions that we talked about, they drafted themselves, |
| 18 | that this was a first of its kind document, not something they |
| 19 | pulled off the shelf, not something they scripted from |
| 20 | somewhere else. |
| 21 | This was first of its kind, novel concepts, novel, |
| 22 | Mr. Cardall, Ms. Mao, Mr. Mitchell.  There was no precedent |
| 23 | available.  And they were asked those questions, and the Orrick |
| 24 | lawyers repeatedly said, "No, there's nothing there." |
| 25 | And Ms. Mao, "No, because this area of providing this type |

1   of financing for charter schools, to my knowledge, didn't

2   exist."

3       And Mr. Mitchell, "No, I was not aware of any such

4   agreement."

5       What you haven't seen in this Court in the last week and a

6   half, CAM has not showed you a single receivables purchase

7   agreement for charter school receivables or a receivables

8   purchase agreement for any government receivables whatsoever

9   that predated the Orrick form.  It was the first of its kind.

10  It was new and novel.  There was nothing to work with.

11      Ms. Mao testified repeatedly that she was being pressed by

12  CAM's lawyers, but she used something else to start with, and

13  she called it a frame.  It was the frame, and everything else

14  that went inside, the Orrick lawyers prepared.  It was a frame,

15  nothing else.  You heard it.  You watched her testify.

16      And then Orrick developed and drafted a whole host of

17  original provisions.  You've seen a lot of them.  We have

18  talked about a lot of them.  You may remember that Mr. -- that

19  CAM's lawyers asked Mr. Cardall about the development of these

20  provisions, and for each and every one of these provisions,

21  Mr. Cardall, Ms. Mao, Mr. Mitchell said:

22      "Who drafted it?"

23      "Orrick did."

24      "Who put this together, this particular combination of

25  words?"

1          "Orrick did."

2          "Who decided to include these provisions in the

3     receivables purchase agreement?"

4          "Orrick did."

5          "Did you or anyone else, to your knowledge, copy this

6     provision from another document?"

7          And the answer was "no," over and over and over again.

8     Orrick did the hard work, and Charter School Capital paid for

9     it.  You have seen all this.  You have seen these numbers.

10    Thousands of hours worked, half a million dollars alone billed

11    to the receivables purchase agreement and its development.

12         Let's talk about Mr. Ellis and the founders.  Mr. Ellis

13    testified -- he's sitting here -- that there were three guys in

14    a garage.  They put this together.  They had the idea.  They

15    didn't pay themselves for the first two and a half years.

16    These are not the greedy fat cats that we've heard about for

17    the last week and a half.

18         And Mr. Ellis and his partners, after they found the

19    solution worked and the tools developed, they spent years,

20    years and tons and money, as they testified, investing in time

21    and money in educating charter schools about the solution,

22    educating their advisors about the receivables purchase

23    agreement and how it worked, and the charter school market came

24    to know the CSC's receivables purchase agreement.

25         Mr. Mireles, whom Mr. Im testified before you, was a

1    visionary.  He sat here and he told you that "They did review

2    the receivables purchase agreement with our advisors, our back

3    office providers, our auditing firm."

4        Mr. Ellis testified without contradiction that Charter

5    School Capital sat for hours in board meetings and received the

6    receivables purchase agreement with their attorneys and their

7    advisors, on and on and on.  And even Mr. Wright, you heard his

8    deposition testimony last Friday, even he said that it was

9    Charter School Capital who developed the solution to the

10   California charter school funding crisis.  There's no question

11   about that.

12       And as Mr. Ellis testified, it is the receivables purchase

13   agreement, the reason why we're here, that is the foundation of

14   the receivables purchasing business of their business.  "It was

15   the foundation of our business.  Without that form and the

16   analysis to support it and the initial legal opinion, we didn't

17   have anything."

18       Now, we've heard from CAM over and over again that "Oh,

19   Charter School Capital developed this business and invested in

20   the analysis solely for their own benefit.  This really wasn't

21   for charter schools."  But again, you saw Mr. Mireles.  You saw

22   this in opening statement, and Mr. Mireles talked about it.  It

23   was part of his statement for the Huffington Post.  "Charter

24   School Capital provided the only option that would allow us to

25   survive.  This partnership has allowed us to run our school as

1    if there were no deferrals," and on and on and on, "and now we

2    get to focus on teaching our kids."  That's what Charter School

3    Capital did.

4         Then in January of 2013, along comes CAM.  And where it

5    starts, you may remember, is Mr. Im takes the receivables

6    purchase agreement and all the Charter School Capital

7    documents.  You have seen this a bunch of times, Exhibit 3.

8    And he did it against the express direction of Mr. Mireles, his

9    boss, and without the permission of Charter School Capital.

10        He asked if he could share it with Mr. Park, and his boss

11   said "no," and he did it anyway, and he did it because he said,

12   "We were planning to open a business to compete against Charter

13   School Capital and to target their customers."  It wasn't just

14   innocent, "Oh, I uploaded it by mistake."  They did it for a

15   very specific person.  Those are Mr. Im's words, and he said

16   them right to you.

17        Now, they recognized, Mr. Im and Mr. Park, that they

18   needed a receivables purchase agreement, so they went up to get

19   one.  And they went to the Ervin, Cohen & Jessup firm, but they

20   knew they needed it because, as Mr. Im said, it's the most

21   important document.  It's the foundation of any receivables

22   purchasing business, again, Mr. Im's words, I think it's

23   Exhibit 19.

24        You've seen it when I did opening; you are seeing it again

25   now.  They needed one quickly, so they went to Ervin, Cohen &

Jessup and said, "We need a receivables purchase agreement. What can you do for us?  Can you make one as comprehensive as Charter School Capital's?"

And they said, "Sure."  But as they told you, they said, "It's expensive."

They said, "We don't want to spend the money."  As you will hear, and you now know, it wasn't that they couldn't afford it.  Mr. Park invested $7 million in this company, a hedge fund manager for years.  It's not that they couldn't afford it; they just didn't want to spend the money to do it right.

CAM says, "No, thank you.  I don't want to spend the money.  Give us what you got off the shelf," because they had to do this deal for Ms. Aleman's school very quickly.  So they got the AIA the LegalZoom form.  That's what they got.  And as soon as they got it, they funded Ms. Aleman's school.

Good for her, but they immediately knew what they knew, the agreement they had wasn't up to par.  They knew that it wasn't necessarily going to be the kind of document on which they could build their business.  They wouldn't be taken seriously by charter schools by the back office providers and by their lawyers.  They needed something better.

So they went and looked for lawyers, new lawyers.  And as you've heard, they called Orrick.  Orrick said, "Sorry can't do it."  They called a bunch of other people, and no one could do

1     this stuff.  So they wound up finding a lawyer in Utah named

2     Mr. Wright.

3          Mr. Wright takes a look at it and says, "It's lousy what

4     you have.  You can't use that."  So he prepares a new

5     agreement, a much better agreement than the lousy one they were

6     using.  And he got it -- yeah, he got it from a law firm, Kutak

7     Rock, but it was a Charter School Capital document.

8          Now, Mr. Wright testified in his deposition he didn't

9     know, that's what he said, but he admitted, you saw his

10    testimony on Friday, that he knew the New Designs Charter

11    School, who was on that form, was a Charter School Capital

12    customer.  He told you that.

13         More importantly, we know that Mr. Im and Mr. Park knew

14    that it was copied.  Oh, they changed their testimony back and

15    forth, and I will show you that later.  Mr. Im testified in

16    front of you, "First, Mr. Park said, 'Hey, we got this new form

17    from Mr. Wright,' and we noticed -- I noticed some similarities

18    between what he gave us and the Charter School Capital

19    document," which he had because Mr. Park gave it to him that he

20    wasn't supposed to.

21         Mr. Im said, "Yeah, we did that."  In fact, Mr. Park told

22    you that he compared the form of agreement with Charter School

23    Capital's form, right?

24         "Yes."

25         "And he told you they were similar?"

1    "Yes."

2        So after they did that, they picked up the phone and

3    discussed it with Mr. Wright, and they told Mr. Wright that

4    they were concerned about the similarity of the agreements.

5    But it wasn't the fact that the agreements looked similar; it

6    was the fact that it was, Mr. Im's words, the words looked very

7    much the same, the words themselves.  Yes, they did.

8        And Mr. Wright told them at the time that he prepared the

9    form, he based it on another form he had in his possession.

10   And Mr. Wright then acknowledged that in creating this new form

11   of receivables purchase agreement, the more comprehensive and

12   better structured template, Mr. Wright told Mr. Im and Mr. Park

13   that he had referred to the Charter School Capital agreements.

14   Didn't he?  And Mr. Im said "yes."

15       They knew.  They knew exactly what had happened.  Then

16   what we've heard about, and we will talk about this later, in

17   fact, I forgot Mr. Park even said he believed that Mr. Wright

18   had copied Charter School Capital's documents.  That's what he

19   believed.  You are going to hear a lot about this.  You will

20   hear a lot about it in their closing.  It's blame the lawyer;

21   blame Mr. Wright.  But we all know ignorance of the law is no

22   defense.

23       CAM's argument:  "My clients had a right to rely on their

24   attorney," but the law the judge just read it to you, a person

25   is liable for copyright infringement by another if that person

has profited directly from it and had the right and ability to supervise or control the infringing activity whether or not the person knew what the lawyer did was infringing.  That's the law.

You don't get to just blame your lawyers, especially when you knew what he did.  They not only knew what he did, but whenever they were challenged by a charter school or back office provider, what did they do?  They went and looked at the Charter School Capital to make sure it was the same.  They asked Mr. Wright to compare section 702, and they said, "Yeah, this is the approach that CSC uses," not the concept, used the same words.

And another one in connection with Academia Moderna it says "Joel, will you take a look in the CSC document and find one that's similar?  According to our legal team, CSC requires the same thing," over and over and over again.  And then if you remember, after they did the reshuffling of the agreement, it was Mr. Park himself and Mr. Im who absolutely insisted that Mr. Wright put a provision back in which they knew came directly from the Charter School Capital documents.  They knew.

Now, let's talk about the reshuffling.  You remember?  Mr. Singer sends a letter on May 24, Charter School Capital's concerned.  They heard about that CAM may be competing unfairly.  Sends a letter on the 24th.  Mr. Im receives it on the 28th.  May 29 Mr. Im and Mr. Park direct Mr. Wright to

1   reshuffle the agreement.  May 30th Mr. Wright does it, creates

2   the new form, new version.  June 3 they use the reshuffled

3   agreement.

4        And then after it's all done, after the agreement is done

5   being reshuffled, remember they embedded all the definitions to

6   make it look different, then Mr. Im responds and says, "Don't

7   worry.  We aren't doing anything wrong.  We would never do

8   that."  Mr. Im admits to the reshuffling.

9        Let's take a look at it.  Not only did he admit it here

10  before you, he tried to explain it and justify it.  First he

11  said, "Well, we were talking about doing this for a long time

12  beforehand.  We had all kinds of communications about

13  reshuffling or doing something different."

14       And you may recall I asked him, I said, "I haven't seen

15  those e-mails.  Would you bring those in.  Would you show them

16  to us?"

17       What did he say the next day?  "I don't have to.  I didn't

18  do it.  I'm not looking for it."  That's what he said.  Then he

19  comes up with an explanation and says, "Well, actually, what we

20  were doing was we needed new revised agreements because we were

21  transitioning customers who used to be with Charter School

22  Capital to us.  That's what we were doing.  We needed new forms

23  because of that reason," except in the very first -- sorry, I

24  forgot to show you the reshuffling.

25       You may remember this from opening.  They took all those

1    definitions in pink that used to be in the definition section,

2    stuck them in the middle of the agreement so now the agreement

3    looks a little different, but it's the same, same words.  And

4    all that was really done was Mr. Wright took the definition

5    from the definitions section, plugged them in just to make it

6    look different.  And Mr. Im admits it, "Yeah, that's what he

7    did," tries to explain the reshuffling.

8         We talked about my questions, and Mr. Im said, "No, not

9    going to do it."  Then he says, "I told you the reason.  Well,

10   we needed a new agreement so that we could deal with people who

11   previously sold stuff to Charter School Capital."  They already

12   had an agreement that did that.  This is May 17.  This is two

13   weeks before the reshuffle.  February 11, the very first draft

14   of the agreement that Mr. Wright prepared had the very

15   provision Mr. Im was trying to tell you, "Well, that's what

16   they needed in the new one."  They already had it.

17        CAM built its business on the Charter School Capital

18   purchase agreement.  The schools cared.  We know that.

19   Mr. Ellis and Mr. Mireles told you about the education of the

20   schools, all the effort it took the schools to understand the

21   form.  Mr. Im and Mr. Park said schools didn't care.  They

22   didn't review it.

23        We had Mr. Ellis' testimony.  He talked about how much

24   effort they put into the schools and how they reviewed it.  I

25   have shown you, and we have put into evidence, a lot of

1    exhibits where CAM sends the agreements to the school and says

2    "Please review them."  Exhibits 476, 480, 485, 486 and a bunch

3    of them, I have shown you exhibits, shown you some of them just

4    a few moments ago, that when schools had questions or their

5    advisors had questions, what does CAM do?  They say, "It's just

6    the same as CSC's."  They knew.

7        Back office providers insisted that they put those

8    provisions in.  And then we know that the receivables purchase

9    agreement was critical to schools.  Mr. Mireles, the visionary

10   that Mr. Im used to work for, told you it was central.  These

11   transactions were critical because the receivables purchase

12   agreement changed the way they did business.  It allowed them

13   to not have liabilities on their books.  It allowed them to

14   just operate their schools and teach their kids.  That's what

15   it did.

16       And CAM knew that the schools wanted the same form.  They

17   wanted to be able to compete on price because they didn't have

18   to make the investment that Charter School Capital did.  But

19   the only way you can compete apples to apples, if you are

20   selling the same thing.  So they had the same agreement.

21   That's what they did.

22       And even Dr. Aleman, their witness, who came in here, even

23   she said that is Mr. Wright saying they don't want to see

24   different forms.  Dr. Aleman said, "I might not have read it,

25   but I expected my board of directors to read it.  That was my

1  expectation."  So to say schools didn't care, they didn't

2  review them, there is no evidence of that.  All the evidence

3  you saw, even from their witnesses, is that the schools do care

4  and they do read.

5      We know that the investors cared.  We saw Ms. Giovine

6  testified when she was working for an investor, they cared.

7  They did due diligence.  We know that the first outside

8  investor in CAM asked for the receivables purchase agreement

9  twice.  CAM didn't bring a single investor here, not a single

10  outside investor that said, "We didn't care.  We don't need to

11  do diligence.  We don't need to read the underlying documents."

12  Not a single one came in here and told you that.

13      In fact, the most important investor, Mr. Park, he put in

14  $7 million.  He cared.  He didn't say it here.  He wanted a new

15  receivables purchase agreement.  In fact, in Exhibit 60 I

16  showed you before, when the agreement that Mr. Wright drafted

17  the second time around was missing some provisions, he blocked

18  and copied what was in Charter School Capital's and said, "You

19  need to put this in."

20      CAM cared.  Most importantly, remember, "It's the most

21  important document."  I am going through here.  CAM cared.  "It

22  was the most important document."  This is how Mr. Im first

23  described the document to Ms. Aleman, "It's more comprehensive.

24  It's an easier template.  We have spent lots of time and

25  effort.  It protects the rights of both the school and CAM.

 1    It's more extensive.  It ensures the 100 percent legality of

 2    our transactions."  They cared because it mattered.

 3        Then what happened?  October we learn about CAM is

 4    actually copying the agreements.  In November we start the

 5    negotiations process with the Orrick firm.  You've got some

 6    holidays in between.  Orrick provides the assignment.  Charter

 7    School Capital files the registration.  Registration is

 8    obtained, immediately files the lawsuit.

 9        One of the things we spent a lot of time on here is

10    distractions.  You have heard stuff -- and I'm going to have to

11    skip a bunch of slides.  You heard a lot of stuff about fat

12    cats, Wall Street.  Mr. Park sat here last Friday and five

13    times said, "Well, I guess I'm just a little bit naive."

14    $7 million investment, hedge fund manager, $20 billion for one

15    fund, 300 million for another, started up multiple companies,

16    he's naive.  I think he's hoping that you are naive and that

17    you will listen to all this noise, all this noise, because they

18    don't want to concentrate on the evidence and the facts.

19        You heard about predatory lending.  They have called

20    Charter School Capital a predatory lender.  That's what

21    Mr. Park said.  Mr. Park at the time said he determined it was

22    a predatory lender even though he really didn't know charter

23    school financing, but that's not what Mr. Mireles said.

24    Looking at the same books, he said, "Definitely not predatory."

25        We heard about monopolies.  Oh, Charter School Capital is

1   the 900 pound gorilla.  How many times did we hear about that?

2   We heard about this 18 percent penalty provision and how bad

3   Charter School Capital was for insisting.  But remember how it

4   was in CAM's very first agreement.  They wanted it.  And then

5   when Mr. Wright dropped it out, they put it back in.

6       All we heard about, Charter School Capital's a monopoly,

7   the market dominator.  Mr. Ellis gave you a list of

8   competitors.  Mr. Ellis told you there are more lenders willing

9   to work with charter schools now than ever before.  More

10  importantly, Mr. Im and Mr. Park -- Mr. Im, there are other

11  companies offering financing.  Mr. Park, during his deposition,

12  although he tried to change it last Friday, in his deposition

13  he said, "I think they are all competitors.  I mean, we don't

14  see one as competitive more than the other."

15      And more importantly, when they were raising money with

16  investors, they told their investors that the charter school

17  financing business has become competitive and has more so in

18  just recent years.  Just noise.

19      We heard a lot about why did it take so long for Charter

20  School Capital to register their copyright?  The answer is, as

21  Mr. Ellis told you, "We already had copyright protection.  Once

22  it's created, the copyright exists."  He didn't understand that

23  you actually had to register it.  And you know what, you just

24  heard the judge read you the instruction, Mr. Ellis was right.

25  A copyright automatically attaches to work the moment the work

```
 1    is fixed in a tangible medium of expression.  Once those

 2    agreements were created, the copyright protection attached.

 3         We heard about the M.A.T.T.I.E. transaction.  Mr. Sauer

 4    grilled Mr. Ellis, "Oh, the M.A.T.T.I.E. transaction, you

 5    didn't tell the truth about the M.A.T.T.I.E. transaction."

 6         But then Mr. Ellis said, "No, you just got your facts

 7    wrong.  You just made a mistake, because actually, we got all

 8    our money.  Our form worked."

 9         We heard about the legal fees.  We have talked about that

10    a little bit, a lot of, "Oh, we didn't have the money.  We

11    didn't want to start it up."  They told Mr. Ellis it was gas

12    and cell phone money.  Everything was about saving legal fees,

13    but they had the money.  You heard that.  They just didn't want

14    to spend it.

15         You will probably hear stuff like, "Well, when you

16    actually look" -- "don't look at the CAM agreements.  Look at

17    charter school agreements.  Let's look at what they didn't

18    copy," but that's like saying, "Look, we copied this much of

19    the book, but we didn't copy the beginning and the end."  Guess

20    what, it doesn't matter.  You don't get to copy a significant

21    portion, call it your own, build a business on it and then not

22    have to pay the piper.

23         And finally, the biggest distraction of them all, we

24    talked about it a little bit, is blame the lawyer, the biggest

25    distraction, blame Mr. Wright.  Joel Wright's video, the one
```

```
1    thing that also went undisputed here, Mr. Wright in his

2    deposition testimony said at some point after they got the

3    Singer letter, Paul Im raised the issue of copyrightability.

4    "Do you want us to take a look at it?" Joel said.

5         And Mr. Wright said, "No, I don't think we want to spend

6    the money."

7         This case is not about the noise; it's about the facts and

8    the law.  You heard the judge talk about the burden of proof,

9    and Charter School Capital has the burden of proving ownership,

10   authorship, copyrightability, transfer.  Burden of proof is

11   never just tipping the scales.  We just have to prove it a

12   little bit more, as the judge said in his opening instructions,

13   50.0000001 percent, and that's it.  And I think the evidence is

14   overwhelming, quite frankly.

15        First issue is originality.  The judge read it.  You have

16   it in your package.  Copyrighted work must be original.  Jury

17   instruction, original parts of the plaintiff's work that are

18   created independently by the work's author, and at least some

19   level of creativity, well you saw the authors:  Really, really,

20   smart lawyers.  Nothing out there, they built it on their own.

21   Just what we heard from the judge, a copyright may be obtained

22   from the receivables purchase agreement.

23        Original provisions, again, we will just look at them

24   again.  There's a lot.  We've got Mr. Cardall's testimony,

25   again, who drafted, who arranged, who put this together.  Did
```

 1    they get this from any other place?  No, no, no, no, no.
 2    Orrick did it all.  Again, a copyright automatically attaches
 3    the moment the original work is created.
 4        Let's go through some of the other pieces.  The
 5    ownership -- authorship, the creator of an original work is the
 6    author.  That's Orrick.  The owner, the plaintiff is the owner
 7    of a copyright if the plaintiff's work is original and the
 8    plaintiff is the author or received a transfer.  So Charter
 9    School has the transfer.  They got the assignment.  The Orrick
10    firm assigned the receivables purchase agreement, including the
11    Avance agreement, the one we talked a lot about.
12        There's the -- you have seen the assignment.  You have
13    seen the judge's jury instructions, the person to whom a
14    copyright is transferred is called an assignee.  Charter School
15    Capital is the assignee.  They are the owner.  Orrick assigned
16    the copyright.  Mr. Cardall talked about it.  You saw it.  You
17    have it in your evidence books.
18        It's registered.  Copyrights are registered with the
19    federal government.  You will get a verdict form, and it will
20    have questions something like this:  Does Charter School
21    Capital own the copyright?  The answer is "yes."  Copying --
22    plaintiff, we have the burden of proving the defendant copied
23    original elements from the work.  Mr. Im knew Mr. Wright copied
24    it.  Remember, he said it wasn't the fact that the forms looked
25    the same; it was the same words, the words themselves.

1    "Question:  So your lawyer in opening statement said you

2    had no knowledge that the agreement was copied.  Forget about

3    Charter School Capital, but, in fact, you knew the form of

4    receivables purchase agreement Mr. Wright prepared was copied

5    from another agreement, and, in fact, included Charter School

6    Capital's language.  You knew that, didn't you?"

7        And Mr. Im said, "Yes."  Oh, he changed it later, but the

8    first time he was asked he said "yes."

9        Mr. Park knew it was copied.  He believed that

10   Mr. Wright's draft was copied from Charter School Capital's

11   agreement.  He told you that.

12       "Question:  Are the agreements substantially similar?  Has

13   there really been copying?"  Unmistakable, our agreement/their

14   agreement.

15       Ms. Giovine testified she went through and highlighted all

16   the words that were the same.  This is in the first agreement,

17   the first provision that Mr. Wright put together.  All that

18   yellow.  Then we have the next agreements.

19       Are any of the defendants liable for infringing?  We have

20   seen the copying on both forms, reshuffled form and the

21   original form, tons of yellow.  Yes.  Which of the defendants

22   did Charter School Capital prove is liable?  Charter Asset

23   Management, LLC, they are the ones that used the first form of

24   the form; Charter Asset Management Fund, now, they are the ones

25   that used the reshuffled form; the general partner of the fund;

1  Mr. Im and Mr. Park, all of them, because whether they

2  originally did the copying from the other form is not

3  important.  They used the form.  They benefited from the form,

4  and they distributed the form.

5      There is also a concept called vicarious liability.  In

6  addition to direct infringement, you can be responsible for

7  infringement if somebody else did it.  And we know that

8  Mr. Wright did it.  You will get a vicarious infringement form

9  whether you knew they were infringed or not, but we do know

10  that they knew.  You have seen all of the evidence so far.  So

11  they were vicariously responsible for whatever Mr. Wright did,

12  even if they didn't use it themselves and benefit from it, but

13  they did.

14      There is also contributory infringement.  A person is

15  liable if they knew or should have known of the infringement

16  activity and induces or contributes.  Well we know they

17  contributed.  They asked him to reshuffle.  They repeatedly

18  referred to the Charter School Capital document when schools

19  and their advisors had questions.

20      Did Mr. Wright -- so this is vicarious liability and

21  contributory.  Did Mr. Wright commit an act of copyright

22  infringement?  Yes.  Which of the defendants are liable?  They

23  all knew.  They all benefited from it.  It's that simple.  And

24  as a consequence, my client is seeking profits that CAM

25  generated on the foundation of this form.  I'm going to come to

1   that in just a few minutes.

2       I do want to talk briefly about credibility.  If you tell

3   the truth, you don't have to remember anything.  The truth

4   doesn't change.  Truth is one of the very few constants in our

5   lives.  The truth is the truth.  Some of you may remember,

6   Mr. Park on Friday said, oh, we could make Mother Theresa look

7   bad because we are just nitpicking.  He said that

8   Mother Theresa -- he compared himself to, but the truth doesn't

9   change.  It's not nitpicking when we ask you a question under

10  oath.

11      We have a right to rely, and if you want to change it

12  again, it's not an, "Oops.  Oh, that was my answer now.  That

13  was my answer today."  That's not the way it works in a court

14  of law.  The oath we take, the law, the penalties of perjury

15  are important.

16      Mr. Im, the salesman -- this is Exhibit 25 where he tells

17  Ms. Aleman at the outset, "Comprehensive document.  It's the

18  greatest thing since sliced the bread.  It's going to protect

19  you.  It's going to protect the school.  It's protecting

20  everybody.  It's a great thing.  It guarantees the legality of

21  our transactions."

22      Oh, question by CAM's lawyers:  "Well, when you wrote

23  this, it was kind of a fluff piece, right?  Marketing, that's

24  all it was?"  That's what he said now.  You have heard the

25  instructions, if you decide a witness has testified

untruthfully about something important, you may choose not to believe them.  If the evidence is that a witness has lied under oath on a prior occasion, it may be considered, along with all the other evidence, whether to believe the witness.

And there's lots.  I'm not going to have a chance to go through them all.  Oh, sometimes people look nice, their appearance is good, but just look at all of the inconsistencies.

"At the time you uploaded the forms, Exhibit 3 were you and Mr. Im planning to build a business to compete against Charter School Capital."

"Yes."  And then Mr. Im's lawyer questioned him, and he said, "No, not at all."

Yes/no.  Day one/day two.

"Did you tell Mr. Park to delete or destroy the documents?

"No, I didn't know."

"Why not?"

"Well, there are a number of reasons.  The first thing is we weren't going to use the documents."  That's what he told his lawyer, "We were never going to use them, so it didn't matter."

But when I asked him the questions, "You kept access to the documents so you could refer to them to build your company, right?"

"Yes."

1       No/yes.

2       The most important document.  I asked Mr. Im here, "Isn't

3   the receivables purchase agreement the most important

4   document?"

5       He said, "No," but then we saw the letter, the e-mail he

6   sent to Mr. Wright, January 29, 2013, "It's the most important

7   document."

8       "Mr. Wright, did he tell you he actually prepared it based

9   on another form?"

10      "I don't think so.  I don't recall talking about how he

11  prepared it."

12      But during his deposition he said, "At the time did he

13  tell you he was basing it on another form?"

14      "Yes."

15      "That was your testimony, right?"

16      "Yes."

17      Changed it again, knowledge of use of the CSC agreement.

18      "Did Mr. Wright tell you that he..." on and on and on.

19  "And he told you that he prepared the first draft?" referring

20  to the Charter School Capital RPA.  "He told you that, didn't

21  he?"

22      "I don't remember."

23      Next day, "Well, Mr. Wright told you he had effectively

24  referred to the Charter School Capital's agreements, didn't

25  he?"

1          "Yes."  "No, don't remember."  "Oops, yes."

2          Mr. Wright's use of the CSC form, "Once again, did

3     Mr. Wright ever advise you, 'Gee, I'm working off the CSC

4     form?'"

5          Mr. Im said, "Yes, he advised me that he was working off

6     all kinds of documents, including Charter School Capital

7     documents."  That's when Mr. Im's lawyer was asking the

8     question, not me, Mr. Im's lawyer.  He got the wrong answer, so

9     he asked it two more times until he finally got the right one.

10    And then he said, "Oh, no, he never really talked about what

11    particular forms he was using, nor did I really ask."

12         It took CAM's lawyers four times to get the answer they

13    were looking for, even though it was inconsistent with all of

14    these other answers.  I will skip through these.  We just don't

15    have enough time to do them all.  Mr. Park, "Mother Theresa."

16         They said when they first formed CAM they weren't looking

17    to go get outside equity investors and set up a fund.  They

18    were there just to help the schools.  Well, actually, I'm sure

19    they were there to help the schools, but you saw the letter,

20    November 30th, long before they formed the company, to Ervin,

21    Cohen & Jessup, "Will you help us set up a private equity

22    fund?"

23         Mr. Park called CSC a monopoly.  In his deposition that's

24    not what he said.  "I think they are all competitors.  I don't

25    see one as more competitive than the other," and on and on and

1   on.

2       It's amazing, all the inconsistencies we've heard.  Nice

3   guys, they look nice, they say nice things, but when you look

4   at what they said from day to day back and forth in their

5   depositions, in their declarations, unbelievable.  Then at one

6   point even the Court asked Mr. Im when we were looking at the

7   demonstrative to Exhibit 8, "Why don't we take a break.  Let's

8   call it a day.  You can have him look it over during the

9   evening and get back to you tomorrow.  He can tell you which of

10  those schools are no longer doing business."

11      The next day after he had been told what to do, I asked

12  him whether he had did it, "No, I haven't done it."

13      Anyway, I will just move on.  Let's get to the core of

14  this for the damage.  Again, the primary basis on which CAM

15  competed with Charter School Capital was price.  Mr. Park said

16  it.  "In your mind, pricing, that was the primary advantage

17  that CAM had over CSC, correct?"

18      "Yes."  He also said repeatedly, "No worries.  CAM is the

19  same as CSC.  We're just cheaper."  Of course they were

20  cheaper.  They didn't have to spend all the money they needed

21  to spend to develop the kind of agreement they needed to build

22  their business.  Stolen goods, knock-offs are always cheaper.

23  They didn't have to spend any money talking to schools, talking

24  to their advisors.

25      "Our agreement is different.  Let us show you why it

works.  Let us show you why it is as good as Charter School
Capital's."  They didn't have to do that because they were
showing schools the same agreements.  And then, it's not
because they couldn't afford it.  Mr. Park has millions.  You
heard it.  They just didn't want to spend the money to do it
right.

     And how did it help CAM build their business?  Mr. Ellis
testified at great length about the runway.  He talked to you
about the fact that by not having to do the investment, it gave
them a huge advantage, how starting seven years -- they started
seven years, they basically took all -- everything that Charter
School Capital did and jumped seven years in the line.  That's
like being in an auto race and saying, "Your Honor, I know
everyone else has to start at the starting line, but we want to
start at the 15th lap, if that's okay."  That's what they did.
Huge advantage, gave them a huge advantage on the profit side.
They didn't have to spend the money.  Of course they were
cheaper.

     Mr. Ellis used the one, "We had to run the whole hundred
yards.  They started at the 98-yardline and only had to go the
last 2."  Saved them a tremendous amount of time and money,
huge advantage and a head start, gave them momentum.  They are
still benefiting.  They are benefiting even today from the use
of that form because they developed a lot of customers.

     And after a year and a half of using the form, now the

customers aren't going to switch.  They are kind of locked in.
They're kind of stuck.  They brought investors in knowing they
were using that form.  They brought the investors in.  It's not
like a business where you've got a building and say, "Well, we
will take out the first ten floors and the rest of the building
stands."  That's not what happens.  You take out the
foundation, and all of it falls.  They would have had nothing.

Let's get through this.  Let's get to the money stuff
because this is complicated, and you're going to get bored.
This is not going to be in the news media tomorrow.  No one
cares except for us and hopefully for you.  We know because
Exhibit 734 shows that CAM generated net profits of 1.194-
through the end of May of 2014, during the time all their
business was based on the Charter School Capital form.

And you have seen all the instructions about the burdens
and so on and so forth.  That's the profits.  That's how they
get split up between CAM LLC -- and I know this looks
complicated, but you actually have the evidence.  It's in
Exhibits 734, 218, 105, 106, 107.  It's all there.  It's really
pretty basic arithmetic.

And then they generate another million and a half dollars
between June and the end of December, another million 3- during
2015, and another 759- through May of this year.  We don't have
the up-to-date stuff.  And these are their profits through the
end of May, $5.8 million.

 1      You will see something in here, these litigation fees,

 2  they said they spent about 966,000 on legal fees.  Well, they

 3  don't get to deduct those expenses because that would be like

 4  saying, "Oh, Charter School Capital, you have to pay for

 5  their -- you have to pay for them to defend your lawsuit, even

 6  though they're the ones who committed the wrong and done the

 7  work."

 8      But we are not going to ask you to give us $5.8 million.

 9  That's not what we are asking for.  We are asking for a lot,

10  but not for that because that includes all the customers, even

11  customers they got after they stopped using the form.  And

12  while we still think we can ask for more, we are not asking for

13  that.  We are really going to focus on the customers they got

14  using the Charter School Capital form of agreement.

15      And so in order to get there, and again, you don't have to

16  look at all this stuff necessarily.  You have to come up with a

17  percentage.  So we know they earned 1.194- on Charter School

18  Capital's form.  The question is:  How much did they earn going

19  forward from those same group of customers?  So you've got to

20  create a ratio, and we do all the math.

21      At the end of the day, 61.3 percent of all of their

22  revenues, all of their profits going forward in June of 2014

23  through the end of May, 61.3 percent is still being generated

24  from the same customers on the Charter School Capital form.

25  Like Mr. Ellis said, they had the runway.  They got the

1    advantage.  They capitalized it, and they kept those customers

2    all the way through.  They weren't using the form anymore, but

3    after a year and a half on the form, people don't switch.

4    People don't switch banks.  People don't switch a lot of

5    different things when you get comfortable with something.

6        So CAM's profits from using the infringing form, they

7    generated 5.2 million in profits through the end of May of this

8    year.  The 1.194- during the time they were using this form,

9    another 900,000 for the last seven months of 2014, 833,000

10   during 2015, 465- for the first five months of this year, and

11   then you add back the legal fees, and then they have some

12   losses.  CAM took some losses in 2015, but those weren't from

13   customers on the Charter School Capital form, so those expenses

14   don't get deducted.

15       So if -- if you believe it was appropriate to give Charter

16   School Capital the benefit of the profits earned on the

17   customers they got using our forms, that number would be

18   $5.283 million.  They only used the form for 16 months,

19   February of 2013 through May of 2014.  That's 16 months.  So

20   maybe if you want to be rational, you want to be fair, you say,

21   "Look, maybe it's not all the way through May of this year.

22   They took a 16-month runway.  We will give you 16 months on the

23   other end."  That number is 4.4 million.

24       So from Charter School Capital's perspective, you have a

25   range, somewhere between 4-4- and 5-2-, then we have to divide

1    the profits up, again, because you've got to allocate profits

2    based on the specific defendants.  What we know, how much CAM

3    LLC generated because they only had the 19,000 for the first

4    two or three months of 2013.  CAM Fund, the big fund, that's

5    the major player here, $5 million.  CAM GP, the general partner

6    of the fund, Mr. Im and Mr. Park, that's another $706,000.  And

7    if we just take it, we get rid of not all the customers, but

8    just the customers they generated using the form, again, their

9    profits are 5.2-.

10        Here's the breakdown that we think is appropriate:  The

11   19- for CAM LLC, CAM Fund is 4-7-, the general partner is

12   515,000, and that all totals out to 5-2-.  If you say, "Well,

13   16 months before, 16 months after, maybe that's fair.  Maybe we

14   shouldn't extend it much beyond the runway that they took."

15        This is the through-September one.  That breaks down this

16   way:  Same 19-6-, 3.578- against the fund, 500,000 against the

17   partners, and the profits are 4 .1-.  So you've got the range.

18   When you are filling out the verdict form, these are the

19   numbers, the range, the high and the low.  We say negative 19-

20   for CAM LLC because they are out of business now.  They are

21   rolled up.  So those numbers will get allocated for Mr. Im and

22   Mr. Park.

23        So for the fund, 3.5- to 4.7-; the general partner 500,000

24   to 515,000; and then Mr. Im and Mr. Park pick up this piece.

25   You may remember Mr. Park had, I think, 72 percent.  Mr. Im has

1    28 percent.  So that's how those numbers -- it's a lot of math.

2    You will have all the financials there.  They are all in

3    evidence.  And that's sort of where we think this goes.

4        Now, you may hear, "Oh, they are trying to put us out of

5    business."  No one is trying to put CAM out of business.

6    Remember, CAM did it to themselves.  They wouldn't have had --

7    they wouldn't be in this position if they just would have spent

8    the money.  If when Mr. Wright said, "Hey, I'm looking at this

9    stuff from Charter School Capital's forms," they said, "No,

10   don't use it."

11       Yeah, I forgot, Mr. Wright said it's not confidential, but

12   you didn't hear anything about confidentiality in the jury

13   instructions.  And you know why?  Because that's not the law.

14   Confidentiality has nothing to do with copyrightability.  I

15   already told you, we did this in opening, this book isn't

16   confidential.  I bought it today.  I can read it in the

17   library.  I can do a lot of things with it.  But you know what

18   I can't do?  I can't copy it.  I can't copy it, put my name on

19   it, say it's mine and go build my business.

20       And there's another reason why we know CAM isn't going out

21   of business because of this.  Mr. Ellis told you, and then even

22   though we didn't hear it in their opening, we found out later

23   why.  Because they sued their lawyers.  They dismissed the

24   claims so they could get through this case, and then depending

25   upon how this goes, they just sue them again.  So nothing that

1   happens here hurts them.  The only one that's been hurt in this

2   whole process is sitting right there and is staring at you.

3        And when you go back and deliberate, we are going to ask

4   you to award between that 4.4- and $5.2 million.

5        And I'm going to stop.  Oh, I'm 30 seconds shorter than I

6   thought I would be.  I reserved ten minutes for rebuttal.  I'm

7   sure Mr. Sauer will have things to say, and I have the right to

8   ten minutes back.

9        Thank you, Your Honor.

10            THE COURT:  All right.  For the defense?

11            MR. G. SAUER:  Is this a good time just to let the

12  jury stretch five minutes?  Because I'm going to go on and use

13  my time, if that's okay.

14            THE COURT:  Okay.  We will give you five minutes.

15            MR. G. SAUER:  Thank you, Your Honor.

16       (Recess taken from 2:53 p.m. to 2:59 p.m.)

17            THE COURT:  Let's bring in the jury.

18       (In the presence of the jury.)

19            THE COURT:  All right.  We will have the defense

20  closing argument at this point.

21            MR. G. SAUER:  May I proceed, Your Honor?

22            THE COURT:  Yes.

23            MR. G. SAUER:  Good afternoon, ladies and gentlemen

24  of the jury.  First, I want to thank you for serving on this

25  panel.  Believe it or not, I have been practicing for 30 years,

1  and I have never met a single person that has gotten a federal

2  jury summons.  So when I see you, it's unique to me to find out

3  how these people end up on here because none of my colleagues

4  or anyone I know has ever received anything in the mail.

5      Now, my presentation is going to be a little different.

6  I'm not going to put up the bells and whistles.  I'm going to

7  talk to you rather than putting up a lot, just so you can pay

8  attention.  If I mention an exhibit, jot it down, but I want to

9  show you what's going on in the courtroom and where the

10  problems are because they have not proven their case.  At the

11  end of this when you go back into that room and you come back

12  out after having listened to us and you examine the evidence

13  and the law, you are going to see they failed miserably, and I

14  will show you why.

15      Now, it's an important thing why we have this system.  And

16  what Judge Wu said early on as you came in, you don't check

17  your common sense at the door.  The reason we have eight of you

18  is the common wisdom that you have there is far more than what

19  you can put together in a global law firm.  It's about common

20  sense and taking a hard look about what's really going on in

21  the courtroom.

22      Now, I'm going to give you one item that is the tool that

23  you use, and I just illustrated to give you how it works.  We

24  use -- and it's corny, but we use the scales of justice.  And

25  what happens is you guys, in weighing the evidence, work the

1     scales of justice.  And you can have one side giving you one

2     item after the other item, but if in your mind no matter what

3     they're saying doesn't ring true, they can't tip that scale.

4     It's not criminal whereby the scales have to come crashing to

5     the ground.  They have to move the scale.  That's the issue.

6     No matter what they put up, are they moving the scale?  Are

7     they actually proving copyright infringement?  And I will get

8     to that.

9          I want to tell you, as I look at this case, the reality

10    is, I think you heard during the trial, I only got involved

11    literally three months ago, and I had another trial.  I was

12    nuts, I thought, because why would I take this on?  Well, I

13    will tell you what.  When I got the call, the reason that I'm

14    here is twofold:  I listened to the story, and I applied my

15    common sense.  And based on it, that's why I decided to come in

16    at the end and try this case.  And I have tried cases in the

17    copyright area, and they have been publicized, and they have

18    been involving movies, movie stars, et cetera, but this one,

19    this one intrigued me, and I will tell you why.

20         Number one, as I looked at it, I was taken aback in terms

21    of my experience in copyright law because I know what lawyers

22    do.  Now, when I've handled a movie or a song, we are talking

23    about the artist.  And that artist, if they're writing the book

24    or the screenplay or they are coming up with the song, they are

25    pouring everything into it.  And what goes on, you don't write

a song by looking at another one as a starting point and then changing it.  You don't write a book by looking at another one and then changing the words.

The people that are the artists, they start and they build it, and it comes to them through inspiration.  This is done.

In my profession, in law school, we start with, whether it is me and copying and pasting from other briefs in the law, or a transactional lawyer.

Now, you heard some fancy words about a frame.  That's not what goes on.  The transactional lawyer, in order to be efficient, in order to do his or her job, does not reinvent the wheel.  All they do is they take the wheel and they modify it to set the circumstances.  So if someone comes up to you with a new idea or something new that didn't exist, in my lifetime -- believe it or not when I started -- now I'm really dating myself.  We obviously didn't have an iPhone.  When I started you didn't even have cell phones.  You had to go to a pay booth.

But the point of it is is that what intrigued me is I know as a basic fact in my profession, and all those lawyers admitted it, no matter what, whether it's Joel Wright, whether it's Ms. Mao or Cardall, what they are doing is they've got to look at a lot of things, and they're copying; they're bringing in provisions.

So as a starting point I'm not saying necessarily that you

can't copyright a legal form, but it baffles me, and that's what attracted me to this case, that we would be at this point whereby a legal form drafted by the lawyers at Orrick Herrington is now being used against these guys, my clients, with their heart of hearts caring about one thing.

And that's what happens in a trial.  I saw it on the stand.  Sometimes at moments you can feel it.  Sometimes in a movie the music, you feel it.  One thing that came out despite all of this, and I will get to this, is that they sincerely care about the schools.  This isn't about trying to get a head start in a race.  This is about trying to help the charter schools.

I'm a product of public schools.  I believe in the public school system.  I think these charter schools are wonderful.  I wish I had the opportunity to go to Dr. Aleman's school.

Now, let's look at this.  Clearly in terms of when you get into the evidence, and I will point you exactly for your deliberations early on, and I will show you in a second why they don't get to the big dollars that they want, why they don't even get close.  Now, my view in this case, despite what they're saying and talking about Mr. Park, I believe at the end of the day, who's going to get hurt?  I believe not only my clients, but the charter schools.

I believe that when you use common sense and you look at the evidence -- and I'm just going to tell you, I don't like

1   bullies.  Okay?  I don't.  But when you look at the evidence

2   and you start with where Mr. Im wanted to try and do something

3   for his school, and yes, he took it on his own in terms of

4   trying and get his friend involved, they did meet with

5   Mr. Mireles.  I find Mr. Mireles, again, to be a visionary.  I

6   could feel that this is someone that is a great teacher and

7   educator.  But what did he do?  He was trying to find the

8   solution, and everything came quickly.

9       The point that you never heard on the stand from

10  Mr. Mireles is why did he turn down my clients?  We don't know.

11  But ask yourself, why would someone who is running a school

12  turn down an opportunity where they could save approximately

13  $50,000, which is a teacher's salary.  Think about it.

14      As we move forward, and again, just exhibits as I tried to

15  lay it out before, I'm going to go very quickly.  Look at the

16  time frame.  As soon as my clients are up and they had funded

17  Gloria Aleman's school, right, the Arts in Action, what

18  happens?  Helgeson calls.  What happened after that?  A Singer

19  letter.  What happens after that?  Despite all that, looking at

20  what they're doing, getting copies from other clients in terms

21  of what's going on, checking the public records, okay,

22  ultimately the assignment -- and I'm going to get into that.

23  That's where I'm going to stop.

24      I'm going to show you the assignment, the copyright

25  registration, lo and behold a lawsuit, financing right of way

 1    to compete against these guys, all of these things, even the

 2    Ganti e-mail that I talked about.  All of this about what?  All

 3    about copyright infringement?  Common sense, common sense as to

 4    what's going on.

 5         Now, I think that there are a lot of concepts that have

 6    been read to you.  I'm only going to go over a few of them

 7    because obviously you saw how long it took Judge Wu to read

 8    them.  Just highlighting, and again, it's going to be in the

 9    room, but I want to start somewhere that's very important.

10    When you go to the definition of copyright, what's not

11    copyrightable, okay, are facts, ideas, procedures, processes,

12    methods of operation, concepts, principles or discoveries

13    cannot be copyrighted.

14         Think of it.  If the first person who had an idea with

15    respect to a particular idea in terms of how to express love or

16    something like that or the word "love," if I had this feeling

17    and I called it "love," I couldn't copyright that.  I couldn't

18    stop anyone from using that or putting that word in a book.

19         With respect to this case, it's important, CSC, keep in

20    mind, the copyright holder, you go through the instructions, is

21    the author, just like the songwriter or the person that writes

22    the books.  And the author here, using the legal arena, is the

23    Orrick firm.  So if you're not the author, how do you get the

24    ability to enforce a copyright?  You have to have an

25    assignment.  And that's Exhibit 533, which I will get to in a

1    second.

2        You're going to see in the instructions burden of proof.

3    Plaintiff has the burden of proof, not the defense.  Those

4    scales I told you about, they've got to move them, not us.  If

5    they fail to, as you weigh the evidence, then and only then at

6    that point you know they haven't proven the case, and this case

7    is over for them.

8        Well, the key thing, and I just want to go over, you're

9    going to hear they must -- they have the burden of proof, and

10   you will see it's on page 7, that they have the burden of

11   proving by a preponderance of the evidence to move that scale

12   that CSC is the owner of a valid copyright, and that my

13   clients, all of them, directly or indirectly copied original

14   expression from the copyrighted work.

15       Now, the plaintiff, as I told you and you will see about

16   assignees, they didn't write it, so the only way they get it is

17   through this assignment agreement.  Okay.  And what you have to

18   keep in mind is that first prong, the very first question you

19   are going to be asked is whether or not they have a valid

20   copyright.

21       I'm going to go through the evidence because guess what?

22   It's not one copyright; it's two of them, two.  And I'm going

23   to give you each exhibit that you must take a hard look at.  So

24   let me move forward, if I could.  And again, all the

25   instructions are there.  I'm not trying to pass over one over

```
  1   another one.  I'm not trying to favor it, but I am directing

  2   you.  They've got the burden.  Do they hold the copyright?

  3       So let's take a look at exactly what went on.  And as you

  4   know, back in 2007, Exhibit 526, that was the initial draft

  5   memo from Dora Mao.  We start this story in 2007, Ms. Mao.

  6   Okay?  What happens is that with respect to it -- with respect

  7   to that, after she's done it, you've heard here and we went

  8   through it, through the testimony -- I want to just put up -- I

  9   am going to show it, but 533, please, the assignment, so I can

 10   orient everyone.

 11       This says -- you go to 533.  I spent a lot of time with

 12   Mr. Cardall on this.  I took him through this document.  I

 13   found -- and I don't want to get into it, but in my experience,

 14   when he started telling this jury that "Well, I signed it, but

 15   I don't know what it really means," it went to his management

 16   committee the first time they ever did it, but let's go to

 17   the -- I believe it's page 8.  Let me just double-check.  It's

 18   a schedule, Schedule 1.

 19       Okay.  Blow that up.

 20       This is a starting point, ladies and gentlemen.  So what

 21   this is saying -- let's start -- let's start to see if they

 22   have a valid copyright.  We now have in the assignment blank

 23   forms, blank forms of the receivable purchase agreement, and

 24   other documents are part of this assignment.  Blank, not the

 25   Avance, not anything else.  Keep that in mind.  Okay?  So the
```

```
 1    importance is, okay, we see that we have that.
 2          I'm going to point you to the next one.
 3          Take that down, please.
 4          So the processes you saw, assignment, I'm telling you that
 5    Orrick is sending over.  And I will show you a graphic in a
 6    minute.  I'm going to summarize.  Orrick is now transferring
 7    its rights from a blank form from 2013 to the plaintiff.
 8          Let's go now to Exhibit 174 in evidence, 174.
 9          This was not touched on.  Okay.  Now, when you look at
10    174, we questioned on it, and I just want you to -- I'm going
11    to go very quickly.  I'm going to circle it and tell you what's
12    in there.  Okay?
13          With respect to number 1, take a look at it, and you'll
14    see the word "form" is on there.  Okay?  This is the blank form
15    document.  Let's go on.
16          Go down.  Take that off, Paul.
17          When you go further down you, go down to 3a, you will see
18    this is 2013.  2013 is when the document is prepared.  Just
19    keep that in mind.  Okay?
20          Let's go to the next page, please.
21          Okay.  A lot of testimony, and this is the important part.
22    Look at here.  I want you to look at this 6a.  I'm going to
23    explain it for a second, so bear with me.  What is that about?
24    Okay.  Let's stop.  They said they started preparing the
25    agreements in 2007 and went through many versions.  They said
```

1    they spent half a million dollars.  What they should have had

2    in that box is some version -- prior version of the blank

3    forms, something.

4         It doesn't mention the Avance.  I'm going to show you why

5    in a minute.  And why is that important?  Let me talk about

6    what this is about.  When you get a copyright, if I have one --

7    and I will use Star Wars.  If it's the first Star Wars, I'm

8    going to pretend, the movie, and I copyright it, I have like

9    Luke Skywalker and Darth Vader.  When I do the second movie, it

10   is a derivative work, just like each of you are derivatives of

11   your parents.  In other words, the same characters are carried

12   forward, and so it's derivative.  It's based on it.

13        Now, why is this important?  Because the copyright office

14   wants to know, "Well, what is your form based on?"  Because if

15   it is, then it wants to take a look and see, "Well, are you

16   entitled to copyright protection or not?"  By that being blank,

17   they've told the world and the copyright office, "This is the

18   original."  So they can't go back up.  In other words, if the

19   second Star Wars movie was the only thing copyrighted, you

20   couldn't stop anyone from infringing on the prior one.  So the

21   right start in terms of where is it that you have the copyright

22   set?  This is in 2013.

23        Let me move forward on this.  What's going to be

24   fascinating --

25        Let's take that off.

 1      You look at, and it's in the instruction, Exhibit 177.

 2  Okay?  177, that's what you get back from the copyright office.

 3  And to follow it through, if you look at the document, what it

 4  is, you can see the title of the work "Charter School Capital

 5  Form Receivables Agreement," year of completion 2013.  The

 6  author was Orrick.  Now Charter School Capital has the

 7  document.  This is -- and who signed it?  Good old Ms. Giovine.

 8  You see that?

 9      So let me show you.  Copyright number one that I'm talking

10  about, we see goes from Orrick to CSC, blank forms into the

11  copyright office.  They hold a copyright.  That's what it looks

12  like.  They hold a copyright.

13      But guess what happened in the courtroom and that

14  Mr. Sauer didn't show you.  Let's pick up Exhibit 564.

15      There's a second copyright registration.  I want you to

16  look at it closely.  This is where their house of cards comes

17  crumbling down, okay, in number one.  How do they describe in

18  the second copyright?  Not blank forms.  Look at what they call

19  it.  They say that their copyright is "Charter School Capital,

20  Inc. 2012 Financing Documents."

21      Now, it doesn't mention Avance.  It doesn't mention

22  anything.  When you look at Exhibit 174, you will see the

23  document behind it.  Look what they did in terms of a magician,

24  they did it very quick.  Let me explain the rest of it, and I

25  will explain.

```
 1          Take that off, please, Paul.

 2          Look at 3a, 2012.  So that's why 2013 has nothing to do

 3   with it.  And we don't know what this applies to, and I will

 4   show you why.

 5          Let's go to the next page.

 6          Lo and behold, 6a, nothing.  They're not saying this is

 7   based on that 2007.  It's not based on anything.  Okay.  So

 8   it's as if we have two filings:  One for something that we

 9   don't know what it is.  There is no evidence before you as to

10   what those finance agreements are.  No one testified, no one

11   showed you what they were.  Okay?  And guess what?  Compare

12   Exhibit 174 -- please mark this down.  Compare 174 to 564.

13          174 shows you the blank forms.  564 is two pages and shows

14   you nothing.  Why?  Because they're trying to somehow say,

15   "Well, it's the Avance agreement."  Oh, really?  Show me where

16   you have a copyright to the receivables purchase agreement for

17   Avance.  Let's follow this through, 178.

18          Let's go to that.  178.  Now, the copyright office, what

19   do they do?  They've got a registration in what?  The same

20   thing.  Charter school, do you see it?  2012 financing

21   documents.  This is a one-page document.  There's nothing

22   attached to it.  There's nothing attached to the registration.

23   Okay.  So they have nothing, and I'm going to illustrate this

24   to you in just one second.

25          So let's put up, if we could, the demonstrative, your last
```

1    one.  I will work through it.  Here's what's going on in this

2    courtroom, and this is where I'm taking on the task.  Okay.

3    This is where I begin to get angry.  The Orrick law firm, as

4    you can see and as I pointed out, prepares the blank form.  It

5    goes to the assignment.  You see in the center of the page, it

6    goes to CSC.  CSC takes the blank form that we saw, takes it to

7    the copyright office, and they have a copyright.

8         Now, guess what.  Throughout this trial -- take a look.

9    Do you see any -- was there ever a comparison of all of these

10   similarities of a blank form?  Did they ever mention the blank

11   form agreements?  They didn't.  And you know why?  Let's take a

12   look at what they did show.  523.

13        Let's put up 523 for a second to complete this.  Zero in

14   on the date so we can see exactly what's going on.

15        Every comparison, this is the Avance agreement.  This is

16   why I have been telling you this isn't a trade secrets case.

17   They thought it was.  This is dated 2012.  Guess what.  No

18   copyright for this document, and they spent days back and

19   forth, and I was waiting.  I have been waiting for them to tie

20   this up.

21        And in the close, Mr. Sauer pointed to nothing.  Why is

22   that?  It's because they know they don't have one.  But let's

23   jam these guys into a courtroom, slough over the pieces of

24   paper, then get to, "Oh, well, here is some substantial

25   similarity.  Throw some big numbers on the board, and let's see

```
 1   if we can bamboozle these people off of the street into
 2   believing that we have a legitimate copyright claim."
 3        They've got nothing.  Okay.
 4        Put up the demonstrative again, please, Paul, the last
 5   one, last piece.
 6        This is what they spent the whole trial doing.  Look at
 7   this.  A non-copyrighted form against the Kirton McConkie, all
 8   the versions they put up.  Why do that?  Why bring us in this
 9   courtroom for that?  I believed -- and again, I hadn't been
10   with this case from 2014.  I thought for certain the global
11   firm of Latham & Watkins would walk into this courtroom and do
12   something that's so basic based on everything I have done in
13   the area of copyright.
14        When you do a movie, if someone brings you a book, you do
15   a check.  It's called chain of title, just like buying a piece
16   of property.  You want to know that you have the rights that
17   someone's giving you.  And you can go through -- remember, I --
18        You can take that down, Paul.
19        You can go through the assignment.  And remember, that
20   was -- I couldn't believe it.  The first time we were doing it,
21   Charles Cardall -- well, I have my visions, I am dating myself,
22   Gilligan's Island, and I thought Mr. Thurston Howell, III was
23   telling us, "Oh, yes, yes, yes, well, of course we signed it,
24   but then we have another agreement that takes it back.  And in
25   the event that we get sued, they will indemnify us."
```

1     Are you kidding me?  Did you hear what he said?  He has

2     this client, it's on his Web page, it's the most important.

3     And he told you he was happy.  He's charging what was it?  $950

4     an hour to come down here to deliver the testimony.  Okay?

5     Think about that.  Think about it because Mr. Sauer will not be

6     able to show any ownership of the Avance agreement.  He will

7     have to say, "Oh, it's in the financing agreements."

8         The case comes crumbling down at the beginning.  So your

9     deliberations, while I would hope you go through all the

10    evidence, look hard at what I'm telling you because it isn't

11    about what's been going on as far as, oh, putting up fancy

12    little slides, and, "Well, he was inconsistent here, and he was

13    inconsistent there."

14        I'm in this profession.  Let me explain how it works, and

15    I will tell you, I tell every witness, lawyers ask questions

16    that are unfair.  And why is that?  Because they ask questions

17    that require the precision of a surgeon's scalpel, and the

18    brain doesn't work that way.  I can ask you, "Did you have

19    lunch today?  And what did you have?" and you can answer.  But

20    lawyers ask you, "Did you have lunch last week?  And what did

21    you have?"  You really don't know.  You really don't know, so

22    then we are trying to work with refreshed recollections and

23    things.

24        What's going on here?  What was going on here, I can tell

25    you, and that's where the moments I saw it come through.

1    Mr. Im did want to do everything right.  That's why they did --

2    this case is not about taking their form, slapping the name

3    "Charter School Capital" on it and running around and signing

4    up a bunch of clients and saying, "We're the same thing.  We're

5    just cheaper."  That's not what the case is about.

6         So when you listen to all this stuff, you know, that's

7    where I begin to get, like I said, I get a little emotional

8    because it upsets me.  Okay?  I find it offensive.  I'm part of

9    this profession, and I don't get it.  This isn't a game.  We

10   are talking about real people sitting over there, right over

11   there.

12        And we have people come in here, real people, people that

13   are doing good things, and they are trying to help them.  You

14   heard the difference.  They are from the bottom up, grass

15   roots.  You heard Dr. Aleman.  She couldn't pick out Stuart

16   Ellis out of a line-up, never heard from him, you know.

17        Mr. Im and Mr. Park, they care about what the heck they're

18   doing.  That's what I care about.  I care about people that are

19   trying to do the right thing.  Are we perfect?  No, there's no

20   one perfect -- well, except Judge Wu, but there's no one

21   perfect.

22        So let me touch on a few things, and that gets the

23   credibility and everything.  I'm not going to go too hard on it

24   because this really is a document case.  It's not about who

25   entered the intersection first.  Well, I think -- and we go

```
1    through all this to try and see who is telling the truth.  It's
2    in the documents.  They have the ability -- you can't tell me
3    that the team of lawyers at Latham & Watkins, coupled with
4    Orrick -- I don't know what you have when you have those two
5    global firms, maybe an intergalactic firm representing them.
6         I pointed to M.A.T.T.I.E. because I did it in the
7    beginning because I knew they were using this as the
8    cornerstone, and it's there.  I gave you on M.A.T.T.I.E. in
9    1001 and 1002, I said, "Wow, this form is so great," but except
10   you were seeing the school was given 300,000, the judgment.
11   That's what they are after, a piece of paper in this courtroom.
12        What is it?  I couldn't keep track of all the slides,
13   5 million, 4 million.  You get that piece of paper, it's
14   enforced by the courts.  Now you are able to go to bank
15   accounts and get money.  The first thing we do in court is get
16   that piece of paper.  That piece of paper that they got on
17   300,000, what was it worth?  25,000.
18        I thought it was interesting we never heard from
19   Mr. Helgeson.  I would have loved to have Mr. Helgeson come in
20   here and tell us he's calling Paul Im at Avance about that
21   "Gee, I heard you funded another school."  Can you imagine?  He
22   was trying to step on an ant.  What's up with that?  So I
23   just -- as I look at this, you know, what's going on?  Millions
24   of dollars.  I had hoped maybe that they would maybe reel it in
25   a little bit.  But you know what?  That's not how it works
```

```
 1    here.  "We are going big.  We are going real big, and we are
 2    going to take these guys down."
 3         Mr. Im, what can I say?  How the heck does Mr. Im and
 4    Mr. Park with 2 other employees compete with a company with 50?
 5    And despite this lawsuit and despite not using their form for
 6    two years, they're still -- pardon my language -- kicking ass
 7    and taking no prisoners.  Okay?  These guys are out there doing
 8    something good for the community, not just here in California,
 9    but in other states.
10         And I thought that it was very interesting to me when
11    Mr. Park took the stand.  They talk about, you know, what was
12    going on.  These guys were trying all the stuff, true sale, got
13    to spend half a million because "Hey, we get that stamp of
14    approval, you know, from Standard & Poor.  We are going to have
15    the banks lining up.  We're going to have hundreds of millions
16    of dollars."
17         These guys, Mr. Park -- and he is shy.  This guy has put
18    his money where his mouth is.  Okay.  The reason that they work
19    is that he's put his money up there.  You heard Mr. Sauer try
20    to talk about it like it's something bad.  He didn't have to do
21    this.  He didn't have to bring in other people that want to do
22    something for the schools, but he did.  And I thought it was
23    just so telling when I listened to him, and I could see it.
24         There are moments -- it doesn't happen all the time, but
25    there are moments where I could see the truth.  It's funny, you
```

```
 1   can feel it.  I can touch it.  I can't explain it, but there
 2   are times when things ring true in the courtroom and I saw it
 3   ring true.  Okay?
 4       Chas Cardall, I just want to touch on it a bit.  I don't
 5   know what to say.  We started at the same place, but I do think
 6   that he lost his way.  I just don't get how a lawyer like that
 7   could tell a jury "Of course I'm getting paid to be here."  I
 8   would think he would say, "Of course I'm here.  I stand behind
 9   my client.  I'm not being paid."  It shocked me he said that.
10   Or how about his comment that after all this stuff on true
11   sale, and he says, "Bankruptcy judges do not care much about
12   the law."
13       Now, that's a lawyer saying that.  What he should have
14   said was that "All judges are human, and they may see things
15   differently, but we believe in the end of the day that this
16   will hold up," but that's not what happened.  He had no
17   knowledge about the number of bankruptcies.  When I took him
18   through it, as well as Mr. Ellis, "Well, you've got a sample of
19   500 charter schools, and I say 3 to 5, that seems high to me.
20   It seems to me all this nonsense about true sale and all this
21   effort you guys did, is it really important at the end of the
22   day?"
23       He said, "Well, one loan could be half of what you have."
24   Well, why would you do that, then?  Why would you take that
25   risk?  By the way, Mr. Park can take that risk.  If he decides
```

```
 1   to, he will take it, if he believes that's where he wants to
 2   put the money.  They have constraints.  That's why this morning
 3   I know I put that, I wanted to show you East West Bank.  They
 4   don't have that deal.  The only deal that they have with their
 5   banker is "Hey, we need more flexibility to compete with these
 6   guys."  How are they beating them?  Efficiency, price,
 7   responsiveness, caring, not some phone call, not trying to push
 8   someone into a long-term deal.
 9        I just can't tell you -- I asked some questions, and it
10   strikes me.  Remember I said about what lawyers do, and I
11   talked about the plagiarism program that is now in effect in
12   schools.  There is no law firm in the country, in the world,
13   that takes agreements and runs it through some program to
14   figure out if it's copyrighted.  There is not a lawyer
15   practicing that is going to be able to say, "Oh, yeah, that's
16   copyrighted."
17        The reality is -- the reality is in our profession -- and
18   Mr. Cardall admitted it.  He was so proud as a fourth-year
19   lawyer, he drafted a tax certificate, and then all of a sudden
20   he saw it out there.  It was coming back to him.  Never sued
21   them.  And you know what?  I have never heard of such a story
22   that some big law firm drafted something and is then out there
23   suing people for using their product.  Maybe it's happened, but
24   I'm unaware of it.
25        As we move -- as we move forward, again, Ms. Mao, as far
```

1   as her testimony, I think she was -- she explained what she

2   did.  She was, I would use the term legally, scribner.  She was

3   the one who was doing the writing.  And you saw Thomas Mitchell

4   come in, and yes, he's at 920 an hour, but he came up with --

5   he is the true sale maven.  Again, I thought my colleague's

6   cross-examination of Ms. Giovine -- Ms. Giovine, the general

7   counsel, very telling to me.  She was really pushing back hard.

8   But guess what?  She signed -- when you take a look at the

9   copyright registrations, she signed them.

10       She is a lawyer.  She had to understand that it's got to

11  be complete so that we know what the heck the registration's

12  going to.  She never uttered a word.  She couldn't explain.

13  She admitted she couldn't explain why she didn't put in

14  anything else as to what these agreements were based on.  "Why

15  wouldn't the blank form agreement be based on the Avance?  You

16  could have done that."  She didn't touch anything.

17       They stayed away from it because they knew that's the

18  hole.  That's the vacuum.  That's where they don't have the

19  evidence.  Okay?  And they are hoping that maybe I would miss

20  it and then you would.  My hopes were even if I was asleep that

21  you would see right through this.

22       Now, Joel Wright, I want to talk about Joel Wright a

23  little bit, try to put this in context for you.  I view Joel

24  Wright, I thought he was a lawyer trying to do the right thing.

25  The evidence is crystal clear that when Mr. Im sent the

1    LegalZoom form to him, he asked him to take a look at it.  If

2    he was going to have something drafted by scratch, he could

3    have simply said to him, "We have this form.  You're the

4    charter financing expert.  Give us an agreement that does X or

5    Y."  That's what a transactional lawyer does, "What do you want

6    to do?  Do you want to transfer a copyright?  You want to buy a

7    home?  What do you need one for?  Do you want to buy a car or a

8    skateboard?  You tell me.  You want stock?"  That's what they

9    do.

10        What I was trying to do, if you see it, and that's what I

11   put up before, is that lo and behold, he's got these guys as if

12   it's a sin to say, "I don't want to pay a lawyer that's almost

13   a thousand dollars an hour."  I don't know who can afford that,

14   "That we want to try and to keep this lean on the start-up."

15        He, on his own, through not the Avance form that they had,

16   but on his own, through the Kutak Rock e-mail that you saw

17   that's in evidence, he on his own prepared an agreement.

18   Mr. Park noticed, "Gee, it seems a lot like it."  But I will

19   tell you what you didn't hear in the evidence.  You didn't hear

20   anything about a side-by-side comparison.

21        And I will show you, and I did it intentionally.  They

22   only showed you a few pages.  I tried to show you when I put up

23   the agreements, you see the yellow and what's going on.  They

24   are really selective in the way they try to make this appear,

25   but at the end of the day, it wasn't as if he did one.

1      And you saw what happened, basically.  It's all about are

2   these guys trying to infringe on a copyright?  They didn't know

3   anything about copyright.  They weren't -- they thought that

4   this was about unfair comp, that the documents were not

5   confidential, and that's what this case they were trying to

6   push through the evidence.

7      And so they went with the form.  Now, common sense -- I

8   want any of you when you go back there, someone tell a story

9   because I don't have one, that "Oh, my God, I rented a car and

10  I looked at that form.  It wasn't the car.  It was the form."

11  "Oh, my God.  I got a credit card.  It was the stuff I got in

12  the credit card packet," or "I leased a vacation home" or

13  anything.

14     Forms are part of our life.  You know why?  Unfortunately,

15  a handshake doesn't work.  And in the old days before the

16  lawyers really got involved and the people at the time were

17  simpler and cared more -- and people are still that way.  You

18  don't need all these damn forms.  I believe with Gloria Aleman,

19  you don't need a form.  You could simply go to her and say,

20  "Gloria I will give you the money.  And when the receivables

21  come in, will you give them to us?"  And I believe she would

22  have shook their hand and said "yes."  You don't need a damn

23  form.  Who does anything for a form?  I don't get it.  Okay.

24     So keep that in mind.  Mr. Wright -- you know, what is it?

25  They made a big issue, Mr. Wright.  The only thing that has

```
 1   gone on here he is not in this courtroom.  My clients were

 2   upset in terms of the fact that they never wanted to tangle

 3   with these guys.  Why?  Because they were worried.  They were

 4   worried about what's been going on.  They're bleeding

 5   attorney's fees on this, money that could go to the schools.

 6   And so they had hoped that the financing expert would protect

 7   them.  But the truth is, yes, there is no action pending

 8   against Mr. Wright.  There is no money that has exchanged

 9   hands.  There is no deal in place.  There's nothing.

10       My guys -- all this happened when I got involved because I

11   told them that "Life is too short.  Let's move on and deal with

12   the bully."  Mr. Wright is a good guy, so I believe it.  So all

13   this stuff that "Mr. Wright did this, and you are vicariously

14   liable or you contributed," are you kidding me?  All Mr. Wright

15   is guilty of is trying to help his client.  That's why you saw

16   in his testimony, he gave him a checklist, and you saw him.

17   He's baffled at the concept that these forms and these

18   agreements, that a loan document -- his words, a loan

19   document -- "Oh, that's copyrightable."

20       I mean -- and so I get it because why?  Because lawyers

21   copy.  The lawyers, the transactional lawyers copy.  The

22   artists, the musicians, they don't.  When you're a musician --

23   the firm we represented -- anyway, some people very well known,

24   and sometimes they will do -- well, is a song an inspiration?

25   So what you will do, a lot of these people that write the
```

```
 1    songs, they do try to stay away from certain things.  They
 2    don't want to be exposed.  What you want to do is go in the
 3    studio alone and have the work come out.  What you don't want
 4    to have happen is it seeps in and then it goes into your work.
 5    So those are the things that go on.
 6         But they don't start, the musicians don't start, the
 7    writers don't start, "Let me have that book and I will use it
 8    as a template, and then I will start changing it around."  It
 9    doesn't work that way.  But the legal profession, that's why I
10    say we're not novel.  We're not.
11         I want to touch on -- and again, I think you have seen it.
12    Mr. Mireles said nothing negative about my clients, nothing.
13    Talked about -- and you know what?  He is beholden for some
14    reason to Charter School Capital.  I'm hopeful at some point he
15    will see the light, but he's beholden.
16         Gloria Aleman is the only person that came in that had an
17    experience with both.  She told you about her experience with
18    CSC, and she told you about her experience with my clients.
19    There is no reason to doubt her.  There is no reason to doubt
20    her.  Why would she switch?  You heard Mr. Sauer, "Oh, once you
21    get the form, you get the form.  You just keep on doing it."
22         Really?  Why did she switch?  She told you why.  She was
23    being pressured into a long-term deal.  It wasn't good for her
24    students and her school, a school that you know what?  I'm
25    proud of her because she's bringing the arts to an area that
```

1    the arts are always kicked to the curb.  She's giving students

2    an opportunity to do things that they otherwise wouldn't be

3    able to do, and my clients are helping her.

4        So let me shift to --

5        I just want to put up, Paul, for a second, let's just do

6    the demonstrative on 523.  Do you have the one with the

7    highlighting that I used at trial?  523.

8        And just touching on this for one second.  Now, 523,

9    again, you don't have to get there, it's the Avance agreement.

10   Okay?  But I had to go through everything.  And when you go in

11   the jury room and you look at it, what I showed you -- let's

12   just turn to page 3.

13       It's the one with the highlighting, Paul.  It's the boxes.

14   I think it's the third version, if you can pull it up.  If not,

15   then we will go on.  I don't want to waste time.

16       There it is.  I went through this with you.  What I was

17   trying to demonstrate to each of you is the following:  That

18   the material in the boxes is what they claim is original if

19   they had a valid copyright.  I feel I shouldn't waste time on

20   this, but if they feel they had a valid copyright, we would be

21   talking about the box that's original, sort of like an original

22   poem or something.

23       But as you can see, what we did is when we highlighted

24   that, we were showing the material that was not being used.

25   The point being is that it's very deceptive if someone reads:

```
 1    "While walking down the beach on a blustery day with the wind
 2    in my hair, I fell," and what they will do, if I use "I fell,"
 3    they will highlight it and say, "Ah-ha, he took 'I fell.'"
 4    Well, we took "I fell," but we didn't take the whole thing.  It
 5    is very deceiving the way this copying has been shown here.
 6        Anyway, go through -- when you go through, I think a very
 7    important agreement is the one that I also showed.  I think
 8    it's 4 -- let me make sure.  494, I believe.  Let me double-
 9    check.
10        It's 493, if you get this far.  I don't believe you will,
11    but this is the declaration of none other than Chas or Charles
12    Cardall, and this is what he submits.  And what I will ask you
13    to do is -- again, he is comparing everything from day one in
14    this case.  It's always about the Avance agreement, 2012, with
15    no copyright, but the first version that has the highlighting,
16    you will see, it's a little blurry, but the first version of it
17    where the highlighting shows what was taken, go through the
18    document on your own because -- and it appears that it starts
19    at page 11, and you will see so many pages that don't have
20    highlighting or anything.  Ask yourself, "Oh, is this 50
21    percent?"  Did you hear I asked --
22        You can take it down, Paul.
23        I asked Mr. Cardall, "Could you estimate for me?"
24        "Would you like a word count?  Do you want me to sit here
25    and count the words?"
```

1     "No, I'm asking for an estimate.  Can you take a look at

2  the highlighting and tell me if it's more than 50 percent?"

3     It's not.  It's not substantially similar.  Because why?

4  They copied -- my head is going to explode on this one in terms

5  of what's going on and what they're trying to sell here.

6     Okay.  So I don't believe even if somehow you would have

7  to bypass and give them a valid copyright, then you would have

8  to say, "Well, okay.  We are giving them the copying," and then

9  on top of it, now they want 4 to $5 million.  They want to say

10  that the effort of these guys, Mr. Im, and everything they've

11  done is worth zero?  If you recall on this particular issue,

12  and they put it up for just a split second, but 734.

13     734, that's the only document, if you get that far, I hope

14  to God you don't, but that's the document that shows, okay,

15  during the period of time -- and remember what happened.  The

16  lawsuit gets filed on May 1.  I will put aside where they run

17  out to the bank to try to compete with my guys, but after the

18  lawsuit gets filed, my guys do two things:  They are getting

19  litigation counsel, Mr. Burtt, who's back there, and they're

20  scrambling to get someone else because "Oh, my God, they say we

21  copied.  Let's just get a new form.  This is crazy."

22     And within a month, starting in May, they had a new firm

23  on board, and they prepared the factoring agreement that's in

24  evidence.  So they stopped using the infringing form.  And you

25  would have thought that these guys would have stopped there and

said, "You know what," if they had a legitimate claim, "you are
not using the form.  That's fine."  But they didn't want to
stop there.  They want to say, "Oh, it doesn't matter that you
swapped everyone out.  We're still entitled to it because
without our form, these clients wouldn't have stayed with you.
Without our form, you wouldn't be making money today."  Are you
kidding me?  Does anyone buy that stuff?  I don't know.  I find
it insulting.  Do they think you're going to buy that?  I know
you're not, but that's what's going on in the courtroom.

       Now, Mr. Park and Mr. Im on damages, Mr. Im was quite
clear.  Mr. Im said, "I don't think they're entitled to a
nickel."

       Mr. Park, I thought -- I will give him credit.  He was
generous because he said, "Well, I guess if we use the form at
all, maybe it's 1 percent," and so he came up with whatever it
is off of an $11,000 number.  Now I'm going to tell you, I
don't believe they're entitled to a penny.  I don't think you
get there, and I don't believe they're entitled to anything.
Why?  Because when you read the form, they've got to show
there's a linkage.  It's not direct.  I'm going to touch on
this.  They have to show indirectly that there's a linkage
between making the money and the use of a form.

       And I will give you an example.  I remember when my kids
were young and they started -- because I deal in the area, and
I tried to explain it.  A friend comes over, and I find out

```
 1   they illegally download a song.  And I sit these little guys

 2   down.  This is what I do.  Who do you like at the time?  And

 3   I'm dating myself, but I'm trying to think of which artist.

 4   I'll pick Michael Jackson, just hypothetically.  So they

 5   downloaded a Michael Jackson song.

 6       So I tried to explain to them that Michael and the people

 7   that work for them are being deprived of some money.  The song

 8   is there.  You get an opportunity, if you pay your money, to

 9   own it and use it and listen to it and enjoy it, but not paying

10   for and illegally downloading, you are taking money directly

11   out of his pocket.

12       I see that.  Copyright law provides for that.  Guess what?

13   The form is not for sale, so it's not the same as a Michael

14   Jackson song.  What's the form about?  It's indirect.  And what

15   the law tells you in the instructions that you have is you

16   can't speculate.  You have to show that somehow that form got

17   the money, that that's where the money comes from.

18       We heard it.  It doesn't come from there.  It comes from

19   the pricing.  My guys are able to compete on price, and they

20   try to gussy it up because they don't have to pay out of the

21   box the 4.25- plus whatever, plus 150,000, plus throw another

22   800,000 in the bank that you can't touch.

23       They are people of means that are putting money in this

24   fund.  Their hopes at one time, you heard the testimony, a low

25   double digit to them, "You are going to get your return.  You
```

 1     are going to make money."  Nowadays it's single digit.

 2          But I will tell you what you didn't hear.  You didn't hear

 3     anyone take the stand and say, "I'm pulling my money.  I'm

 4     pulling my money because I don't believe in these guys."  You

 5     didn't see any testimony about -- of anyone take the stand,

 6     they talk about investors.  Did you see any investor take the

 7     stand?  They could have called them.  "A single investor for my

 8     client that said 'Wow, the reason I'm putting my money in,

 9     those are reckless.  Whoo, they're smart.  True Sale Doctrine,

10     I was at the dinner table and I was telling my buddies, 'True

11     Sale Doctrine,' and I couldn't believe it.'"

12          Come on.  No investor cared about that.  They care about

13     the subscription agreement.  They care about Mr. Park and

14     Mr. Im and his money, but Mr. Park put his money where his

15     mouth is.  And if you see someone that's putting up that kind

16     of capital, you go with them.  Compare what he did to

17     Mr. Ellis, $250,000, to the number you know from Mr. Park.

18     That's the difference at the core of this thing.

19          Now, so my belief is no damages.  I'm just covering it

20     because I've got to.  You get to this thing, and I told you

21     about it and it's in there.  You heard about this thing.  It's

22     merger, merger of affirmative defense.  I hope you don't get

23     there.  It's technical.  In my opening I talked about it, what

24     is that?

25          So here's the way it works.  Someone has -- and I did in

1      my opening, and I will give you an example.  Someone has an

2      idea that they want to figure out a location on the globe, so

3      someone comes up with longitude and latitude, and those

4      coordinates, you can find where someone is at.  If I was to run

5      out to protect it by filing for copyright registration, it

6      wouldn't work because the idea of finding a place and the

7      expression longitude and latitude, there is really only one way

8      to do it, so no one could hold that.

9          So why I bring it up, and it's all technical, and I will

10     move on, God forbid you looked at the agreement and you saw,

11     "Oh, they're copied," and that's what I talked to Mr. Cardall

12     about.  There were a couple sentences that they claim was

13     original:  One was about an audit; one was about six, seven

14     words.  And they said, "How else would you write this?"

15         And he said, "Well, I would put a clause on the end and

16     hereto, wherefore, whereby, so so and so."  So based on that,

17     he said, "Oh, there's many ways to express it."  And I say

18     again, where is the common sense?  I don't know what happened

19     to this guy.  Are you kidding me?  No way.  So I only throw

20     that out there, somehow through all of this you find a little

21     fragment that "Oh, they might have copied it."

22         Anyway, I just -- I'm tired, ladies and gentlemen.  I can

23     tell you, it's been a long trial.  I -- I don't know why this

24     always happens to me at the end.  But I do believe these guys,

25     Mr. Im and Mr. Park, did nothing wrong in my heart of hearts.

1    I believe in my heart that all of this, I think you can see

2    through it.  I believe that when you go back there -- and

3    that's why I put it up, no fancy slides.  But when you go back

4    there, they don't own the copyright.  They don't own the

5    copyright to the very agreement that they lied that they

6    thought was stolen, that they wanted to pin the tail on Mr. Im

7    and Mr. Park, that those are the guys that did something wrong.

8         And, you know, life's imperfect.  Sometimes things go off

9    the rails.  My sense in this courtroom in this trial is that

10   it's not, that I think all the evidence has come in.  I hope

11   that I've done my level best in terms of trying to present that

12   evidence to you.  And I do hope, you know, that you will go

13   back there, do your job, look at the instructions, look at the

14   evidence, but take that common sense all the way into that jury

15   room.  Look at what I told you about the registrations.

16        And whatever Mr. Sauer does, I challenge him.  Point to an

17   agreement that says that the 2012 financing agreements have the

18   Avance document attached to it.  He won't be able to do it.

19   He's going to point you in the other directions because he gets

20   the last say.  But guess what?  Unfortunately for him, he

21   failed.  CSC failed.  They failed miserably.

22        So I'm going to stop.  You have been very patient.  I

23   appreciate how you've listened to me.

24        I want to at this point thank you, my colleagues.  I

25   couldn't have done it without Mr. Torkamani; Mr. Burtt in back;

```
 1   and Mr. Rodney, who is running all the graphics for me;
 2   Mr. Abram.
 3        And my two clients, can you stand up one last time so the
 4   jury can see you?
 5        And on behalf of my clients, I do want to thank you.
 6   Thank you for your service.  Thank you for looking at the
 7   evidence.  Thank you for taking the time to be ripped out of
 8   your lives to come into this courtroom.  I know when you came
 9   down here you were "Oh, I don't want to be here," but this is
10   real.  I'm confident you will do the right thing:  Return a
11   verdict they didn't make their burden, defense verdict for us,
12   they don't get beyond the first question.  Let them know you
13   can't do this.  Thank you, ladies and gentlemen of the jury.
14             THE COURT:  All right.  For the plaintiff for
15   closing argument?
16             MR. R. SAUER:  I do have 10 minutes and 21 seconds.
17        I get the last 10 minutes and 20 seconds.  I do, like
18   Mr. Sauer, want to thank you for all the attention, all your
19   patience with all these complicated terms.  And again, you have
20   seen Mr. Ellis and my colleagues sitting there.  I wouldn't be
21   able to do this without them.
22        A trial is an incredibly long and tedious exercise in
23   terms of all the work.  Let's get to it, ten minutes.
24        Mr. Sauer started -- Mr. Sauer, Mr. Sauer, very confusing.
25   Mr. Sauer started with "common sense."  He started his opening,
```

```
 1    and he started his closing.  So let's think about common sense.
 2        Mr. Sauer showed you a couple of exhibits, and we will
 3    talk about them in a second.  Showed you no testimony.  He is
 4    calling our slides bells and whistles.  Oh, they may look
 5    flashy, but it's just a PowerPoint.  But the reason I showed
 6    them to you is because I actually have witness testimony that
 7    supports my case, documents that support my client's case.
 8    That's why I'm showing you PowerPoints.  I'm not just talking
 9    because there actually is evidence.
10        It's easy for Mr. Sauer to stand up here and argue and wax
11    eloquently about what he thinks and what he believes and what
12    he's done in 30 years of practice.  I have been practicing 36.
13    I used to be 6-4, I'm getting squished.  But what Mr. Sauer
14    does and what he tells you isn't evidence.  The evidence that
15    you heard was from Mr. Cardall, Ms. Mao, Mr. Mitchell.
16        I showed you them, I showed you some of their testimony.
17    We can bring it up, but it would be too cumbersome, so I won't
18    do it again.  Mr. Sauer says lawyers don't do anything
19    originally.  They do all the time.  They don't always copyright
20    it.  They don't always think about it that way, but in this
21    case, it's original.  They told you they started with nothing.
22    Yeah, lots of times people have -- you'll come with a piece of
23    precedent, you make some changes, and you move it back and
24    forth.
25        This is not that case.  They looked hard -- Mr. Ellis
```

1   looked hard.  The Orrick firm looked hard.  These are people

2   that practice all the time.  It was not out there.  This was

3   something new and novel.  They presented not little, they

4   presented no evidence, zero evidence, other than Mr. Sauer

5   saying it wasn't new and novel.  They didn't show a receivables

6   purchase agreement that applied to charter schools that showed

7   you government receivables.  Why?  Because there was nothing

8   out there.  They created this.

9        Ms. Mao, and I told you this before, she said, "Well, we

10  started something with a template."  She called it the frame.

11  It's basically -- she said -- I think the words she used,

12  "Well, there was the signature block and all this other stuff,

13  but all this in between, we had to fill in.  We had to write."

14  So it's easy to say, "Well, there's nothing original.  Lawyers

15  don't do anything original," except that's not evidence.

16       What the evidence is, what Mr. Cardall, Ms. Mao and what

17  Mr. Mitchell told you and what the judge read to you in the

18  instruction and what you have in front of you, that, in fact,

19  the receivables purchase agreement can be copyrighted.  It's in

20  your instructions.  I'm not arguing.  You can read it.

21       The heart of the argument was no copyright.  You really

22  think we spent the last week and a half when Charter School

23  Capital doesn't have a copyright?  There's no testimony by

24  anybody that the Avance agreement wasn't covered by the

25  assignment.  In fact, Mr. Orrick, Ms. Mao and Mr. Mitchell

1   talked extensively about the Avance agreement in connection

2   with what Mr. Cardall said was assigned.  It's easy to say it,

3   but there is the evidence.

4       Orrick testified at length.  There's no testimony that the

5   Avance agreement wasn't covered by the assignment, none, zero.

6   And, in fact, Mr. Sauer stood up here, and I'm sure he believes

7   it, that there is no testimony, nothing that shows that the CSC

8   agreement is covered by the registration.  No evidence except

9   for the testimony of Carrie Giovine.  She specifically

10  testified, when she was shown the registration statement,

11  Exhibit 564, and was asked what it covered, she said it was the

12  Avance agreement.

13      So there's no evidence other than the evidence.  It's easy

14  to say no evidence and not show anything.  Ms. Giovine, read

15  her testimony.

16      Now, it was sort of interesting because Mr. Sauer got

17  offended when he thought I was attacking Mr. Park, and I

18  wasn't.  What I was pointing out was Mr. Sauer and camp spent

19  most of this trial talking about Wall Street, big banks, the

20  fat cats.  I don't know how many times I heard "fat cats" in

21  the first five days.  I started counting them up over the

22  weekend and stopped at about 21 because I just got tired of it.

23  And so the only point there was this is -- CAM is a start-up,

24  but it's not a start-up by just a couple of guys in a garage,

25  like Mr. Ellis and his partners; started up by guys with a lot

 1  of money.

 2      And so, again, there's nothing wrong with being a fat cat.

 3  There is nothing wrong in America of earning money and

 4  developing things and, quite frankly, making yourself like

 5  Mr. Park.  Congratulations to him, but you don't sit there in

 6  jeans and T-shirts for the last seven days trying to look like

 7  you don't have millions and sit there and call Mr. Ellis, who

 8  put in $250,000 -- and he told you why, because that's all he

 9  had.

10      They didn't pay themselves.  They couldn't afford to pay

11  themselves, the founders, for two and a half years, and they

12  all worked second jobs.  Fat cats, I don't think so.

13      Congratulations, Mr. Park, you have done well.  I think

14  that's terrific, but that wasn't the point.

15      Mr. Sauer talked about lunch, and oh, people make mistakes

16  and one thing or another.  This is a court of law.  We are not

17  talking about lunch, "What did you have for breakfast last

18  week?"  Mr. Im signed a bunch of declarations that he took the

19  time to read and under the penalty of perjury.  They were

20  wrong; they were false.  He testified in this courtroom from

21  one day to the other "Yes," "No," "Yes," "No," "Yes," "No."

22      In fact, on the same day on several occasions, I showed

23  you on some of those slides, he changed his testimony.  If I

24  asked the question, he said one thing.  If his lawyer asked the

25  question, he said another thing.  That isn't "What did you have

1    for lunch last week?"  This is a court of law.  You swear to
2    tell the truth, the whole truth and nothing but the truth, and
3    that's what you do.
4        The truth doesn't change.  If you're not sure, every
5    lawyer knows their client has the right to say, "I don't
6    remember," "I'm not sure."  But when you say "yes," you better
7    mean "yes," and when you say "no," you better mean "no."  And
8    when you say "yes" today and "no" tomorrow, that means you
9    weren't telling the truth on one of those occasions and you are
10   not to be credited.  That's the law.
11       Mr. Helgeson, they wanted to hear Mr. Helgeson.  He called
12   them up.  How terrible that he called them up the first month
13   after CAM started business and saying, "I want to make sure you
14   are not doing anything inappropriate, you are not using our
15   stuff."  What a horrible thing for him to do.
16       Well, guess what.  He was right.  Mr. Im took 233 pages of
17   Charter School Capital and Avance, the receivables purchase
18   agreement, all this stuff that shows them how to run their
19   competing business, he took it.  Mr. Helgeson was concerned
20   because they thought he might do it.  He did it.  He admitted
21   he did it, finally.  He didn't in his deposition, I showed you
22   that, but he had to admit it now because Mr. Park ratted him
23   out.  Unbelievable.
24       We will talk about the linkage to the profits.  You have
25   seen the linkage.  We talked about the runway.  We have talked

1    about the fact that they want you to ignore the fact that they

2    had a 16-month head start without having to spend a nickel on

3    the agreement.  They acknowledge they competed on price, but

4    they ignore the fact that they were able to compete on price

5    because they had to bear none of the start-up costs, none of

6    them.  They didn't have to go out and have an agreement

7    created.

8         In fact, Mr. Park testified yesterday, "If I was told it

9    was going to cost me a hundred thousand dollars," his words

10   were, "I would have run away.  I would have" -- his words,

11   "Ervin, Cohen & Jessup said we can do a comprehensive

12   agreement, but it's going to be expensive.  No, thank you.

13   Give me the off-the-shelf stuff."  Of course they were cheaper.

14   Of course they were cheaper.

15        If we could bring up slides AIA 13 to 28.

16        Again, the focus was on "Let's look at some of these

17   selected provisions and see what pieces were copied."  That's

18   what they are talking about.  They want you to focus on what

19   wasn't copied and what was.  Will you just flip through.  We

20   will show you.  Take a look.  When you take out all the words

21   that were copied -- keep going -- you take out the copied

22   words, this is what you're left with.

23        That's enough.  Go to the next agreement.  I think it's

24   Holly slides 29 to 42.

25        This is on the shuffling agreement.  This is what you're

 1    left with.

 2          Make it quick.  I'm running out of time.

 3          There you go.  This is what you get.  Is that it?

 4          There you go.  Quick, quick, quick.  There you go.  That's

 5    enough.  They get the picture.

 6          You don't focus on the Avance agreements, "Well, they

 7    didn't copy this provision or this provision."  They copied

 8    what they needed.  And when you take it out, they've got

 9    nothing left.  That's what's left.  And let's talk about --

10          Pull the building.  I think it's 43 and 45.

11          And just build this up.  This is the foundation -- the

12    foundation of CAM is the receivables purchase agreement.  They

13    used it to say they were the same as Charter School Capital and

14    they competed on price, and then they were allowed to -- they

15    got customers, they got profits, investors, returns, all the

16    way, all the way up.  What they want you to do is just --

17          Not yet.

18          They pick the green one and say, "Oh, no, stop here.  We

19    only earned 1.194- while we were using your form.  So we will

20    just use that as the green one.  So you shouldn't give them

21    anything up above there."  Remember, I talked about the

22    building.  You take the foundation out, what happens to the

23    building?

24          That's what happens.  Clever, bells and whistles, but

25    that's the evidence.  It's not argument; that's the evidence.

```
 1          Ladies and gentlemen, 4.1- to 5.2-, I showed you the

 2    numbers.  Deliberate.  We appreciate your patience.  We thank

 3    you for your time.

 4          Thank you, Your Honor.

 5               THE COURT:  All right.  Let me ask, do we have a

 6    bailiff?

 7               THE COURTROOM DEPUTY:  Yes, Your Honor.

 8               THE COURT:  Let me have the clerk swear in the

 9    bailiff.

10               THE COURTROOM DEPUTY:  Please state your full name.

11               THE BAILIFF:  Steve McGrath, M-c-G-r-a-t-h.

12               THE COURTROOM DEPUTY:  Please raise your right hand.

13               STEVE McGRATH, THE BAILIFF, WAS SWORN

14               THE BAILIFF:  I do.

15               THE COURT:  All right.  Let me have the jury follow

16    the clerk and the bailiff.

17          (Out of the presence of the jury.)

18               THE COURT:  I'm looking at, I guess, the parties'

19    verdict form.

20               MR. MOON:  Your Honor, factually we reached an

21    agreement on most of them.  I think we just have one issue for

22    you to resolve.

23               THE COURT:  I thought this was the one -- this is

24    not -- is this something different?  Let me see the one you

25    guys are agreeing on now.
```

1          MR. MOON:  Oh, sure.  So we have reached agreement

2    on all the items except number 1 and 2, Your Honor.

3          THE COURT:  Okay.

4          MR. MOON:  I think all defendants are asking for is

5    to divide up 1 and 2 into 1A and 1B.  This is the two

6    copyrights, Your Honor.  And these are just because CSC owned

7    the work that was being infringed, and defendants are asking to

8    break this out.

9          THE COURT:  This is extremely strange.  I feel this

10   incredible déjà vu that I have done this before.  I am not

11   blaming either side for that.  I can see these two copies, and

12   this was the same issue.

13         MR. G. SAUER:  In another case?

14         THE COURT:  In another case, but it can't be

15   because, obviously, this is fairly specific, but it is this

16   incredible déjà vu, but let me just take a quick look.

17       (Pause in proceedings.)

18         THE COURT:  Let me ask counsel.  I am kind of

19   partial more toward plaintiff's version than the defense,

20   because, again, you have made the argument.

21         MR. MOON:  Right.

22         THE COURT:  And so I don't see why we need to divide

23   the thing up.  The question is do they have a copyright?  And

24   was the copyright violated?  So --

25         MR. G. SAUER:  I mean, Your Honor, on this one for

```
 1    me, then I know if they go through it, then I know -- the
 2    verdict form also is somewhat a form of guidance, then I know
 3    they looked at both.  I know I made the argument, but I know
 4    they've looked at both.  And there is no -- I don't have to
 5    worry about a reversal on appeal or anything.  I know they
 6    considered exactly what I'm doing.
 7              THE COURT:  I thought I was the only one worried
 8    about reversals on appeal.
 9              MR. G. SAUER:  Your record is intact.
10              THE COURT:  No, trust me, mine's not.  I went all
11    the way up to the Supreme Court and got reversed.  I have been
12    reversed by professionals.
13              MR. G. SAUER:  All I'm saying, Your Honor, I think
14    it helps for the deliberation, is my view.  That's all.  I'm
15    not trying -- I'm the one that came back.  I worked on this
16    weekend.  I got the forms essentially --
17              THE COURT:  Here you only have the -- is there
18    somewhere else that you have the other one?
19              MR. G. SAUER:  Yes, there's 1 and 2.  And
20    Mr. Park -- it's questions 1 and 2.  He would turn it into 1A
21    and 1B so we know they are looking at the 2012, which is a
22    blank form.
23              MR. MOON:  Your Honor, the plaintiff's position, it
24    is a simple question like we ask in most of these verdict
25    forms:  Does Charter School Capital own a copyright?  Was it
```

```
 1   infringed?
 2            THE COURT:  I agree, do they own a copyright?  Was
 3   it infringed?  So that being said, does that mean I don't have
 4   to look at the rest of it because both sides agree?
 5            MR. MOON:  The parties agree on the rest of the
 6   form, Your Honor.
 7            MR. G. SAUER:  Can we check --
 8            THE COURT:  You guys can check.
 9            MR. G. SAUER:  -- before it goes in there?
10            MR. MOON:  It's the same one I showed you.
11            MR. G. SAUER:  I know.
12            THE COURT:  I will return these to you, and you can
13   provide them to the jury.  Also, you guys have already gone
14   through the exhibits already?
15            THE COURTROOM DEPUTY:  No.
16            THE COURT:  You have to go through the exhibits now
17   with my clerk.  Also, it's not too late to settle.
18                 (Proceedings concluded at 4:21 p.m.)
19                          ---oOo---
20
21
22
23
24
25
```

1                    **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6            I, CAROL JEAN ZURBORG, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date:  August 23, 2016

17

18

19                            /s/ CAROL JEAN ZURBORG

20            _____
              CAROL JEAN ZURBORG, CSR NO. 7921, CCRR
21                 Federal Official Court Reporter

22

23

24

25

**$**

**$11,000** [1] - 63:16
**$20** [1] - 16:14
**$250,000** [2] - 65:17, 72:8
**$5.283** [1] - 31:18
**$50,000** [1] - 39:13
**$706,000** [1] - 32:6
**$950** [1] - 49:3

**'**

**'Gee** [1] - 26:3
**'Hey** [1] - 9:16
**'True** [1] - 65:10
**'Wow** [1] - 65:8

**/**

**/s** [1] - 80:19

**1**

**1** [9] - 1:9, 42:18, 43:13, 62:16, 63:15, 77:2, 77:5, 78:19, 78:20
**1-** [1] - 32:17
**1.194** [4] - 29:12, 30:17, 31:8, 75:19
**10** [2] - 68:16, 68:17
**100** [1] - 16:1
**1001** [1] - 51:9
**1002** [1] - 51:9
**105** [1] - 29:19
**106** [1] - 29:19
**107** [1] - 29:19
**11** [2] - 13:13, 61:19
**1150** [1] - 2:12
**13** [1] - 74:15
**150,000** [1] - 64:21
**15th** [1] - 28:15
**16** [5] - 31:18, 31:19, 31:22, 32:13
**16-month** [2] - 31:22, 74:2
**17** [1] - 13:12
**174** [7] - 43:8, 43:10, 45:22, 46:12, 46:13
**177** [2] - 45:1, 45:2
**178** [2] - 46:17, 46:18
**18** [1] - 17:2
**1801** [1] - 2:12
**19** [3] - 7:23, 32:11, 32:19
**19,000** [1] - 32:3
**19-6** [1] - 32:16
**1A** [2] - 77:5, 78:20
**1B** [2] - 77:5, 78:21

**2**

**2** [6] - 28:21, 52:4, 77:2, 77:5, 78:19, 78:20
**20** [1] - 68:17
**2007** [4] - 42:4, 42:5, 43:25, 46:7
**2012** [7] - 45:20, 46:2, 46:20, 47:17, 61:14, 67:17, 78:21
**2013** [10] - 7:4, 25:6, 31:19, 32:4, 43:7, 43:18, 44:22, 45:5, 46:2
**2014** [5] - 29:13, 30:22, 31:9, 31:19, 48:10
**2015** [3] - 29:23, 31:10, 31:12
**2016** [3] - 1:14, 3:1, 80:16
**207** [1] - 2:15
**208-1909** [1] - 2:16
**21** [2] - 68:16, 71:22
**213** [2] - 1:25, 2:8
**218** [1] - 29:19
**22** [2] - 1:14, 3:1
**23** [1] - 80:16
**233** [1] - 73:16
**24** [1] - 11:22
**24th** [1] - 11:24
**25** [1] - 23:16
**25,000** [1] - 51:17
**28** [3] - 33:1, 74:15, 80:9
**28th** [1] - 11:25
**29** [3] - 11:25, 25:6, 74:24
**2:05** [2] - 1:14, 3:2
**2:14-cv-03385-GHW( PLAx** [1] - 1:7
**2:53** [1] - 34:16
**2:59** [1] - 34:16

**3**

**3** [6] - 7:7, 12:2, 24:9, 29:22, 53:19, 60:12
**3.5** [1] - 32:23
**3.578** [1] - 32:16
**30** [3] - 34:5, 34:25, 69:12
**300** [1] - 16:15
**300,000** [2] - 51:10, 51:17
**30th** [2] - 12:1, 26:20
**310** [1] - 2:13
**312** [1] - 1:24
**317** [1] - 2:15

**355** [1] - 2:6
**36** [1] - 69:12
**3a** [2] - 43:17, 46:2

**4**

**4** [4] - 32:17, 51:13, 61:8, 62:9
**4-4** [1] - 31:25
**4-7** [1] - 32:11
**4.1** [1] - 76:1
**4.25** [1] - 64:21
**4.4** [2] - 31:23, 34:4
**4.7** [1] - 32:23
**414** [1] - 1:24
**42** [1] - 74:24
**43** [1] - 75:10
**45** [1] - 75:10
**465** [1] - 31:10
**476** [1] - 14:2
**480** [1] - 14:2
**485** [1] - 14:2
**485-1234** [1] - 2:7
**486** [1] - 14:2
**493** [1] - 61:10
**494** [1] - 61:8
**4:21** [1] - 79:18

**5**

**5** [4] - 32:5, 51:13, 53:19, 62:9
**5-2** [1] - 31:25
**5-2-** [1] - 32:12
**5.2** [3] - 31:7, 34:4, 76:1
**5.2-** [1] - 32:9
**5.8** [2] - 29:25, 30:8
**50** [3] - 52:4, 61:20, 62:2
**50.0000001** [1] - 19:13
**500** [1] - 53:19
**500,000** [2] - 32:16, 32:23
**510** [1] - 2:16
**515,000** [2] - 32:12, 32:24
**523** [5] - 47:12, 47:13, 60:6, 60:7, 60:8
**526** [1] - 42:4
**533** [3] - 40:25, 42:9, 42:11
**564** [3] - 45:14, 46:12, 46:13, 71:11

**6**

**6-4** [1] - 69:13
**60** [1] - 15:15
**61.3** [2] - 30:21, 30:23

**6a** [2] - 43:22, 46:6

**7**

**7** [5] - 1:13, 8:8, 15:14, 16:14, 41:10
**702** [1] - 11:10
**712-8100** [1] - 2:13
**72** [1] - 32:25
**734** [4] - 29:12, 29:19, 62:12, 62:13
**753** [1] - 80:9
**759** [1] - 29:23
**7921** [2] - 1:23, 80:20

**8**

**8** [2] - 27:7, 42:17
**80** [1] - 1:9
**800,000** [1] - 64:22
**833,000** [1] - 31:9
**894-3539** [1] - 1:25

**9**

**900** [1] - 17:1
**900,000** [1] - 31:9
**90012** [1] - 1:24
**90067** [1] - 2:12
**90071** [1] - 2:7
**920** [1] - 55:4
**94607** [1] - 2:16
**966,000** [1] - 30:2
**98-yardline** [1] - 28:20

**A**

**aback** [1] - 36:20
**ability** [3] - 11:1, 40:24, 51:2
**able** [9] - 14:17, 49:6, 51:14, 54:15, 60:3, 64:19, 67:18, 68:21, 74:4
**above-entitled** [1] - 80:12
**Abram** [1] - 68:2
**absolutely** [1] - 11:18
**Academia** [1] - 11:13
**access** [1] - 24:22
**according** [1] - 11:15
**accounts** [1] - 51:15
**acknowledge** [1] - 74:3
**acknowledged** [1] - 10:10
**act** [1] - 22:21
**action** [1] - 58:7
**Action** [1] - 39:17
**activity** [2] - 11:2,

22:16
**add** [1] - 31:11
**addition** [1] - 22:6
**admit** [2] - 12:9, 73:22
**admits** [2] - 12:8, 13:6
**admitted** [5] - 9:9, 37:21, 54:18, 55:13, 73:20
**advantage** [6] - 27:16, 28:10, 28:16, 28:22, 31:1
**advise** [1] - 26:3
**advised** [1] - 26:5
**advisors** [6] - 5:22, 6:2, 6:7, 14:5, 22:19, 27:24
**afford** [5] - 8:8, 8:10, 28:4, 56:13, 72:10
**afternoon** [1] - 34:23
**AFTERNOON** [1] - 1:13
**ago** [2] - 14:4, 36:11
**agree** [3] - 79:2, 79:4, 79:5
**agreeing** [1] - 76:25
**agreement** [83] - 4:4, 4:7, 4:8, 5:3, 5:11, 5:23, 5:24, 6:2, 6:6, 6:13, 7:6, 7:18, 8:1, 8:18, 9:5, 9:22, 10:11, 11:17, 12:1, 12:3, 12:4, 13:2, 13:10, 13:12, 13:14, 13:18, 14:9, 14:12, 14:20, 15:8, 15:15, 15:16, 17:4, 19:22, 20:10, 20:11, 21:2, 21:4, 21:5, 21:11, 21:14, 21:16, 25:3, 25:17, 27:21, 27:25, 30:14, 41:17, 42:23, 46:15, 46:16, 47:15, 48:24, 49:6, 55:15, 56:4, 56:17, 60:9, 61:7, 61:14, 62:23, 65:13, 66:10, 67:5, 67:17, 70:6, 70:19, 70:24, 71:1, 71:5, 71:8, 71:12, 73:18, 74:3, 74:6, 74:12, 74:23, 74:25, 75:12, 76:21, 77:1
**Agreement** [1] - 45:5
**agreement/their** [1] - 21:13
**agreements** [23] - 10:4, 10:5, 10:13, 12:20, 14:1, 16:4, 18:2, 18:16, 18:17, 21:12, 21:18, 25:24,

28:3, 43:25, 46:10, 47:11, 49:7, 54:13, 55:14, 56:23, 58:18, 67:17, 75:6
**Ah-ha** [1] - 61:3
**AIA** [2] - 8:15, 74:15
**al** [1] - 1:8
**Aleman** [6] - 14:22, 15:23, 23:17, 50:15, 57:18, 59:16
**aleman** [1] - 14:24
**Aleman's** [4] - 8:14, 8:16, 38:15, 39:17
**allocate** [1] - 32:1
**allocated** [1] - 32:21
**allow** [1] - 6:24
**allowed** [4] - 6:25, 14:12, 14:13, 75:14
**almost** [1] - 56:12
**alone** [2] - 5:10, 59:3
**amazing** [1] - 27:2
**America** [1] - 72:3
**AMIR** [1] - 2:11
**amount** [1] - 28:21
**analysis** [2] - 6:16, 6:20
**ANGELES** [4] - 1:15, 1:24, 3:1, 80:3
**Angeles** [2] - 2:7, 2:12
**angry** [1] - 47:3
**answer** [8] - 5:7, 17:20, 20:21, 23:12, 23:13, 26:8, 26:12, 49:19
**answers** [1] - 26:14
**ant** [1] - 51:22
**anyway** [5] - 7:11, 27:13, 58:23, 61:6, 66:22
**appeal** [2] - 78:5, 78:8
**appear** [1] - 56:24
**appearance** [1] - 24:7
**APPEARANCES** [1] - 2:1
**apples** [1] - 14:19
**applied** [2] - 36:14, 70:6
**applies** [1] - 46:3
**appreciate** [2] - 67:23, 76:2
**approach** [1] - 11:11
**appropriate** [2] - 31:15, 32:10
**approval** [1] - 52:14
**area** [5] - 3:25, 36:17, 48:13, 59:25, 63:24
**arena** [1] - 40:22
**argue** [1] - 69:10
**arguing** [1] - 70:20
**argument** [7] - 10:23,

34:20, 68:15, 70:21, 75:25, 77:20, 78:3
**arguments** [2] - 3:5
**arithmetic** [1] - 29:20
**arranged** [1] - 19:25
**artist** [3] - 36:23, 64:3
**artists** [2] - 37:4, 58:22
**arts** [2] - 59:25, 60:1
**Arts** [1] - 39:17
**aside** [1] - 62:16
**asleep** [1] - 55:20
**ass** [1] - 52:6
**Asset** [2] - 21:22, 21:24
**ASSET** [1] - 1:8
**assigned** [3] - 20:10, 20:15, 71:2
**assignee** [2] - 20:14, 20:15
**assignees** [1] - 41:16
**assignment** [15] - 16:6, 20:9, 20:12, 39:22, 39:24, 40:25, 41:17, 42:9, 42:22, 42:24, 43:4, 47:5, 48:19, 70:25, 71:5
**attached** [4] - 18:2, 46:22, 67:18
**attaches** [2] - 17:25, 20:2
**attacking** [1] - 71:17
**attention** [2] - 35:8, 68:18
**attorney** [1] - 10:24
**Attorney** [1] - 2:15
**attorney's** [1] - 58:5
**attorneys** [1] - 6:6
**Attorneys** [2] - 2:6, 2:11
**attracted** [1] - 38:2
**audit** [1] - 66:13
**auditing** [1] - 6:3
**August** [1] - 80:16
**AUGUST** [2] - 1:14, 3:1
**author** [7] - 19:18, 20:6, 20:8, 40:21, 40:22, 40:23, 45:6
**authors** [1] - 19:19
**authorship** [2] - 19:10, 20:5
**auto** [1] - 28:13
**automatically** [2] - 17:25, 20:2
**available** [1] - 3:23
**Avance** [20] - 20:11, 42:25, 44:4, 45:21, 46:15, 46:17, 47:15, 49:6, 51:20, 55:15,

56:15, 60:9, 61:14, 67:18, 70:24, 71:1, 71:5, 71:12, 73:17, 75:6
**Avenue** [1] - 2:6
**award** [1] - 34:4
**aware** [1] - 4:3

# B

**bad** [3] - 17:2, 23:7, 52:20
**baffled** [1] - 58:17
**baffles** [1] - 38:1
**bailiff** [3] - 76:6, 76:9, 76:16
**BAILIFF** [3] - 76:11, 76:13, 76:14
**bamboozle** [1] - 48:1
**Bank** [1] - 54:3
**bank** [3] - 51:14, 62:17, 64:22
**banker** [1] - 54:5
**bankruptcies** [1] - 53:17
**Bankruptcy** [1] - 53:11
**banks** [3] - 31:4, 52:15, 71:19
**based** [13] - 10:9, 25:8, 29:14, 32:2, 36:15, 44:12, 44:14, 46:7, 48:12, 55:14, 55:15, 66:16
**basic** [3] - 29:20, 37:20, 48:12
**basing** [1] - 25:13
**basis** [1] - 27:14
**beach** [1] - 61:1
**bear** [2] - 43:23, 74:5
**beating** [1] - 54:6
**become** [1] - 17:17
**beforehand** [1] - 12:12
**begin** [2] - 47:3, 50:7
**beginning** [3] - 18:19, 49:8, 51:7
**behalf** [1] - 68:5
**behind** [2] - 45:23, 53:8
**behold** [3] - 39:25, 46:6, 56:11
**beholden** [2] - 59:13, 59:15
**belief** [1] - 65:19
**believes** [3] - 54:1, 69:11, 71:6
**bells** [1] - 35:6, 69:4, 75:24
**benefit** [3] - 6:20,

22:12, 31:16
**benefited** [2] - 22:3, 22:23
**benefiting** [2] - 28:23
**best** [1] - 67:11
**better** [5] - 8:22, 9:5, 10:12, 73:6, 73:7
**between** [9] - 9:18, 16:6, 29:17, 29:22, 31:25, 34:4, 63:22, 70:13
**beyond** [2] - 32:14, 68:12
**big** [8] - 32:4, 38:19, 47:25, 52:1, 54:22, 57:25, 71:19
**biggest** [2] - 18:23, 18:24
**billed** [1] - 5:10
**billion** [1] - 16:14
**bit** [7] - 16:13, 18:10, 18:24, 19:12, 51:25, 53:4, 55:23
**blame** [5] - 10:20, 10:21, 11:5, 18:24, 18:25
**blaming** [1] - 77:11
**blank** [16] - 42:22, 42:23, 42:24, 43:7, 43:14, 44:2, 44:16, 45:10, 45:18, 46:13, 47:4, 47:6, 47:10, 55:15, 78:22
**bleeding** [1] - 58:4
**block** [1] - 70:12
**blocked** [1] - 15:17
**blow** [1] - 42:19
**blurry** [1] - 61:16
**blustery** [1] - 61:1
**board** [4] - 6:5, 14:25, 47:25, 62:23
**book** [7] - 18:19, 33:15, 36:23, 37:2, 40:18, 48:14, 59:7
**books** [4] - 14:13, 16:24, 20:17, 40:22
**booth** [1] - 37:18
**bored** [1] - 29:9
**boss** [2] - 7:9, 7:10
**bottom** [1] - 50:14
**bought** [1] - 33:16
**box** [3] - 44:2, 60:21, 64:21
**boxes** [2] - 60:13, 60:18
**brain** [1] - 49:18
**bread** [1] - 23:18
**break** [3] - 3:7, 27:7, 77:8
**breakdown** [1] - 32:10

**breakfast** [1] - 72:17
**breaks** [1] - 32:15
**briefly** [1] - 23:2
**briefs** [1] - 37:7
**bring** [8] - 12:15, 15:9, 34:17, 48:8, 52:21, 66:9, 69:17, 74:15
**bringing** [2] - 37:23, 59:25
**brings** [1] - 48:14
**brought** [2] - 29:2, 29:3
**buddies** [1] - 65:10
**build** [10] - 3:9, 8:20, 18:21, 24:10, 24:23, 27:21, 28:7, 33:19, 37:4, 75:11
**building** [5] - 29:4, 29:5, 75:10, 75:22, 75:23
**built** [2] - 13:17, 19:20
**bullies** [1] - 39:1
**bully** [1] - 58:12
**bunch** [6] - 7:7, 8:25, 14:2, 16:11, 50:4, 72:18
**burden** [10] - 19:8, 19:9, 19:10, 20:22, 41:2, 41:3, 41:9, 41:10, 42:2, 68:11
**burdens** [1] - 29:15
**Burtt** [2] - 62:19, 67:25
**BURTT** [1] - 2:14
**business** [25] - 3:9, 6:14, 6:15, 6:19, 7:12, 7:22, 8:20, 13:17, 14:12, 17:17, 18:21, 24:10, 27:10, 27:22, 28:7, 29:4, 29:14, 32:20, 33:5, 33:19, 33:21, 73:13, 73:19
**buy** [4] - 56:6, 56:7, 63:7, 63:8
**buying** [1] - 48:15
**BY** [6] - 2:4, 2:5, 2:5, 2:10, 2:11, 2:14
**bypass** [1] - 62:7

# C

**California** [6] - 2:7, 2:12, 2:16, 6:10, 52:8, 80:8
**CALIFORNIA** [5] - 1:2, 1:15, 1:24, 3:1, 80:4
**CAM** [38] - 3:13, 4:6, 6:18, 7:4, 8:12, 11:23, 13:17, 14:1,

14:5, 14:16, 15:8, 15:9, 15:20, 15:21, 15:25, 16:3, 18:16, 22:24, 26:16, 27:14, 27:17, 27:18, 28:7, 29:12, 29:17, 31:12, 32:2, 32:4, 32:5, 32:11, 32:20, 33:5, 33:6, 33:20, 71:23, 73:13, 75:12
**CAM's** [8] - 3:10, 4:12, 4:19, 10:23, 17:4, 23:22, 26:12, 31:6
**camp** [1] - 71:18
**cannot** [1] - 40:13
**capital** [1] - 65:16
**Capital** [50] - 5:8, 6:5, 6:9, 6:19, 6:24, 7:3, 7:6, 7:9, 7:13, 9:7, 9:11, 9:18, 10:13, 11:9, 11:20, 12:22, 13:11, 13:17, 14:18, 16:7, 16:20, 16:25, 17:3, 17:20, 19:9, 20:15, 20:21, 21:3, 21:22, 22:18, 24:11, 25:20, 26:6, 27:15, 28:12, 29:14, 30:4, 30:14, 30:24, 31:13, 31:16, 45:4, 45:6, 45:19, 50:3, 59:14, 70:23, 73:17, 75:13, 78:25
**CAPITAL** [1] - 1:5
**Capital's** [13] - 8:3, 9:23, 10:18, 11:22, 15:18, 17:6, 21:6, 21:10, 25:24, 28:2, 30:18, 31:24, 33:9
**capitalized** [1] - 31:1
**car** [3] - 56:7, 57:9, 57:10
**card** [2] - 57:11, 57:12
**Cardall** [16] - 3:14, 3:22, 4:19, 4:21, 20:16, 37:22, 42:12, 48:21, 53:4, 54:18, 61:12, 61:23, 66:11, 69:15, 70:16, 71:2
**Cardall's** [1] - 19:24
**cards** [1] - 45:16
**care** [11] - 13:21, 15:1, 15:3, 15:10, 38:10, 50:17, 50:18, 53:11, 65:12, 65:13
**cared** [9] - 13:18, 15:5, 15:6, 15:14, 15:20, 15:21, 16:2, 57:17, 65:12
**cares** [1] - 29:11

**caring** [2] - 38:5, 54:7
**CAROL** [4] - 1:23, 80:6, 80:19, 80:20
**Carrie** [1] - 71:9
**carried** [1] - 44:11
**Case** [1] - 1:7
**case** [24] - 19:7, 33:24, 35:10, 36:9, 36:16, 38:2, 38:20, 40:19, 41:6, 47:16, 48:10, 49:8, 50:2, 50:5, 50:24, 57:5, 61:14, 69:7, 69:21, 69:25, 77:13, 77:14
**cases** [1] - 36:16
**cat** [1] - 72:2
**cats** [5] - 5:16, 16:12, 71:20, 72:12
**CCRR** [2] - 1:23, 80:20
**cell** [2] - 18:12, 37:17
**center** [1] - 47:5
**Central** [1] - 80:8
**central** [1] - 14:10
**CENTRAL** [1] - 1:2
**Century** [1] - 2:12
**certain** [2] - 48:10, 59:1
**certificate** [1] - 54:19
**CERTIFICATE** [1] - 80:1
**certify** [1] - 80:8
**cetera** [1] - 36:18
**chain** [1] - 48:15
**challenge** [1] - 67:16
**challenged** [1] - 11:7
**chance** [1] - 24:5
**change** [5] - 17:12, 23:4, 23:9, 23:11, 73:4
**changed** [5] - 9:14, 14:12, 21:7, 25:17, 72:23
**changes** [1] - 69:23
**changing** [3] - 37:2, 37:3, 59:8
**characters** [1] - 44:11
**charging** [1] - 49:3
**Charles** [2] - 48:21, 61:11
**CHARTER** [2] - 1:5, 1:8
**charter** [19] - 4:1, 4:7, 5:21, 5:23, 6:10, 6:21, 8:21, 11:7, 16:22, 17:9, 17:16, 18:17, 38:11, 38:14, 38:23, 46:20, 53:19, 56:4, 70:6
**Charter** [67] - 5:8, 6:4, 6:9, 6:19, 6:23, 7:2,

7:6, 7:9, 7:12, 8:3, 9:7, 9:10, 9:11, 9:18, 9:22, 10:13, 10:18, 11:9, 11:20, 11:22, 12:21, 13:11, 13:17, 14:18, 15:18, 16:6, 16:20, 16:25, 17:3, 17:6, 17:19, 19:9, 20:8, 20:14, 20:20, 21:3, 21:5, 21:10, 21:22, 21:24, 22:18, 24:11, 25:20, 25:24, 26:6, 27:15, 28:1, 28:11, 29:14, 30:4, 30:14, 30:17, 30:24, 31:13, 31:15, 31:24, 33:9, 45:4, 45:6, 45:19, 50:3, 59:14, 70:22, 73:17, 75:13, 78:25
**Chas** [2] - 53:4, 61:11
**cheaper** [7] - 27:19, 27:20, 27:22, 28:18, 50:5, 74:13, 74:14
**check** [6] - 35:16, 42:17, 48:15, 61:9, 79:7, 79:8
**checking** [1] - 39:21
**checklist** [1] - 58:16
**choose** [1] - 24:1
**circle** [1] - 43:11
**circumstances** [1] - 37:13
**claim** [4] - 48:2, 60:18, 63:1, 66:12
**claims** [1] - 33:24
**clause** [1] - 66:15
**clear** [2] - 55:25, 63:11
**clearly** [1] - 38:16
**clerk** [3] - 76:8, 76:16, 79:17
**clever** [1] - 75:24
**client** [6] - 22:24, 49:2, 53:9, 58:15, 65:8, 73:5
**client's** [1] - 69:7
**clients** [15] - 10:23, 38:4, 38:23, 39:10, 39:16, 39:20, 41:13, 50:4, 58:1, 59:12, 59:18, 60:3, 63:5, 68:3, 68:5
**close** [2] - 38:20, 47:21
**closely** [1] - 45:16
**closing** [7] - 3:4, 3:5, 10:20, 34:20, 68:15, 69:1
**Code** [1] - 80:9
**Cohen** [4] - 7:19, 7:25,

26:21, 74:11
**colleague's** [1] - 55:5
**colleagues** [3] - 35:3, 67:24, 68:20
**combination** [1] - 4:24
**comfortable** [1] - 31:5
**coming** [2] - 36:24, 54:20
**comment** [1] - 53:10
**commit** [1] - 22:21
**committed** [1] - 30:6
**committee** [1] - 42:16
**common** [12] - 35:17, 35:18, 35:19, 36:15, 38:24, 40:3, 57:7, 66:18, 67:14, 68:25, 69:1
**communications** [1] - 12:12
**community** [1] - 52:8
**comp** [1] - 57:4
**companies** [2] - 16:15, 17:11
**company** [4] - 8:8, 24:23, 26:20, 52:4
**compare** [4] - 11:10, 46:11, 46:12, 65:16
**compared** [2] - 9:22, 23:8
**comparing** [1] - 61:13
**comparison** [3] - 47:9, 47:15, 56:20
**compete** [10] - 7:12, 14:17, 14:19, 24:10, 40:1, 52:4, 54:5, 62:17, 64:19, 74:4
**competed** [3] - 27:15, 74:3, 75:14
**competing** [1] - 11:23, 73:19
**competitive** [3] - 17:14, 17:17, 26:25
**competitors** [3] - 17:8, 17:13, 26:24
**complete** [2] - 47:13, 55:11
**completion** [1] - 45:5
**complicated** [3] - 29:9, 29:18, 68:19
**comprehensive** [4] - 8:2, 10:11, 15:23, 74:11
**Comprehensive** [1] - 23:17
**concentrate** [1] - 16:18
**concept** [3] - 11:11, 22:5, 58:17
**concepts** [3] - 3:21, 40:5, 40:12

**concerned** [3] - 10:4, 11:23, 73:19
**concluded** [2] - 3:8, 79:18
**conference** [1] - 80:13
**confident** [1] - 68:10
**confidential** [3] - 33:11, 33:16, 57:5
**confidentiality** [2] - 33:12, 33:14
**conformance** [1] - 80:13
**confusing** [1] - 68:24
**congratulations** [2] - 72:5, 72:13
**connection** [2] - 11:13, 71:1
**consequence** [1] - 22:24
**considered** [2] - 24:3, 78:6
**constants** [1] - 23:4
**constraints** [1] - 54:2
**context** [1] - 55:23
**contradiction** [1] - 6:4
**contributed** [2] - 22:17, 58:14
**contributes** [1] - 22:16
**contributory** [2] - 22:14, 22:21
**control** [1] - 11:2
**coordinates** [1] - 66:4
**copied** [20] - 9:14, 10:18, 15:18, 18:18, 20:22, 20:23, 21:2, 21:4, 21:9, 21:10, 41:13, 62:4, 62:21, 66:11, 66:21, 74:17, 74:19, 74:21, 75:7
**copies** [2] - 39:20, 77:11
**copy** [9] - 5:5, 18:18, 18:19, 18:20, 33:18, 58:21, 75:7
**copying** [9] - 16:4, 20:21, 21:13, 21:20, 22:2, 37:7, 37:23, 61:5, 62:8
**copyright** [68] - 10:25, 17:20, 17:21, 17:22, 17:25, 18:2, 19:21, 20:2, 20:7, 20:14, 20:16, 20:21, 22:21, 36:7, 36:17, 36:21, 38:1, 39:24, 40:3, 40:10, 40:17, 40:20, 40:24, 41:12, 41:20, 41:22, 42:2, 42:22, 44:6, 44:8, 44:13,

44:16, 44:17, 44:21, 45:2, 45:9, 45:11, 45:12, 45:15, 45:18, 45:19, 46:16, 46:18, 47:7, 47:18, 48:2, 48:13, 55:9, 56:6, 57:2, 57:3, 60:19, 60:20, 61:15, 62:7, 64:12, 66:5, 67:4, 67:5, 69:19, 70:21, 70:23, 77:23, 77:24, 78:25, 79:2

**copyrightability** [3] - 19:3, 19:10, 33:14

**copyrightable** [2] - 40:11, 58:19

**copyrighted** [8] - 19:16, 40:13, 41:14, 44:19, 48:7, 54:14, 54:16, 70:19

**copyrights** [2] - 20:18, 77:6

**core** [2] - 27:13, 65:18

**cornerstone** [1] - 51:8

**corny** [1] - 35:24

**correct** [2] - 27:17, 80:10

**cost** [1] - 74:9

**costs** [1] - 74:5

**COUNSEL** [1] - 2:1

**counsel** [3] - 55:7, 62:19, 77:18

**count** [2] - 61:24, 61:25

**counting** [1] - 71:21

**country** [1] - 54:12

**COUNTY** [1] - 80:3

**couple** [3] - 66:12, 69:2, 71:24

**coupled** [1] - 51:3

**course** [7] - 27:19, 28:17, 48:23, 53:7, 53:8, 74:13, 74:14

**court** [4] - 23:13, 51:15, 72:16, 73:1

**Court** [6] - 4:5, 27:6, 78:11, 80:7, 80:20

**COURT** [26] - 1:1, 1:23, 3:4, 34:10, 34:14, 34:17, 34:19, 34:22, 68:14, 76:5, 76:8, 76:15, 76:18, 76:23, 77:3, 77:9, 77:14, 77:18, 77:22, 78:7, 78:10, 78:17, 79:2, 79:8, 79:12, 79:16

**COURTROOM** [4] - 76:7, 76:10, 76:12, 79:15

**courtroom** [14] - 35:9, 35:21, 45:13, 47:2, 47:23, 48:9, 48:11, 51:11, 53:2, 58:1, 63:9, 67:9, 68:8, 72:20

**courts** [1] - 51:14

**covered** [4] - 70:24, 71:5, 71:8, 71:11

**covering** [1] - 65:19

**crashing** [1] - 36:4

**crazy** [1] - 62:21

**create** [1] - 30:20

**created** [6] - 17:22, 18:2, 19:18, 20:3, 70:8, 74:7

**creates** [1] - 12:1

**creating** [1] - 10:10

**creative** [1] - 3:12

**creativity** [1] - 19:19

**creator** [1] - 20:5

**credibility** [2] - 23:2, 50:23

**credit** [3] - 57:11, 57:12, 63:13

**credited** [1] - 73:10

**criminal** [1] - 36:4

**crisis** [1] - 6:10

**critical** [2] - 14:9, 14:11

**cross** [1] - 55:6

**cross-examination** [1] - 55:6

**crumbling** [2] - 45:17, 49:8

**crystal** [1] - 55:25

**CSC** [18] - 11:11, 11:14, 11:15, 25:17, 26:2, 26:3, 26:23, 27:17, 27:19, 40:19, 41:12, 45:10, 47:6, 59:18, 67:21, 71:7, 77:6

**CSC's** [2] - 5:24, 14:6

**CSR** [2] - 1:23, 80:20

**cumbersome** [1] - 69:17

**curb** [1] - 60:1

**customer** [1] - 9:12

**customers** [15] - 7:13, 12:21, 28:24, 29:1, 30:10, 30:11, 30:13, 30:19, 30:24, 31:1, 31:13, 31:17, 32:7, 32:8, 75:15

## D

**damage** [1] - 27:14

**damages** [2] - 63:10,

65:19

**damn** [2] - 57:18, 57:22

**Darth** [1] - 44:9

**Date** [1] - 80:16

**date** [2] - 29:24, 47:14

**dated** [1] - 47:17

**dating** [3] - 37:15, 48:21, 64:3

**DAVID** [1] - 2:14

**DAY** [1] - 1:13

**days** [4] - 47:18, 57:15, 71:21, 72:6

**deal** [9] - 8:14, 13:10, 54:4, 54:8, 58:9, 58:11, 59:23, 63:24

**deceiving** [1] - 61:5

**December** [1] - 29:22

**deceptive** [1] - 60:25

**decide** [1] - 23:25

**decided** [2] - 5:2, 36:15

**decides** [1] - 53:25

**declaration** [1] - 61:11

**declarations** [2] - 27:5, 72:18

**deduct** [1] - 30:3

**deducted** [1] - 31:14

**defend** [1] - 30:5

**defendant** [1] - 20:22

**DEFENDANTS** [1] - 2:9

**Defendants** [1] - 1:9

**defendants** [6] - 21:19, 21:21, 22:22, 32:2, 77:4, 77:7

**defense** [7] - 10:22, 34:10, 34:19, 41:3, 65:22, 68:11, 77:19

**deferrals** [1] - 7:1

**Definitely** [1] - 16:24

**definition** [3] - 13:1, 13:4, 40:10

**definitions** [3] - 12:5, 13:1, 13:5

**delete** [1] - 24:15

**deliberate** [2] - 34:3, 76:2

**deliberation** [1] - 78:14

**deliberations** [2] - 38:18, 49:9

**deliver** [1] - 49:4

**demonstrate** [1] - 60:17

**demonstrative** [4] - 27:7, 46:25, 48:4, 60:6

**deposition** [8] - 6:8, 9:8, 17:11, 17:12,

19:2, 25:12, 26:23, 73:21

**depositions** [1] - 27:5

**deprived** [1] - 64:7

**DEPUTY** [4] - 76:7, 76:10, 76:12, 79:15

**derivative** [2] - 44:10, 44:12

**derivatives** [1] - 44:10

**describe** [1] - 45:17

**described** [1] - 15:23

**Designs** [1] - 9:10

**despite** [5] - 38:8, 38:20, 39:19, 52:5

**destroy** [1] - 24:15

**determined** [1] - 16:21

**develop** [1] - 27:21

**developed** [5] - 4:16, 5:19, 6:9, 6:19, 28:24

**developing** [2] - 3:9, 72:4

**development** [2] - 4:19, 5:11

**difference** [2] - 50:14, 65:18

**different** [9] - 12:6, 12:13, 13:3, 13:6, 14:24, 27:25, 31:5, 35:5, 76:24

**differently** [1] - 53:15

**digit** [2] - 64:25, 65:1

**diligence** [2] - 15:7, 15:11

**dinner** [1] - 65:10

**direct** [3] - 11:25, 22:6, 63:20

**directing** [1] - 42:1

**direction** [1] - 7:8

**directions** [1] - 67:19

**directly** [4] - 11:1, 11:20, 41:13, 64:10

**directors** [1] - 14:25

**discoveries** [1] - 40:12

**discussed** [1] - 10:3

**dismissed** [1] - 33:23

**distraction** [2] - 18:23, 18:25

**distractions** [1] - 16:10

**distributed** [1] - 22:4

**District** [2] - 80:7, 80:8

**DISTRICT** [3] - 1:1, 1:2, 1:3

**divide** [3] - 31:25, 77:5, 77:22

**DIVISION** [1] - 1:2

**Doctrine** [2] - 65:9, 65:11

**document** [30] - 3:18, 5:6, 7:21, 8:19, 9:7, 9:19, 11:14, 15:21, 15:22, 15:23, 22:18, 23:17, 25:2, 25:4, 25:7, 42:12, 43:15, 43:18, 45:3, 45:7, 45:23, 46:21, 47:18, 50:24, 58:18, 58:19, 61:18, 62:13, 62:14, 67:18

**Documents** [1] - 45:20

**documents** [14] - 7:7, 10:18, 11:20, 15:11, 24:15, 24:19, 24:23, 26:6, 26:7, 42:24, 46:21, 51:2, 57:4, 69:7

**dollars** [8] - 5:10, 29:21, 38:19, 44:1, 51:24, 52:16, 56:13, 74:9

**dominator** [1] - 17:7

**done** [15] - 12:4, 13:4, 27:12, 30:6, 37:5, 42:7, 48:12, 55:16, 62:11, 67:11, 67:25, 69:12, 72:13, 77:10

**door** [1] - 35:17

**Dora** [1] - 42:5

**double** [3] - 42:17, 61:8, 64:25

**double-check** [1] - 42:17

**doubt** [2] - 59:19

**down** [18] - 32:15, 35:8, 39:10, 39:12, 43:3, 43:16, 43:17, 45:17, 46:12, 48:18, 49:4, 49:8, 52:2, 61:1, 61:22, 64:2, 68:9

**download** [1] - 64:1

**downloaded** [1] - 64:5

**downloading** [1] - 64:10

**Dr** [4] - 14:22, 14:24, 38:15, 50:15

**draft** [4] - 13:13, 21:10, 25:19, 42:4

**drafted** [9] - 3:17, 4:16, 4:22, 15:16, 19:25, 38:3, 54:19, 54:22, 56:2

**dropped** [1] - 17:5

**due** [1] - 15:7

**during** [9] - 17:11, 25:12, 27:8, 29:13, 29:22, 31:8, 31:10,

36:10, 62:15
**déjà** [2] - 77:10, 77:16

# E

**e-mail** [3] - 25:5, 40:2, 56:16
**e-mails** [1] - 12:15
**early** [2] - 35:16, 38:18
**earn** [1] - 30:18
**earned** [3] - 30:17, 31:16, 75:19
**earning** [1] - 72:3
**easier** [1] - 15:24
**East** [2] - 2:12, 54:3
**easy** [4] - 69:10, 70:14, 71:2, 71:13
**educating** [2] - 5:21, 5:22
**education** [1] - 13:19
**educator** [1] - 39:7
**effect** [1] - 54:11
**effectively** [1] - 25:23
**efficiency** [1] - 54:6
**efficient** [1] - 37:11
**effort** [5] - 13:20, 13:24, 15:25, 53:21, 62:10
**eight** [1] - 35:17
**either** [1] - 77:11
**elements** [1] - 20:23
**Ellis** [24] - 5:12, 5:18, 6:4, 6:12, 13:19, 17:7, 17:8, 17:21, 17:24, 18:4, 18:6, 18:11, 28:7, 28:19, 30:25, 33:21, 50:16, 53:18, 65:17, 68:20, 69:25, 71:25, 72:7
**Ellis'** [1] - 13:23
**eloquently** [1] - 69:11
**embedded** [1] - 12:5
**emotional** [1] - 50:7
**employees** [1] - 52:4
**end** [17] - 18:19, 29:13, 29:22, 29:25, 30:21, 30:23, 31:7, 31:23, 35:3, 35:11, 36:16, 38:21, 53:15, 53:21, 56:25, 66:15, 66:24
**enforce** [1] - 40:24
**enforced** [1] - 51:14
**enjoy** [1] - 64:9
**ensures** [1] - 16:1
**entered** [1] - 50:25
**entitled** [6] - 44:16, 63:4, 63:11, 63:17, 63:18, 80:12
**equity** [2] - 26:17,

26:21
**Ervin** [4] - 7:19, 7:25, 26:20, 74:11
**especially** [1] - 11:5
**essentially** [1] - 78:16
**estimate** [2] - 61:23, 62:1
**et** [2] - 1:8, 36:18
**evening** [1] - 27:9
**event** [1] - 48:25
**evidence** [46] - 13:25, 15:2, 16:18, 19:13, 20:17, 22:10, 24:2, 24:4, 29:18, 33:3, 35:12, 35:25, 38:17, 38:25, 39:1, 41:5, 41:11, 41:21, 43:8, 46:9, 49:10, 55:19, 55:25, 56:17, 56:19, 57:6, 62:24, 67:10, 67:12, 67:14, 68:7, 69:9, 69:14, 70:4, 70:15, 70:16, 71:3, 71:8, 71:13, 71:14, 75:25
**exactly** [5] - 10:15, 38:17, 42:3, 47:14, 78:6
**examination** [1] - 55:6
**examine** [1] - 35:12
**example** [2] - 63:23, 66:1
**except** [7] - 12:23, 29:11, 50:20, 51:9, 70:15, 71:8, 77:2
**exchanged** [1] - 58:8
**exercise** [1] - 68:22
**exhibit** [2] - 35:8, 41:23
**Exhibit** [15] - 7:7, 7:23, 15:15, 23:16, 24:9, 27:7, 29:12, 40:25, 42:4, 43:8, 45:1, 45:14, 45:22, 46:12, 71:11
**Exhibits** [1] - 29:19
**exhibits** [7] - 14:1, 14:2, 14:3, 39:14, 69:2, 79:14, 79:16
**exist** [2] - 4:2, 37:14
**exists** [1] - 17:22
**expectation** [1] - 15:1
**expected** [1] - 14:25
**expenses** [2] - 30:3, 31:13
**expensive** [2] - 8:5, 74:12
**experience** [5] - 36:21, 42:13, 59:17, 59:18

**expert** [2] - 56:4, 58:6
**explain** [11] - 12:10, 13:7, 43:23, 45:24, 45:25, 49:14, 53:1, 55:12, 55:13, 63:25, 64:6
**explained** [1] - 55:1
**explanation** [1] - 12:19
**explode** [1] - 62:4
**exposed** [1] - 59:2
**express** [3] - 7:8, 40:15, 66:17
**expression** [3] - 18:1, 41:14, 66:7
**extend** [1] - 32:14
**extensive** [1] - 16:1
**extensively** [1] - 71:1
**extremely** [1] - 77:9

# F

**fact** [20] - 9:21, 10:5, 10:6, 10:17, 15:13, 15:15, 20:24, 21:3, 21:5, 28:9, 37:20, 58:2, 70:18, 70:25, 71:6, 72:22, 74:1, 74:4, 74:8
**factoring** [1] - 62:23
**facts** [4] - 16:18, 18:6, 19:7, 40:11
**factually** [1] - 76:20
**fail** [1] - 41:5
**failed** [4] - 35:13, 67:21
**fair** [2] - 31:20, 32:13
**fairly** [1] - 77:15
**falls** [1] - 29:7
**false** [1] - 72:20
**fancy** [3] - 37:9, 49:11, 67:3
**far** [6] - 22:10, 35:18, 49:11, 54:25, 61:10, 62:13
**fascinating** [1] - 44:24
**fat** [5] - 5:16, 16:11, 71:20, 72:2, 72:12
**favor** [1] - 42:1
**February** [2] - 13:13, 31:19
**Federal** [2] - 80:6, 80:20
**FEDERAL** [1] - 1:23
**federal** [2] - 20:19, 35:1
**fees** [6] - 18:9, 18:12, 30:1, 30:2, 31:11, 58:5
**fell** [4] - 61:2, 61:3,

61:4
**few** [6] - 14:4, 23:1, 23:4, 40:6, 50:22, 56:22
**figure** [2] - 54:14, 66:2
**filed** [2] - 62:16, 62:18
**files** [2] - 16:7, 16:8
**filing** [1] - 66:5
**filings** [1] - 46:8
**fill** [1] - 70:13
**filling** [1] - 32:18
**finally** [3] - 18:23, 26:9, 73:21
**finance** [1] - 46:10
**financials** [1] - 33:2
**financing** [10] - 4:1, 16:23, 17:11, 17:17, 39:25, 46:20, 49:7, 56:4, 58:6, 67:17
**Financing** [1] - 45:20
**fine** [1] - 63:2
**firm** [15] - 6:3, 7:19, 9:6, 16:5, 20:10, 35:19, 40:23, 47:3, 48:11, 51:5, 54:12, 54:22, 58:23, 62:22, 70:1
**firms** [1] - 51:5
**First** [1] - 9:16
**first** [35] - 3:18, 3:21, 4:9, 5:15, 12:10, 12:23, 13:13, 15:7, 15:22, 17:4, 19:15, 21:8, 21:16, 21:17, 21:23, 24:18, 25:19, 26:16, 29:5, 31:10, 32:3, 34:24, 40:14, 41:18, 42:16, 44:7, 48:20, 50:25, 51:15, 61:15, 61:16, 68:12, 71:21, 73:12
**five** [6] - 16:12, 31:10, 34:12, 34:14, 71:21
**fixed** [1] - 18:1
**flashy** [1] - 69:5
**flexibility** [1] - 54:5
**flip** [1] - 74:19
**floors** [1] - 29:5
**fluff** [1] - 23:23
**focus** [5] - 7:2, 30:13, 74:16, 74:18, 75:6
**follow** [3] - 45:3, 46:17, 76:15
**following** [1] - 60:17
**FOR** [2] - 2:3, 2:9
**forbid** [1] - 66:10
**foregoing** [1] - 80:10
**forget** [1] - 21:2
**forgot** [3] - 10:17, 12:24, 33:11

**form** [90] - 4:9, 6:15, 8:15, 9:11, 9:16, 9:22, 9:23, 10:9, 10:10, 12:2, 13:21, 14:16, 18:8, 20:19, 21:3, 21:20, 21:21, 21:23, 21:24, 21:25, 22:2, 22:3, 22:4, 22:8, 22:25, 25:9, 25:13, 26:2, 26:4, 28:24, 28:25, 29:3, 29:14, 30:11, 30:14, 30:18, 30:24, 31:2, 31:3, 31:6, 31:8, 31:13, 31:18, 32:8, 32:18, 38:1, 38:3, 43:7, 43:14, 44:14, 47:4, 47:6, 47:10, 47:11, 48:7, 50:2, 51:9, 52:5, 55:15, 56:1, 56:3, 56:15, 57:7, 57:10, 57:19, 57:23, 59:21, 62:21, 62:24, 63:2, 63:5, 63:6, 63:14, 63:19, 63:22, 64:13, 64:14, 64:16, 75:19, 76:19, 78:2, 78:22, 79:6
**Form** [1] - 45:5
**format** [1] - 80:12
**formed** [2] - 26:16, 26:20
**forms** [19] - 12:22, 14:24, 20:24, 21:20, 24:9, 26:11, 31:17, 33:9, 42:23, 44:3, 45:10, 45:18, 46:13, 57:14, 57:18, 58:17, 78:16, 78:25
**forth** [5] - 9:15, 27:4, 29:16, 47:19, 69:24
**forward** [7] - 30:19, 30:22, 39:14, 41:24, 44:12, 44:23, 54:25
**foundation** [8] - 6:13, 6:15, 7:21, 22:25, 29:7, 75:11, 75:12, 75:22
**founders** [2] - 5:12, 72:11
**four** [1] - 26:12
**fourth** [1] - 54:18
**fourth-year** [1] - 54:18
**fragment** [1] - 66:21
**frame** [6] - 4:13, 4:14, 37:9, 39:16, 70:10
**frankly** [2] - 19:14, 72:4
**Friday** [5] - 6:8, 9:10, 16:12, 17:12, 23:6

friend [2] - 39:4, 63:25
front [2] - 9:16, 70:18
full [1] - 76:10
FUND [1] - 1:8
fund [11] - 8:9, 16:14, 16:15, 21:25, 26:17, 26:22, 32:4, 32:6, 32:16, 32:23, 64:24
Fund [3] - 21:24, 32:4, 32:11
funded [3] - 8:16, 39:16, 51:21
funding [1] - 6:10
funny [1] - 52:25

**G**

game [1] - 50:9
Ganti [1] - 40:2
garage [2] - 5:14, 71:24
gas [1] - 18:11
Gee [2] - 51:21, 56:18
general [5] - 21:25, 32:5, 32:11, 32:23, 55:6
generate [1] - 29:21
generated [6] - 22:25, 29:12, 30:23, 31:7, 32:3, 32:8
generous [1] - 63:14
gentlemen [5] - 34:23, 42:20, 66:22, 68:13, 76:1
GEORGE [1] - 1:3
GERALD [1] - 2:10
Gilligan's [1] - 48:22
giovine [1] - 15:5
Giovine [6] - 21:15, 45:7, 55:6, 71:9, 71:14
given [1] - 51:10
global [3] - 35:19, 48:10, 51:5
globe [1] - 66:2
Gloria [4] - 39:17, 57:18, 57:20, 59:16
God [5] - 57:9, 57:11, 62:14, 62:20, 66:10
goods [1] - 27:22
gorilla [1] - 17:1
government [3] - 4:8, 20:19, 70:7
GP [1] - 32:5
Grand [1] - 2:6
graphic [1] - 43:5
graphics [1] - 68:1
grass [1] - 50:14
great [4] - 23:20, 28:8, 39:6, 51:9

greatest [1] - 23:18
greedy [1] - 5:16
green [2] - 75:18, 75:20
grilled [1] - 18:4
ground [1] - 36:5
group [1] - 30:19
guarantees [1] - 23:20
guess [13] - 16:13, 18:19, 41:21, 45:13, 46:11, 47:8, 47:17, 55:8, 63:14, 64:12, 67:20, 73:16, 76:18
guidance [1] - 78:2
guilty [1] - 58:15
gussy [1] - 64:20
guy [3] - 52:17, 58:12, 66:19
guys [30] - 5:13, 27:3, 35:25, 38:4, 40:1, 47:23, 52:2, 52:7, 52:12, 52:17, 53:21, 54:6, 56:11, 57:2, 58:3, 58:10, 62:10, 62:17, 62:18, 62:25, 64:1, 64:19, 65:4, 66:24, 67:7, 71:24, 71:25, 76:25, 79:8, 79:13

**H**

hair [1] - 61:2
half [12] - 4:6, 5:10, 5:15, 5:17, 28:25, 29:21, 31:3, 44:1, 52:13, 53:23, 70:22, 72:11
hand [2] - 57:22, 76:12
handled [1] - 36:22
hands [1] - 58:9
handshake [1] - 57:15
happy [1] - 49:3
hard [9] - 5:8, 35:20, 41:23, 49:10, 50:23, 55:7, 69:25, 70:1
he.. [1] - 25:18
head [4] - 28:22, 38:10, 62:4, 74:2
hear [16] - 8:7, 10:19, 10:20, 17:1, 18:15, 33:4, 33:12, 33:22, 41:9, 49:1, 56:19, 61:21, 65:2, 73:11
heard [41] - 3:13, 4:15, 5:16, 6:7, 6:18, 8:24, 10:16, 11:23, 16:10, 16:11, 16:19, 16:25, 17:2, 17:6, 17:19,

17:24, 18:3, 18:9, 18:13, 19:8, 19:21, 23:24, 27:2, 28:5, 36:10, 37:9, 39:9, 42:7, 50:14, 50:15, 50:16, 51:18, 51:21, 52:19, 54:21, 59:20, 64:18, 64:24, 65:21, 69:15, 71:20
heart [4] - 38:5, 66:25, 67:1, 70:21
hearts [2] - 38:5, 66:25
heck [3] - 50:17, 52:3, 55:11
hedge [2] - 8:9, 16:14
held [1] - 80:11
Helgeson [6] - 39:18, 51:19, 73:11, 73:19
help [7] - 26:18, 26:19, 26:21, 28:7, 38:11, 50:13, 58:15
helping [1] - 60:3
helps [1] - 78:14
hereby [1] - 80:8
hereto [1] - 66:16
Herrington [1] - 38:4
high [2] - 32:19, 53:19
highlight [1] - 61:3
highlighted [2] - 21:15, 60:23
highlighting [7] - 40:8, 60:7, 60:13, 61:15, 61:17, 61:20, 62:2
himself [2] - 11:18, 23:8
hold [5] - 42:2, 45:11, 45:12, 53:16, 66:8
holder [1] - 40:20
hole [1] - 55:18
holidays [1] - 16:6
Holly [1] - 74:24
home [2] - 56:7, 57:12
Honor [14] - 3:6, 28:13, 34:9, 34:15, 34:21, 76:4, 76:7, 76:20, 77:2, 77:6, 77:25, 78:13, 78:23, 79:6
HONORABLE [1] - 1:3
hope [5] - 49:9, 62:13, 65:22, 67:10, 67:12
hoped [1] - 51:24, 58:6
hopeful [1] - 59:14
hopefully [1] - 29:11
hopes [1] - 55:20, 64:24
hoping [2] - 16:16,

55:19
horrible [1] - 73:15
host [1] - 4:16
hour [3] - 49:4, 55:4, 56:13
hours [2] - 5:10, 6:5
house [1] - 45:16
Howell [1] - 48:22
Huffington [1] - 6:23
huge [4] - 28:10, 28:16, 28:22
human [1] - 53:14
hundred [2] - 28:19, 74:9
hundreds [1] - 52:15
hurt [2] - 34:1, 38:22
hurts [1] - 34:1
hypothetically [1] - 64:4

**I**

idea [6] - 5:14, 37:14, 40:14, 40:15, 66:2, 66:6
ideas [1] - 40:11
ignorance [1] - 10:21
ignore [2] - 74:1, 74:4
Ill [1] - 48:22
illegally [2] - 64:1, 64:10
illustrate [1] - 46:23
illustrated [1] - 35:23
lm's [6] - 7:15, 7:22, 10:6, 24:12, 26:7, 26:8
imagine [1] - 51:21
immediately [2] - 8:17, 16:8
imperfect [1] - 67:8
importance [1] - 43:1
important [19] - 7:21, 15:13, 15:21, 15:22, 22:3, 23:15, 24:1, 25:2, 25:3, 25:6, 35:15, 40:9, 40:19, 43:21, 44:5, 44:13, 49:2, 53:21, 61:7
importantly [4] - 9:13, 15:20, 17:10, 17:15
inappropriate [1] - 73:14
INC [1] - 1:5
Inc [1] - 45:20
include [1] - 5:2
included [1] - 21:5
includes [1] - 30:10
including [2] - 20:10, 26:6
inconsistencies [2] -

24:8, 27:2
inconsistent [3] - 26:13, 49:12, 49:13
incredible [1] - 77:10, 77:16
incredibly [1] - 68:22
indemnify [1] - 48:25
independently [1] - 19:18
indirect [1] - 64:14
indirectly [2] - 41:13, 63:21
induces [1] - 22:16
infringe [1] - 57:2
infringed [4] - 22:9, 77:7, 79:1, 79:3
infringement [9] - 10:25, 22:6, 22:7, 22:8, 22:14, 22:15, 22:22, 36:7, 40:3
infringing [6] - 11:2, 11:3, 21:19, 31:6, 44:20, 62:24
initial [2] - 6:16, 42:4
innocent [1] - 7:14
inside [1] - 4:14
insisted [2] - 11:18, 14:7
insisting [1] - 17:3
inspiration [2] - 37:5, 58:24
instruction [4] - 17:24, 19:17, 45:1, 70:18
instructions [11] - 19:12, 20:13, 23:25, 29:15, 33:13, 40:20, 41:2, 41:25, 64:15, 67:13, 70:20
insulting [1] - 63:8
intact [1] - 78:9
intentionally [1] - 56:21
interesting [3] - 51:18, 52:10, 71:16
intergalactic [1] - 51:5
intersection [1] - 50:25
intrigued [2] - 36:19, 37:19
invested [2] - 6:19, 8:8
investing [1] - 5:20
investment [3] - 14:18, 16:14, 28:9
investor [8] - 15:6, 15:8, 15:9, 15:10, 15:13, 65:6, 65:7, 65:12
investors [8] - 15:5,

17:16, 26:17, 29:2, 29:3, 65:6, 75:15
**involved** [4] - 36:10, 39:4, 57:16, 58:10
**involving** [1] - 36:18
**iPhone** [1] - 37:16
**Island** [1] - 48:22
**issue** [7] - 19:3, 19:15, 36:5, 57:25, 62:11, 76:21, 77:12
**item** [3] - 35:22, 36:2
**items** [1] - 77:2

## J

**Jackson** [3] - 64:4, 64:5, 64:14
**jam** [1] - 47:23
**JAMES** [1] - 2:5
**JAMIE** [1] - 2:5
**January** [2] - 7:4, 25:6
**JEAN** [4] - 1:23, 80:6, 80:19, 80:20
**jeans** [1] - 72:6
**Jessup** [4] - 7:19, 8:1, 26:21, 74:11
**job** [2] - 37:11, 67:13
**jobs** [1] - 72:12
**Joel** [7] - 11:14, 18:25, 19:4, 37:21, 55:22, 55:23
**jot** [1] - 35:8
**JR** [1] - 2:4
**judge** [7] - 10:24, 17:24, 19:8, 19:12, 19:15, 19:21, 70:17
**Judge** [3] - 35:16, 40:7, 50:20
**JUDGE** [1] - 1:3
**judge's** [1] - 20:13
**judges** [2] - 53:11, 53:14
**judgment** [1] - 51:10
**judicial** [1] - 80:13
**jumped** [1] - 28:12
**June** [3] - 12:2, 29:22, 30:22
**jury** [17] - 19:16, 20:13, 33:12, 34:12, 34:17, 34:18, 34:24, 35:2, 42:14, 53:7, 60:11, 67:14, 68:4, 68:13, 76:15, 76:17, 79:13
**justice** [2] - 35:24, 36:1
**justify** [1] - 12:10

## K

**keep** [9] - 40:19, 41:18, 42:25, 43:19, 51:12, 56:14, 57:24, 59:21, 74:21
**kept** [2] - 24:22, 31:1
**key** [1] - 41:8
**kicked** [1] - 60:1
**kicking** [1] - 52:6
**kidding** [4] - 49:1, 58:14, 63:7, 66:19
**kids** [3] - 7:2, 14:14, 63:23
**kind** [10] - 3:18, 3:21, 4:9, 8:19, 23:23, 27:21, 29:1, 29:2, 65:15, 77:18
**kinds** [2] - 12:12, 26:6
**Kirton** [1] - 48:7
**knock** [1] - 27:22
**knock-offs** [1] - 27:22
**knowing** [1] - 29:2
**knowledge** [5] - 4:1, 5:5, 21:2, 25:17, 53:17
**known** [2] - 22:15, 58:23
**knows** [1] - 73:5
**Kutak** [2] - 9:6, 56:16

## L

**ladies** [5] - 34:23, 42:20, 66:22, 68:13, 76:1
**language** [2] - 21:6, 52:6
**lap** [1] - 28:15
**last** [18] - 4:5, 5:17, 6:8, 16:12, 17:12, 28:21, 31:9, 46:25, 48:4, 48:5, 49:20, 67:20, 68:3, 68:17, 70:22, 72:6, 72:17, 73:1
**late** [1] - 79:17
**LATHAM** [1] - 2:4
**Latham** [2] - 48:11, 51:3
**latitude** [2] - 66:3, 66:7
**law** [22] - 9:6, 10:21, 10:24, 11:4, 19:8, 23:14, 33:13, 35:13, 35:19, 36:21, 37:6, 37:7, 47:3, 53:12, 54:12, 54:22, 64:12, 64:15, 72:16, 73:1, 73:10

**Law** [3] - 2:6, 2:11, 2:15
**lawsuit** [6] - 16:8, 30:5, 39:25, 52:5, 62:16, 62:18
**lawyer** [21] - 9:1, 10:20, 11:3, 18:24, 21:1, 24:12, 24:20, 26:7, 26:8, 37:8, 37:10, 53:6, 53:13, 54:14, 54:19, 55:10, 55:24, 56:5, 56:12, 72:24, 73:5
**lawyers** [28] - 3:13, 3:14, 3:24, 4:12, 4:14, 4:19, 8:22, 8:23, 11:5, 19:20, 23:22, 26:12, 33:23, 36:21, 37:20, 38:3, 49:15, 49:20, 51:3, 54:10, 57:16, 58:20, 58:21, 69:18, 70:14
**lay** [1] - 39:15
**lean** [1] - 56:14
**learn** [1] - 16:3
**leased** [1] - 57:12
**least** [1] - 19:18
**left** [5] - 3:7, 74:22, 75:1, 75:9
**legal** [10] - 6:16, 11:15, 18:9, 18:12, 30:2, 31:11, 38:1, 38:3, 40:22, 59:9
**LEGAL** [1] - 2:14
**legality** [2] - 16:1, 23:20
**legally** [1] - 55:2
**LegalZoom** [2] - 8:15, 56:1
**legitimate** [2] - 48:2, 63:1
**lender** [2] - 16:20, 16:22
**lenders** [1] - 17:8
**lending** [1] - 16:19
**length** [2] - 28:8, 71:4
**letter** [6] - 11:22, 11:24, 19:3, 25:5, 26:19, 39:19
**level** [2] - 19:19, 67:11
**liabilities** [1] - 14:13
**liability** [2] - 22:5, 22:20
**liable** [6] - 10:25, 21:19, 21:22, 22:15, 22:22, 58:14
**library** [1] - 33:17
**lied** [2] - 24:2, 67:5
**life** [1] - 57:14
**Life** [1] - 58:11

**life's** [1] - 67:8
**lifetime** [1] - 37:14
**light** [1] - 59:15
**line** [3] - 28:12, 28:14, 50:16
**line-up** [1] - 50:16
**lining** [1] - 52:15
**linkage** [4] - 63:20, 63:21, 73:24, 73:25
**list** [1] - 17:7
**listen** [3] - 16:17, 50:6, 64:9
**listened** [4] - 35:12, 36:14, 52:23, 67:23
**literally** [1] - 36:11
**litigation** [2] - 30:1, 62:19
**lives** [2] - 23:5, 68:8
**LLC** [5] - 21:23, 29:17, 32:3, 32:11, 32:20
**LLP** [2] - 2:4, 2:10
**lo** [3] - 39:25, 46:6, 56:11
**loan** [3] - 53:23, 58:18
**location** [1] - 66:2
**locked** [1] - 29:1
**long-term** [2] - 54:8, 59:23
**longitude** [2] - 66:3, 66:7
**Look** [2] - 18:18, 31:21
**look** [57] - 9:3, 11:14, 12:6, 12:9, 13:6, 18:16, 18:17, 19:4, 19:23, 23:6, 24:6, 24:7, 27:3, 27:8, 30:16, 35:20, 36:9, 37:23, 38:16, 38:24, 39:1, 39:15, 41:23, 42:3, 43:9, 43:13, 43:22, 44:15, 45:1, 45:3, 45:16, 45:18, 45:22, 45:23, 46:2, 47:8, 47:12, 48:6, 49:10, 51:23, 55:8, 56:1, 60:11, 62:1, 67:13, 67:15, 69:4, 72:6, 74:16, 74:20, 77:16, 79:4
**looked** [13] - 8:23, 10:5, 10:6, 11:8, 20:24, 36:20, 57:10, 66:10, 69:25, 70:1, 78:3, 78:4
**looking** [12] - 12:18, 16:24, 26:13, 26:16, 27:6, 33:8, 37:1, 37:2, 39:19, 68:6, 76:18, 78:21

**looks** [3] - 13:3, 29:17, 45:11
**LOS** [4] - 1:15, 1:24, 3:1, 80:3
**Los** [2] - 2:7, 2:12
**losses** [2] - 31:12
**lost** [1] - 53:6
**lousy** [2] - 9:3, 9:5
**love** [3] - 40:15, 40:16, 40:17
**loved** [1] - 51:19
**low** [2] - 32:19, 64:24
**LP** [1] - 1:8
**Luke** [1] - 44:9
**lunch** [5] - 49:19, 49:20, 72:15, 72:17, 73:1

## M

**M-c-G-r-a-t-h** [1] - 76:11
**M.A.T.T.I.E** [5] - 18:3, 18:4, 18:5, 51:6, 51:8
**magician** [1] - 45:23
**mail** [4] - 25:5, 35:4, 40:2, 56:16
**mails** [1] - 12:15
**major** [1] - 32:5
**MANAGEMENT** [1] - 1:8
**Management** [2] - 21:23, 21:24
**management** [1] - 42:15
**manager** [2] - 8:9, 16:14
**Mao** [13] - 3:14, 3:22, 3:25, 4:11, 4:21, 37:22, 42:5, 54:25, 69:15, 70:9, 70:16, 70:25
**mark** [1] - 46:12
**market** [2] - 5:23, 17:7
**marketing** [1] - 23:23
**material** [2] - 60:18, 60:24
**math** [2] - 30:20, 33:1
**matter** [7] - 18:20, 24:21, 36:2, 36:6, 37:21, 63:3, 80:12
**mattered** [1] - 16:2
**maven** [1] - 55:5
**McConkie** [1] - 48:7
**McGrath** [2] - 76:11, 76:13
**mean** [6] - 17:13, 58:20, 73:7, 77:25, 79:3

**means** [3] - 42:15, 64:23, 73:8
**media** [1] - 29:10
**medium** [1] - 18:1
**meet** [1] - 39:4
**meetings** [1] - 6:5
**memo** [1] - 42:5
**mention** [5] - 35:8, 44:4, 45:21, 47:10
**merger** [2] - 65:22
**met** [1] - 35:1
**methods** [1] - 40:12
**Michael** [4] - 64:4, 64:5, 64:6, 64:13
**middle** [1] - 13:2
**might** [3] - 14:24, 66:21, 73:20
**million** [19] - 5:10, 8:8, 15:14, 16:14, 16:15, 29:21, 29:22, 29:25, 30:8, 31:7, 31:18, 31:23, 32:5, 34:4, 44:1, 51:13, 52:13, 62:9
**millions** [4] - 28:4, 51:23, 52:15, 72:7
**mind** [8] - 3:8, 27:16, 36:2, 40:20, 41:18, 42:25, 43:19, 57:24
**mine** [1] - 33:19
**mine's** [1] - 78:10
**minute** [2] - 43:6, 44:5
**minutes** [8] - 23:1, 34:6, 34:8, 34:12, 34:14, 68:16, 68:17, 68:23
**Mireles** [11] - 5:25, 6:21, 6:22, 7:8, 13:19, 14:9, 16:23, 39:5, 39:10, 59:12
**miserably** [2] - 35:13, 67:21
**miss** [1] - 55:19
**missing** [1] - 15:17
**mistake** [2] - 7:14, 18:7
**mistakes** [1] - 72:15
**Mitchell** [8] - 3:14, 3:22, 4:3, 4:21, 55:3, 69:15, 70:17, 70:25
**MOBILITY** [1] - 2:14
**Moderna** [1] - 11:13
**modify** [1] - 37:12
**moment** [2] - 17:25, 20:3
**moments** [5] - 14:4, 38:7, 49:25, 52:24, 52:25
**momentum** [1] - 28:22
**MONDAY** [2] - 1:14,

3:1
**money** [41] - 5:20, 5:21, 8:6, 8:10, 8:13, 17:15, 18:8, 18:10, 18:12, 18:13, 19:6, 27:20, 27:23, 28:5, 28:17, 28:21, 29:8, 33:8, 51:15, 52:18, 52:19, 54:2, 57:20, 58:5, 58:8, 63:6, 63:22, 64:7, 64:8, 64:10, 64:17, 64:23, 65:1, 65:3, 65:4, 65:8, 65:14, 72:1, 72:3
**monopolies** [1] - 16:25
**monopoly** [2] - 17:6, 26:23
**month** [2] - 62:22, 73:12
**months** [9] - 31:9, 31:10, 31:18, 31:19, 31:22, 32:4, 32:13, 36:11
**MOON** [8] - 2:5, 76:20, 77:1, 77:4, 77:21, 78:23, 79:5, 79:10
**morning** [1] - 54:2
**most** [12] - 7:20, 15:13, 15:20, 15:22, 25:2, 25:3, 25:6, 49:2, 71:19, 76:21, 78:24
**Mother** [2] - 23:6, 23:8, 26:15
**mouth** [2] - 52:18, 65:15
**move** [12] - 27:13, 36:5, 39:14, 41:4, 41:11, 41:24, 44:23, 54:25, 58:11, 66:10, 69:23
**movie** [7] - 36:18, 36:22, 38:8, 44:8, 44:9, 44:19, 48:14
**movies** [1] - 36:18
**moving** [1] - 36:6
**MR** [21] - 3:6, 34:11, 34:15, 34:21, 34:23, 68:16, 76:20, 77:1, 77:4, 77:13, 77:21, 77:25, 78:9, 78:13, 78:19, 78:23, 79:5, 79:7, 79:9, 79:10, 79:11
**multiple** [1] - 16:15
**music** [1] - 38:8
**musician** [1] - 58:22
**musicians** [2] - 58:22,

59:6
**must** [3] - 19:16, 41:9, 41:23

## N

**naive** [3] - 16:13, 16:16
**name** [3] - 33:18, 50:2, 76:10
**named** [1] - 9:1
**necessarily** [3] - 8:19, 30:16, 37:25
**need** [10] - 8:1, 15:10, 15:11, 15:19, 54:5, 56:7, 57:18, 57:19, 57:22, 77:22
**needed** [11] - 7:18, 7:20, 7:25, 8:22, 12:20, 12:22, 13:10, 13:16, 27:20, 27:21, 75:8
**negative** [2] - 32:19, 59:12
**negotiations** [1] - 16:5
**net** [1] - 29:12
**never** [12] - 12:7, 19:11, 24:20, 26:10, 35:1, 39:9, 50:16, 51:18, 54:20, 54:21, 55:12, 58:2
**new** [19] - 3:15, 4:10, 8:23, 9:4, 9:16, 10:10, 12:2, 12:20, 12:22, 13:10, 13:16, 15:14, 37:14, 62:21, 62:22, 70:3, 70:5
**New** [1] - 9:10
**news** [1] - 29:10
**next** [8] - 12:17, 21:18, 25:23, 27:11, 43:2, 43:20, 46:5, 74:23
**nice** [4] - 24:6, 27:2, 27:3
**nickel** [2] - 63:12, 74:2
**nitpicking** [2] - 23:7, 23:9
**NO** [1] - 80:20
**no/yes** [1] - 25:1
**noise** [4] - 16:17, 17:18, 19:7
**non** [1] - 48:7
**non-copyrighted** [1] - 48:7
**none** [5] - 35:3, 61:11, 71:5, 74:5
**nonsense** [1] - 53:20
**NORTH** [1] - 1:24
**nothing** [28] - 3:16, 3:24, 4:10, 4:15,

19:20, 29:7, 33:14, 33:25, 46:2, 46:6, 46:14, 46:21, 46:22, 46:23, 47:21, 48:3, 58:9, 59:12, 66:25, 69:21, 70:7, 70:14, 71:7, 72:2, 72:3, 73:2, 75:9
**noticed** [3] - 9:17, 56:18
**novel** [7] - 3:15, 3:21, 4:10, 59:10, 70:3, 70:5
**November** [2] - 16:4, 26:20
**nowadays** [1] - 65:1
**number** [24] - 18:17, 31:17, 31:23, 36:20, 43:13, 45:9, 45:17, 53:17, 63:16, 65:17, 77:2
**numbers** [6] - 5:9, 32:19, 32:21, 33:1, 47:25, 76:2
**nuts** [1] - 36:12

## O

**Oakland** [1] - 2:16
**oath** [3] - 23:10, 23:14, 24:3
**obtained** [2] - 16:8, 19:21
**obviously** [3] - 37:16, 40:7, 77:15
**occasion** [1] - 24:3
**occasions** [2] - 72:22, 73:9
**October** [1] - 16:3
**OF** [6] - 1:2, 1:13, 2:1, 80:1, 80:3, 80:4
**off-the-shelf** [1] - 74:13
**offended** [1] - 71:17
**offensive** [1] - 50:8
**offering** [1] - 17:11
**office** [10] - 6:3, 8:21, 11:8, 14:7, 44:13, 44:17, 45:2, 45:11, 46:18, 47:7
**OFFICIAL** [1] - 1:23, 80:1
**Official** [2] - 80:6, 80:20
**offs** [1] - 27:22
**old** [2] - 45:7, 57:15
**once** [3] - 17:21, 18:1, 59:20
**Once** [1] - 26:2
**one** [84] - 3:11, 4:20,

7:19, 7:25, 8:2, 8:25, 9:5, 11:13, 11:15, 13:16, 15:16, 16:9, 16:14, 17:14, 18:25, 20:11, 23:4, 26:9, 26:25, 27:5, 28:19, 29:10, 32:15, 33:5, 34:1, 35:22, 36:1, 36:18, 36:19, 36:20, 37:1, 37:2, 38:5, 38:8, 41:22, 41:25, 42:1, 43:2, 44:6, 44:20, 45:9, 45:17, 46:8, 46:10, 46:21, 46:24, 47:1, 47:22, 48:5, 50:20, 53:23, 55:3, 56:7, 56:25, 57:9, 60:6, 60:8, 60:13, 61:7, 61:13, 62:4, 64:24, 66:7, 66:8, 66:13, 68:3, 72:16, 72:21, 72:24, 73:9, 75:18, 75:20, 76:21, 76:23, 76:24, 77:25, 78:7, 78:15, 78:18, 79:10
**one-page** [1] - 46:21
**one/day** [1] - 24:14
**ones** [3] - 21:23, 21:24, 30:6
**oOo** [2] - 3:3, 79:19
**Oops** [2] - 23:12, 26:1
**open** [1] - 7:12
**opening** [12] - 3:10, 6:22, 7:24, 12:25, 19:12, 21:1, 33:15, 33:22, 65:23, 66:1, 68:25
**operate** [1] - 14:14
**operation** [1] - 40:12
**opinion** [1] - 6:16
**opportunity** [4] - 38:15, 39:12, 60:2, 64:8
**option** [1] - 6:24
**order** [3] - 30:15, 37:10, 37:11
**orient** [1] - 42:10
**original** [19] - 3:12, 4:17, 19:16, 19:17, 19:23, 20:3, 20:5, 20:7, 20:23, 21:21, 41:13, 44:18, 60:18, 60:21, 66:13, 69:21, 70:14, 70:15
**originality** [1] - 19:15
**originally** [2] - 22:2, 69:19
**Orrick** [29] - 3:7, 3:14, 3:23, 4:9, 4:14, 4:16,

4:23, 5:1, 5:4, 5:8, 8:24, 16:5, 16:6, 20:2, 20:6, 20:9, 20:15, 38:3, 40:23, 43:5, 43:6, 45:6, 45:10, 47:3, 51:4, 70:1, 70:25, 71:4
**Orrick's** [1] - 3:13
**otherwise** [1] - 60:2
**outset** [1] - 23:17
**outside** [3] - 15:7, 15:10, 26:17
**overwhelming** [1] - 19:14
**own** [14] - 6:20, 18:21, 19:20, 20:21, 39:3, 56:15, 56:16, 56:17, 61:18, 64:9, 67:4, 78:25, 79:2
**owned** [1] - 77:6
**owner** [4] - 20:6, 20:15, 41:12
**ownership** [3] - 19:9, 20:5, 49:6

**P**

**P.C** [1] - 2:14
**p.m** [3] - 34:16, 79:18
**P.M** [2] - 1:14, 3:2
**package** [1] - 19:16
**packet** [1] - 57:12
**page** [10] - 41:10, 42:17, 43:20, 46:5, 46:21, 47:5, 49:2, 60:12, 61:19, 80:12
**pages** [4] - 46:13, 56:22, 61:19, 73:16
**Pages** [1] - 1:9
**paid** [3] - 5:8, 53:7, 53:9
**panel** [1] - 34:25
**paper** [5] - 47:24, 51:11, 51:13, 51:16
**par** [1] - 8:18
**pardon** [1] - 52:6
**parents** [1] - 44:11
**park** [48] - 7:10, 7:17, 8:8, 9:13, 9:16, 9:19, 9:21, 10:12, 10:17, 11:18, 11:25, 13:21, 15:13, 16:12, 16:21, 17:10, 17:11, 21:9, 22:1, 23:6, 24:15, 26:15, 26:23, 27:15, 28:4, 32:6, 32:22, 32:24, 32:25, 38:21, 50:17, 52:4, 52:11, 52:17, 53:25, 56:18, 63:10, 63:13, 65:17,

66:25, 67:7, 71:17, 72:5, 72:13, 73:22, 74:8, 78:20
**Park** [3] - 2:12, 65:13, 65:14
**part** [6] - 3:11, 6:23, 42:24, 43:21, 50:8, 57:14
**partial** [1] - 77:19
**particular** [4] - 4:24, 26:11, 40:15, 62:11
**parties** [1] - 79:5
**parties'** [1] - 76:18
**partner** [4] - 21:25, 32:5, 32:11, 32:23
**partners** [3] - 5:18, 32:17, 71:25
**partnership** [1] - 6:25
**parts** [1] - 19:17
**pass** [1] - 41:25
**pasting** [1] - 37:7
**patience** [2] - 68:19, 76:2
**patient** [1] - 67:22
**Paul** [9] - 19:3, 43:16, 46:1, 48:4, 48:18, 51:20, 60:5, 60:13, 61:22
**Pause** [1] - 77:17
**pay** [11] - 5:15, 18:22, 30:4, 30:5, 35:7, 37:17, 56:12, 64:8, 64:20, 72:10
**paying** [1] - 64:9
**penalties** [1] - 23:14
**penalty** [2] - 17:2, 72:19
**pending** [1] - 58:7
**penny** [1] - 63:17
**people** [25] - 8:25, 13:10, 24:6, 31:3, 31:4, 35:3, 37:4, 48:1, 50:10, 50:12, 50:18, 52:21, 54:23, 57:16, 57:17, 58:23, 58:25, 64:6, 64:23, 69:22, 70:1, 72:15
**percent** [10] - 16:1, 17:2, 19:13, 30:21, 30:23, 32:25, 33:1, 61:21, 62:2, 63:15
**percentage** [1] - 30:17
**perfect** [2] - 50:19, 50:20, 50:21
**period** [1] - 62:15
**perjury** [2] - 23:14, 72:19
**permission** [1] - 7:9
**person** [10] - 7:15, 10:24, 10:25, 11:3,

20:13, 22:14, 35:1, 40:14, 40:21, 59:16
**perspective** [1] - 31:24
**phone** [3] - 10:2, 18:12, 54:7
**phones** [1] - 37:17
**pick** [5] - 32:24, 45:14, 50:15, 64:4, 75:18
**picked** [1] - 10:2
**picture** [1] - 75:5
**piece** [9] - 23:23, 32:24, 48:5, 48:15, 51:11, 51:13, 51:16, 69:22
**pieces** [3] - 20:4, 47:23, 74:17
**pin** [1] - 67:6
**pink** [1] - 13:1
**piper** [1] - 18:22
**place** [4] - 20:1, 53:5, 58:9, 66:6
**plagiarism** [1] - 54:11
**PLAINTIFF** [1] - 2:3
**Plaintiff** [1] - 1:6
**plaintiff** [4] - 3:5, 20:6, 20:8, 20:22, 41:3, 41:15, 43:7, 68:14
**plaintiff's** [4] - 19:17, 20:7, 77:19, 78:23
**planning** [2] - 7:12, 24:10
**player** [1] - 32:5
**plugged** [1] - 13:5
**plus** [3] - 64:21
**pocket** [1] - 64:11
**poem** [1] - 60:22
**point** [19] - 19:2, 27:6, 34:20, 37:1, 37:19, 37:25, 38:2, 38:17, 39:9, 41:6, 42:20, 43:2, 59:14, 60:25, 67:16, 67:19, 67:24, 71:23, 72:14
**pointed** [3] - 47:4, 47:21, 51:6
**pointing** [1] - 71:18
**Poor** [1] - 52:14
**portion** [1] - 18:21
**position** [2] - 33:7, 78:23
**possession** [1] - 10:9
**Post** [1] - 6:23
**pound** [1] - 17:1
**pouring** [1] - 36:25
**PowerPoint** [1] - 69:5
**PowerPoints** [1] - 69:8
**practice** [2] - 69:12, 70:2

**practicing** [3] - 34:25, 54:15, 69:12
**precedent** [2] - 3:22, 69:23
**precision** [1] - 49:17
**predated** [1] - 4:9
**predatory** [4] - 16:19, 16:20, 16:22, 16:24
**prepared** [10] - 4:14, 10:8, 13:14, 21:4, 25:8, 25:11, 25:19, 43:18, 56:17, 62:23
**prepares** [2] - 9:4, 47:4
**preparing** [1] - 43:24
**preponderance** [1] - 41:11
**presence** [2] - 34:18, 76:17
**present** [1] - 67:11
**presentation** [1] - 35:5
**presented** [2] - 70:3, 70:4
**pressed** [1] - 4:11
**pressured** [1] - 59:23
**pretend** [1] - 44:8
**pretty** [1] - 29:20
**previously** [1] - 13:11
**price** [7] - 14:17, 27:15, 54:6, 64:19, 74:3, 74:4, 75:14
**pricing** [2] - 27:16, 64:19
**primary** [2] - 27:14, 27:16
**principles** [1] - 40:12
**prisoners** [1] - 52:7
**private** [1] - 26:21
**problems** [1] - 35:10
**procedures** [1] - 40:11
**proceed** [1] - 34:21
**Proceedings** [1] - 79:18
**proceedings** [2] - 77:17, 80:11
**PROCEEDINGS** [1] - 1:13
**process** [2] - 16:5, 34:2
**processes** [2] - 40:11, 43:4
**product** [2] - 38:13, 54:23
**profession** [7] - 3:11, 37:6, 37:20, 49:14, 50:9, 54:17, 59:9
**professionals** [1] - 78:12
**profit** [1] - 28:16

**profited** [1] - 11:1
**profits** [14] - 22:24, 29:12, 29:16, 29:24, 30:22, 31:6, 31:7, 31:16, 32:1, 32:9, 32:17, 73:24, 75:15
**program** [2] - 54:11, 54:13
**prong** [1] - 41:18
**proof** [5] - 19:8, 19:10, 41:2, 41:3, 41:9
**property** [1] - 48:16
**protect** [2] - 23:18, 23:19, 58:6, 66:5
**protecting** [1] - 23:19
**protection** [3] - 17:21, 18:2, 44:16
**protects** [1] - 15:25
**proud** [2] - 54:18, 59:25
**prove** [2] - 19:11, 21:22
**proven** [2] - 35:10, 41:6
**provide** [1] - 79:13
**provided** [1] - 6:24
**provider** [1] - 11:8
**providers** [6] - 6:3, 8:21, 14:7
**provides** [2] - 16:6, 64:12
**providing** [1] - 3:25
**proving** [4] - 19:9, 20:22, 36:7, 41:11
**provision** [7] - 5:6, 11:19, 13:15, 17:2, 21:17, 75:7
**provisions** [10] - 3:17, 4:17, 4:20, 5:2, 14:8, 15:17, 19:23, 37:24, 74:17
**public** [3] - 38:13, 39:21
**publicized** [1] - 36:17
**pull** [2] - 60:14, 75:10
**pulled** [1] - 3:19
**pulling** [2] - 65:3, 65:4
**purchase** [28] - 4:6, 4:8, 5:3, 5:11, 5:22, 5:24, 6:2, 6:6, 6:12, 7:6, 7:18, 8:1, 10:11, 13:18, 14:8, 14:11, 15:8, 15:15, 19:22, 20:10, 21:4, 25:3, 42:23, 46:16, 70:6, 70:19, 73:17, 75:12
**purchasing** [2] - 6:14, 7:22
**pursuant** [1] - 80:9
**push** [2] - 54:7, 57:6

**pushing** [1] - 55:7
**put** [38] - 3:8, 4:24, 5:14, 11:19, 13:24, 13:25, 14:7, 15:13, 15:19, 17:5, 19:25, 21:17, 33:4, 33:5, 33:18, 35:6, 35:19, 36:6, 42:8, 46:25, 47:13, 48:4, 48:8, 52:17, 52:19, 54:2, 54:3, 55:13, 55:23, 56:11, 56:22, 60:5, 62:12, 62:16, 65:14, 66:15, 67:3, 72:8
**putting** [6] - 35:7, 40:18, 49:11, 64:23, 65:8, 65:15

## Q

**questioned** [2] - 24:12, 43:10
**questions** [11] - 3:23, 13:8, 14:4, 14:5, 20:20, 22:19, 24:22, 49:15, 49:16, 54:9, 78:20
**quick** [6] - 45:24, 75:2, 75:4, 77:16
**quickly** [5] - 7:25, 8:14, 39:8, 39:15, 43:11
**quite** [3] - 19:14, 63:10, 72:4

## R

**race** [2] - 28:13, 38:11
**rails** [1] - 67:9
**raise** [1] - 76:12
**raised** [1] - 19:3
**raising** [1] - 17:15
**range** [3] - 31:25, 32:17, 32:19
**rather** [1] - 35:7
**ratio** [1] - 30:20
**rational** [1] - 31:20
**ratted** [1] - 73:22
**reached** [2] - 76:20, 77:1
**read** [15] - 10:24, 14:24, 14:25, 15:4, 15:11, 17:24, 19:15, 33:16, 40:6, 40:7, 63:19, 70:17, 70:20, 71:14, 72:19
**reads** [1] - 60:25
**real** [4] - 50:10, 50:12, 52:1, 68:10
**reality** [3] - 36:9, 54:17

**really** [24] - 6:20, 13:4, 16:22, 19:19, 21:13, 26:10, 26:11, 29:19, 30:13, 35:20, 37:15, 42:15, 46:15, 49:21, 50:24, 53:21, 55:7, 56:24, 57:16, 59:22, 66:7, 70:21
**Realtime** [1] - 80:6
**reason** [12] - 6:13, 12:23, 13:9, 33:20, 35:17, 36:13, 52:18, 59:14, 59:19, 65:8, 69:5
**reasons** [1] - 24:18
**rebuttal** [1] - 34:6
**receivable** [1] - 42:23
**receivables** [32] - 4:6, 4:7, 4:8, 5:3, 5:11, 5:22, 5:24, 6:2, 6:6, 6:12, 6:14, 7:5, 7:18, 7:21, 8:1, 10:11, 14:8, 14:11, 15:8, 15:15, 19:22, 20:10, 21:4, 25:3, 46:16, 57:20, 70:5, 70:7, 70:19, 73:17, 75:12
**Receivables** [1] - 45:5
**received** [3] - 6:5, 20:8, 35:4
**receives** [1] - 11:24
**recent** [1] - 17:18
**Recess** [1] - 34:16
**reckless** [1] - 65:9
**recognized** [1] - 7:17
**recollections** [1] - 49:22
**record** [1] - 78:9
**records** [1] - 39:21
**reel** [1] - 51:24
**refer** [1] - 24:23
**referred** [3] - 10:13, 22:18, 25:24
**referring** [1] - 25:19
**refreshed** [1] - 49:22
**register** [2] - 17:20, 17:23
**registered** [2] - 20:18
**registration** [9] - 16:7, 39:25, 45:15, 46:19, 46:22, 66:5, 71:8, 71:10
**registration's** [1] - 55:11
**registrations** [2] - 55:9, 67:15
**regulations** [1] - 80:13
**reinvent** [1] - 37:11
**rely** [2] - 10:23, 23:11
**remember** [22] - 4:18,

7:5, 11:17, 11:21, 12:5, 12:25, 15:20, 17:3, 20:24, 23:3, 23:5, 25:22, 26:1, 32:25, 33:6, 48:17, 48:19, 54:10, 62:15, 63:23, 73:6, 75:21
**rented** [1] - 57:9
**repeatedly** [4] - 3:24, 4:11, 22:17, 27:18
**reported** [1] - 80:11
**REPORTER** [2] - 1:23, 80:1
**Reporter** [2] - 80:7, 80:20
**REPORTER'S** [1] - 1:13
**represented** [1] - 58:23
**representing** [1] - 51:5
**require** [1] - 49:17
**requires** [1] - 34:6
**reserved** [1] - 34:6
**reshuffle** [3] - 12:1, 13:13, 22:17
**reshuffled** [4] - 12:2, 12:5, 21:20, 21:25
**reshuffling** [6] - 11:17, 11:21, 12:8, 12:13, 12:24, 13:7
**resolve** [1] - 76:22
**respect** [5] - 40:15, 40:19, 42:6, 43:13
**responds** [1] - 12:6
**responsible** [2] - 22:6, 22:11
**responsiveness** [1] - 54:7
**rest** [4] - 29:5, 45:24, 79:4, 79:5
**return** [3] - 64:25, 68:10, 79:12
**returns** [1] - 75:15
**revenues** [1] - 30:22
**reversal** [1] - 78:5
**reversals** [1] - 78:8
**reversed** [2] - 78:11, 78:12
**review** [4] - 6:1, 13:22, 14:2, 15:2
**reviewed** [1] - 13:24
**revised** [1] - 12:20
**rid** [1] - 32:7
**rights** [3] - 15:25, 43:7, 48:16
**ring** [1] - 36:3, 53:2, 53:3
**ripped** [1] - 68:7
**risk** [2] - 53:25

**Rock** [2] - 9:7, 56:16
**Rodney** [1] - 68:1
**rolled** [1] - 32:21
**room** [4] - 35:11, 40:9, 60:11, 67:15
**ROOM** [1] - 1:24
**roots** [1] - 50:15
**RPA** [1] - 25:20
**run** [6] - 6:25, 28:19, 62:16, 66:4, 73:18, 74:10
**running** [4] - 39:11, 50:3, 68:1, 75:2
**runs** [1] - 54:13
**runway** [5] - 28:8, 30:25, 31:22, 32:14, 73:25
**RUSSELL** [1] - 2:4

## S

**salary** [1] - 39:13
**Sale** [2] - 65:9, 65:11
**sale** [5] - 52:12, 53:11, 53:20, 55:5, 64:13
**salesman** [2] - 23:16
**sample** [1] - 53:18
**sat** [3] - 6:1, 6:5, 16:12
**Sauer** [22] - 18:3, 34:7, 45:14, 47:21, 49:5, 52:19, 59:20, 67:16, 68:18, 68:24, 68:25, 69:2, 69:10, 69:13, 69:18, 70:4, 71:6, 71:16, 71:18, 72:15
**SAUER** [17] - 2:4, 2:10, 2:10, 3:6, 34:11, 34:15, 34:21, 34:23, 68:16, 77:13, 77:25, 78:9, 78:13, 78:19, 79:7, 79:9, 79:11
**save** [1] - 39:12
**saved** [1] - 28:21
**saving** [1] - 18:12
**saw** [22] - 6:21, 9:9, 15:3, 15:5, 19:19, 20:16, 25:5, 26:19, 38:6, 40:7, 43:4, 47:6, 49:25, 53:2, 54:20, 55:3, 56:16, 57:1, 58:15, 58:16, 66:10
**scale** [4] - 36:3, 36:5, 36:6, 41:11
**scales** [5] - 19:11, 35:24, 36:1, 36:4, 41:4
**scalpel** [1] - 49:17
**schedule** [1] - 42:18

**Schedule** [1] - 42:18
**School** [65] - 5:8, 6:5, 6:9, 6:19, 6:24, 7:2, 7:6, 7:9, 7:13, 8:3, 9:7, 9:11, 9:18, 9:22, 10:13, 10:18, 11:9, 11:20, 11:22, 12:21, 13:11, 13:17, 14:18, 15:18, 16:7, 16:20, 16:25, 17:3, 17:6, 17:20, 19:9, 20:9, 20:14, 20:20, 21:3, 21:5, 21:10, 21:22, 22:18, 24:11, 25:20, 25:24, 26:6, 27:15, 28:1, 28:12, 29:14, 30:4, 30:14, 30:17, 30:24, 31:13, 31:16, 31:24, 33:9, 45:4, 45:6, 45:19, 50:3, 59:14, 70:22, 73:17, 75:13, 78:25
**SCHOOL** [1] - 1:5
**school** [24] - 4:7, 5:23, 6:10, 6:25, 8:14, 8:16, 11:7, 14:1, 15:25, 16:23, 17:16, 18:17, 23:19, 37:6, 38:14, 38:15, 39:3, 39:11, 39:17, 46:20, 51:10, 51:21, 59:24
**schools** [32] - 4:1, 5:21, 6:21, 8:21, 13:18, 13:20, 13:21, 13:24, 14:4, 14:9, 14:14, 14:16, 15:1, 15:3, 17:9, 22:18, 26:18, 26:19, 27:10, 27:23, 28:3, 38:10, 38:12, 38:13, 38:14, 38:23, 52:22, 53:19, 54:12, 58:5, 70:6
**scrambling** [1] - 62:20
**scratch** [1] - 56:2
**screenplay** [1] - 36:24
**scribner** [1] - 55:2
**scripted** [1] - 3:19
**second** [15] - 15:17, 38:18, 41:1, 43:23, 44:9, 44:19, 45:15, 45:18, 46:24, 47:13, 60:5, 60:8, 62:12, 69:3, 72:12
**seconds** [3] - 34:5, 68:16, 68:17
**secrets** [1] - 47:16
**Section** [1] - 80:9
**section** [3] - 11:10, 13:1, 13:5
**see** [45] - 14:23, 17:14,

26:25, 30:1, 35:2, 35:13, 41:2, 41:10, 41:15, 42:21, 43:1, 43:14, 43:17, 44:15, 45:4, 45:8, 45:10, 45:22, 46:20, 47:4, 47:5, 47:9, 47:14, 47:25, 51:1, 52:23, 52:25, 53:14, 55:21, 56:10, 56:23, 59:15, 60:23, 61:16, 61:19, 64:12, 65:5, 65:6, 65:15, 67:1, 68:4, 74:17, 76:24, 77:11, 77:22

**seeing** [2] - 7:24, 51:10

**seeking** [1] - 22:24

**seeps** [1] - 59:4

**selected** [1] - 74:17

**selective** [1] - 56:24

**sell** [1] - 62:5

**selling** [1] - 14:20

**sending** [1] - 43:5

**sends** [3] - 11:22, 11:24, 14:1

**sense** [12] - 35:17, 35:20, 36:15, 38:24, 40:3, 57:7, 66:18, 67:9, 67:14, 68:25, 69:1

**sent** [2] - 25:6, 55:25

**sentences** [1] - 66:12

**September** [1] - 32:15

**seriously** [1] - 8:21

**service** [1] - 68:6

**serving** [1] - 34:24

**SESSION** [1] - 1:13

**set** [4] - 26:17, 26:21, 37:13, 44:22

**settle** [1] - 79:17

**seven** [6] - 28:10, 28:11, 28:12, 31:9, 66:13, 72:6

**several** [1] - 72:22

**share** [1] - 7:10

**shelf** [3] - 3:19, 8:13, 74:13

**shift** [1] - 60:4

**shirts** [1] - 72:6

**shocked** [1] - 53:9

**shook** [1] - 57:22

**short** [1] - 58:11

**shorter** [1] - 34:5

**show** [27] - 9:15, 12:15, 12:24, 27:25, 28:1, 35:9, 35:14, 38:18, 39:24, 42:9, 43:5, 44:4, 45:9, 45:14, 46:4, 46:15,

47:12, 49:6, 54:3, 56:21, 56:22, 63:19, 63:21, 64:16, 70:5, 71:14, 74:20

**showed** [16] - 4:6, 15:16, 46:11, 56:22, 60:11, 61:7, 69:2, 69:3, 69:5, 69:16, 70:6, 72:22, 73:21, 76:1, 79:10

**showing** [3] - 28:3, 60:24, 69:8

**shown** [5] - 13:25, 14:3, 61:5, 71:10

**shows** [7] - 29:12, 46:13, 61:17, 62:14, 71:7, 73:18

**shuffling** [1] - 74:25

**shy** [1] - 52:17

**side** [5] - 28:16, 36:1, 56:20, 77:11

**side-by-side** [1] - 56:20

**sides** [1] - 79:4

**signature** [1] - 70:12

**signed** [6] - 42:14, 45:7, 48:23, 55:8, 55:9, 72:18

**significant** [1] - 18:20

**signing** [1] - 50:3

**similar** [5] - 9:25, 10:5, 11:15, 21:12, 62:3

**similarities** [2] - 9:17, 47:10

**similarity** [2] - 10:4, 47:25

**simple** [2] - 22:23, 78:24

**simpler** [1] - 57:17

**simply** [2] - 56:3, 57:19

**sin** [1] - 56:12

**sincerely** [1] - 38:9

**Singer** [3] - 11:22, 19:3, 39:18

**single** [7] - 4:6, 15:9, 15:12, 35:1, 65:1, 65:7

**sit** [4] - 61:24, 64:1, 72:5, 72:7

**sitting** [4] - 5:13, 34:2, 50:10, 68:20

**six** [1] - 66:13

**skateboard** [1] - 56:8

**skip** [2] - 16:11, 26:14

**Skywalker** [1] - 44:9

**slapping** [1] - 50:2

**sliced** [1] - 23:18

**slides** [8] - 16:11,

49:12, 51:12, 67:3, 69:4, 72:23, 74:15, 74:24

**slough** [1] - 47:23

**smart** [2] - 19:20, 65:9

**sold** [1] - 13:11

**solely** [1] - 6:20

**solution** [4] - 5:19, 5:21, 6:9, 39:8

**someone** [13] - 37:13, 39:6, 39:11, 48:14, 54:8, 57:8, 60:25, 62:20, 65:15, 65:25, 66:1, 66:3, 66:4

**sometimes** [5] - 24:6, 38:7, 58:24, 67:8

**somewhat** [1] - 78:2

**somewhere** [4] - 3:20, 31:25, 40:9, 78:18

**song** [8] - 36:22, 36:24, 37:1, 58:24, 64:1, 64:5, 64:7, 64:14

**songs** [1] - 59:1

**songwriter** [1] - 40:21

**soon** [2] - 8:16, 39:16

**sorry** [1] - 12:23

**Sorry** [1] - 8:24

**sort** [3] - 33:3, 60:21, 71:16

**South** [1] - 2:6

**specific** [3] - 7:15, 32:2, 77:15

**specifically** [1] - 71:9

**speculate** [1] - 64:16

**spend** [12] - 8:6, 8:10, 8:12, 18:14, 19:5, 27:20, 27:21, 27:23, 28:5, 28:17, 52:13, 74:2

**spent** [11] - 5:19, 15:24, 16:9, 30:2, 33:7, 42:11, 44:1, 47:18, 48:6, 70:22, 71:18

**split** [2] - 29:17, 62:12

**SPRAGUE** [1] - 2:5

**SPRING** [1] - 1:24

**squished** [1] - 69:13

**stamp** [1] - 52:13

**stand** [3] - 38:7, 39:9, 52:11, 53:8, 65:3, 65:5, 65:7, 68:3, 69:10

**Standard** [1] - 52:14

**stands** [1] - 29:6

**Star** [3] - 44:7, 44:19

**staring** [1] - 34:2

**stars** [1] - 36:18

**start** [24] - 4:12, 16:4,

18:11, 28:14, 28:15, 28:22, 37:4, 37:6, 38:11, 39:2, 40:9, 42:5, 42:21, 44:21, 56:14, 59:6, 59:7, 59:8, 71:23, 71:24, 74:2, 74:5

**start-up** [4] - 56:14, 71:23, 71:24, 74:5

**started** [18] - 16:15, 28:10, 28:20, 37:15, 37:16, 42:14, 43:24, 53:5, 63:24, 68:24, 68:25, 69:1, 69:21, 70:10, 71:21, 71:25, 73:13

**starting** [6] - 28:10, 28:14, 37:1, 37:25, 42:20, 62:22

**starts** [2] - 7:5, 61:18

**STATE** [1] - 80:4

**state** [1] - 76:10

**statement** [5] - 3:10, 6:22, 6:23, 21:1, 71:10

**statements** [1] - 3:10

**states** [1] - 52:9

**States** [3] - 80:7, 80:9, 80:14

**STATES** [1] - 1:1

**stay** [1] - 59:1

**stayed** [2] - 55:17, 63:5

**stenographically** [1] - 80:11

**step** [1] - 51:22

**Steve** [1] - 76:11

**STEVE** [1] - 76:13

**still** [6] - 28:23, 30:12, 30:23, 52:6, 57:17, 63:4

**stock** [1] - 56:8

**stolen** [2] - 27:22, 67:6

**stood** [1] - 71:6

**stop** [8] - 34:5, 39:23, 40:18, 43:24, 44:20, 63:3, 67:22, 75:18

**stopped** [4] - 30:11, 62:24, 62:25, 71:22

**story** [4] - 36:14, 42:5, 54:21, 57:8

**strange** [1] - 77:9

**street** [1] - 48:1

**STREET** [1] - 1:24

**Street** [3] - 2:15, 16:12, 71:19

**stretch** [1] - 34:12

**strikes** [1] - 54:10

**structured** [1] - 10:12

**Stuart** [1] - 50:15

**stuck** [2] - 13:2, 29:2

**students** [2] - 59:24, 60:1

**studio** [1] - 59:3

**stuff** [19] - 9:1, 13:11, 16:10, 16:11, 18:15, 29:8, 29:24, 30:16, 33:9, 50:6, 52:12, 53:10, 57:11, 58:13, 63:7, 70:12, 73:15, 73:18, 74:13

**submits** [1] - 61:12

**subscription** [1] - 65:13

**substantial** [1] - 47:24

**substantially** [2] - 21:12, 62:3

**sudden** [1] - 54:19

**sue** [1] - 33:25

**sued** [3] - 33:23, 48:25, 54:20

**suing** [1] - 54:23

**Suite** [2] - 2:12, 2:15

**summarize** [1] - 43:6

**summons** [1] - 35:2

**supervise** [1] - 11:2

**support** [2] - 6:16, 69:7

**supports** [1] - 69:7

**supposed** [1] - 9:20

**Supreme** [1] - 78:11

**surgeon's** [1] - 49:17

**survive** [1] - 6:25

**swapped** [1] - 63:4

**swear** [2] - 73:1, 76:8

**switch** [6] - 29:1, 31:3, 31:4, 59:20, 59:22

**SWORN** [1] - 76:13

**system** [2] - 35:15, 38:14

## T

**T-shirts** [1] - 72:6

**table** [1] - 65:10

**tail** [1] - 67:6

**tangible** [1] - 18:1

**tangle** [1] - 58:2

**target** [1] - 7:13

**task** [1] - 47:2

**tax** [1] - 54:19

**teach** [1] - 14:14

**teacher** [1] - 39:6

**teacher's** [1] - 39:13

**teaching** [1] - 7:2

**team** [2] - 11:15, 51:3

**technical** [2] - 65:23, 66:9

**tedious** [1] - 68:22

**template** [4] - 10:12, 15:24, 59:8, 70:10
**ten** [4] - 29:5, 34:6, 34:8, 68:23
**term** [3] - 54:8, 55:2, 59:23
**terms** [12] - 36:20, 38:16, 39:3, 39:20, 40:15, 44:21, 45:23, 58:2, 62:4, 67:11, 68:19, 68:23
**terrible** [1] - 73:12
**terrific** [1] - 72:14
**testified** [17] - 4:11, 5:13, 5:20, 5:25, 6:4, 6:12, 9:8, 9:15, 15:6, 21:15, 23:25, 28:8, 46:10, 71:4, 71:10, 72:20, 74:8
**testify** [1] - 4:15
**testimony** [23] - 6:8, 9:10, 9:14, 13:23, 19:2, 19:24, 25:15, 42:8, 43:21, 49:4, 55:1, 58:16, 64:24, 65:5, 69:3, 69:6, 69:16, 70:23, 71:4, 71:7, 71:9, 71:15, 72:23
**THE** [33] - 2:3, 2:9, 3:4, 34:10, 34:14, 34:17, 34:19, 34:22, 68:14, 76:5, 76:7, 76:8, 76:10, 76:11, 76:12, 76:13, 76:14, 76:15, 76:18, 76:23, 77:3, 77:9, 77:14, 77:18, 77:22, 78:7, 78:10, 78:17, 79:2, 79:8, 79:12, 79:15, 79:16
**themselves** [8] - 3:17, 5:15, 10:7, 20:25, 22:12, 33:6, 72:10, 72:11
**Theresa** [3] - 23:6, 23:8, 26:15
**they've** [10] - 37:22, 41:4, 42:2, 44:17, 46:19, 48:3, 62:10, 63:19, 75:8, 78:4
**thinks** [1] - 69:11
**third** [1] - 60:14
**Thomas** [1] - 55:3
**thousand** [2] - 56:13, 74:9
**thousands** [1] - 5:10
**three** [3] - 5:13, 32:4, 36:11
**through-September**

[1] - 32:15
**throughout** [1] - 47:8
**throw** [3] - 47:25, 64:21, 66:19
**Thurston** [1] - 48:22
**tie** [1] - 47:19
**tip** [1] - 36:3
**tipping** [1] - 19:11
**tired** [2] - 66:22, 71:22
**Title** [1] - 80:9
**title** [2] - 45:4, 48:15
**today** [6] - 23:13, 28:23, 33:16, 49:19, 63:6, 73:8
**together** [5] - 4:24, 5:14, 19:25, 21:17, 35:19
**tomorrow** [3] - 27:9, 29:10, 73:8
**tons** [2] - 5:20, 21:21
**took** [18] - 12:25, 13:4, 13:20, 26:12, 28:11, 31:12, 31:22, 32:14, 39:3, 40:7, 42:12, 52:11, 53:17, 61:3, 61:4, 72:18, 73:16, 73:19
**tool** [1] - 35:22
**tools** [2] - 3:9, 5:19
**top** [1] - 62:9
**TORKAMANI** [1] - 2:11
**Torkamani** [1] - 67:25
**totals** [1] - 32:12
**touch** [7] - 50:22, 53:1, 53:4, 55:16, 59:11, 63:20, 64:22
**touched** [1] - 43:9
**touching** [1] - 60:8
**toward** [1] - 77:19
**track** [1] - 51:12
**trade** [1] - 47:16
**transaction** [3] - 18:3, 18:4, 18:5
**transactional** [4] - 37:8, 37:10, 56:5, 58:21
**transactions** [3] - 14:11, 16:2, 23:21
**transcript** [2] - 80:10, 80:12
**TRANSCRIPT** [1] - 1:13
**transfer** [4] - 19:10, 20:8, 20:9, 56:6
**transferred** [1] - 20:14
**transferring** [1] - 43:6
**transitioning** [1] - 12:21
**tremendous** [1] -

28:21
**trial** [10] - 36:10, 36:11, 38:6, 47:8, 48:6, 60:7, 66:23, 67:9, 68:22, 71:19
**TRIAL** [2] - 1:13, 1:13
**tried** [7] - 12:10, 17:12, 36:16, 39:14, 56:22, 63:25, 64:6
**tries** [1] - 13:7
**true** [8] - 36:3, 52:12, 53:2, 53:3, 53:10, 53:20, 55:5, 80:10
**True** [1] - 65:9
**trust** [1] - 78:10
**truth** [15] - 18:5, 23:3, 23:4, 23:5, 23:8, 51:1, 52:25, 58:7, 73:2, 73:4, 73:9
**try** [10] - 36:16, 39:2, 51:1, 52:19, 55:23, 56:14, 56:24, 59:1, 62:17, 64:20
**trying** [27] - 13:15, 33:4, 33:5, 38:10, 38:11, 39:4, 39:7, 41:25, 42:1, 46:14, 49:22, 50:13, 50:19, 51:22, 52:12, 54:7, 55:24, 56:10, 57:2, 57:5, 58:15, 60:17, 62:5, 64:3, 67:11, 72:6, 78:11
**turn** [4] - 39:10, 39:12, 60:12, 78:20
**twice** [1] - 15:9
**two** [16] - 5:15, 13:12, 24:14, 26:9, 32:4, 41:22, 46:8, 46:13, 51:4, 52:6, 62:18, 68:3, 72:11, 77:5, 77:11
**twofold** [1] - 36:14
**type** [1] - 3:25

**U**

**U.S** [1] - 1:3
**ultimately** [1] - 39:22
**unaware** [1] - 54:24
**unbelievable** [2] - 27:5, 73:23
**under** [3] - 23:9, 24:2, 72:19
**underlying** [1] - 15:11
**undisputed** [1] - 19:1
**unfair** [2] - 49:16, 57:4
**unfairly** [1] - 11:24
**unfortunately** [2] - 57:14, 67:20

**unique** [1] - 35:2
**UNITED** [1] - 1:1
**United** [3] - 80:7, 80:9, 80:14
**unmistakable** [1] - 21:13
**untruthfully** [1] - 24:1
**up** [70] - 7:18, 8:18, 9:1, 10:2, 12:19, 16:15, 18:11, 26:17, 26:21, 29:17, 29:24, 30:16, 32:1, 32:21, 32:24, 35:3, 35:6, 35:7, 36:6, 36:24, 37:13, 39:16, 42:8, 42:19, 44:18, 45:14, 46:25, 47:13, 47:20, 48:4, 48:8, 49:11, 50:4, 50:14, 50:16, 51:22, 52:15, 52:19, 53:16, 55:4, 56:11, 56:14, 56:22, 60:5, 60:14, 62:12, 63:15, 64:20, 65:15, 66:3, 66:9, 67:3, 68:3, 69:10, 69:17, 71:6, 71:21, 71:23, 71:24, 71:25, 73:12, 74:5, 74:15, 75:11, 75:16, 75:21, 77:5, 77:23, 78:11
**up-to-date** [1] - 29:24
**uploaded** [2] - 7:14, 24:9
**upset** [1] - 58:2
**upsets** [1] - 50:8
**uses** [1] - 11:11
**Utah** [1] - 9:1
**uttered** [1] - 55:12

**V**

**vacation** [1] - 57:12
**vacuum** [1] - 55:18
**Vader** [1] - 44:9
**valid** [6] - 41:12, 41:19, 42:22, 60:19, 60:20, 62:7
**verdict** [7] - 20:19, 32:18, 68:11, 76:19, 78:2, 78:24
**version** [7] - 12:2, 44:2, 60:14, 61:15, 61:16, 77:19
**versions** [2] - 43:25, 48:8
**vicarious** [3] - 22:5, 22:8, 22:20
**vicariously** [2] - 22:11, 58:13

**video** [1] - 18:25
**view** [3] - 38:20, 55:23, 78:14
**violated** [1] - 77:24
**visionary** [3] - 6:1, 14:9, 39:5
**visions** [1] - 48:21
**vs** [1] - 1:7
**vu** [2] - 77:10, 77:16

**W**

**WAGNER** [1] - 2:10
**waiting** [2] - 47:19
**walk** [1] - 48:11
**walking** [1] - 61:1
**Wall** [2] - 16:12, 71:19
**wants** [3] - 44:14, 44:15, 54:1
**Wars** [3] - 44:7, 44:19
**WAS** [1] - 76:13
**Washington** [1] - 2:15
**waste** [2] - 60:15, 60:19
**watched** [1] - 4:15
**WATKINS** [1] - 2:4
**Watkins** [2] - 48:11, 51:3
**wax** [1] - 69:10
**ways** [1] - 66:17
**Web** [1] - 49:2
**week** [6] - 4:5, 5:17, 49:20, 70:22, 72:18, 73:1
**weekend** [2] - 71:22, 78:16
**weeks** [1] - 13:13
**weigh** [1] - 41:5
**weighing** [1] - 35:25
**West** [1] - 54:3
**WESTERN** [1] - 1:2
**whatsoever** [1] - 4:8
**wheel** [2] - 37:12
**whereby** [3] - 36:4, 38:3, 66:16
**wherefore** [1] - 66:16
**whistles** [3] - 35:6, 69:4, 75:24
**whole** [6] - 4:16, 28:19, 34:2, 48:6, 61:4, 73:2
**whoo** [1] - 65:9
**willing** [1] - 17:8
**wind** [1] - 61:1
**wisdom** [1] - 35:18
**wish** [1] - 38:15
**witness** [6] - 14:22, 23:25, 24:2, 24:4, 49:15, 69:6
**witnesses** [1] - 15:3

**UNITED STATES DISTRICT COURT**

**wonderful** [1] - 38:14
**word** [5] - 40:16, 40:18, 43:14, 55:12, 61:24
**words** [23] - 4:25, 7:15, 7:22, 10:6, 10:7, 11:12, 13:3, 20:25, 21:16, 37:3, 37:9, 44:11, 44:18, 58:18, 61:25, 66:14, 70:11, 74:9, 74:10, 74:20, 74:22
**work's** [1] - 19:18
**works** [6] - 23:13, 28:1, 35:23, 49:14, 51:25, 65:25
**world** [2] - 44:17, 54:12
**worried** [3] - 58:3, 58:4, 78:7
**worries** [1] - 27:18
**worry** [2] - 12:7, 78:5
**worth** [2] - 51:17, 62:11
**wound** [1] - 9:1
**Wow** [1] - 51:9
**Wright** [48] - 6:7, 9:2, 9:3, 9:8, 9:17, 10:3, 10:8, 10:10, 10:12, 10:17, 10:21, 11:10, 11:19, 11:25, 12:1, 13:4, 13:14, 14:23, 15:16, 17:5, 18:25, 19:1, 19:5, 20:23, 21:4, 21:17, 22:8, 22:11, 22:20, 22:21, 25:6, 25:8, 25:18, 25:23, 26:3, 33:8, 33:11, 37:21, 55:22, 55:24, 57:24, 57:25, 58:8, 58:12, 58:13, 58:14
**Wright's** [3] - 18:25, 21:10, 26:2
**write** [6] - 36:25, 37:2, 41:16, 58:25, 66:14, 70:13
**writers** [1] - 59:7
**writes** [1] - 40:21
**writing** [2] - 36:23, 55:3
**wrote** [1] - 23:22
**WU** [1] - 1:3
**Wu** [3] - 35:16, 40:7, 50:20

## Y

**yards** [1] - 28:20
**year** [8] - 28:25, 29:23,

31:3, 31:8, 31:10, 31:21, 45:5, 54:18
**years** [12] - 5:15, 5:19, 5:20, 8:9, 17:18, 28:10, 28:11, 28:12, 34:25, 52:6, 69:12, 72:11
**yellow** [3] - 21:18, 21:21, 56:23
**yes/no** [1] - 24:14
**yesterday** [1] - 74:8
**young** [1] - 63:24
**yourself** [3] - 39:11, 61:20, 72:4

## Z

**zero** [4] - 47:13, 62:11, 70:4, 71:5
**ZURBORG** [4] - 1:23, 80:6, 80:19, 80:20

**UNITED STATES DISTRICT COURT**